# EXHIBIT B

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **KRISTINA SARHADI,** | Civil Action No. 1:24-cv-00031 (GLS/CFH) |
| Plaintiff, | |
| - against - | **~~FIRST~~SECOND AMENDED COMPLAINT ~~and~~AND DEMAND FOR JURY TRIAL** |
| **JUSTIN CATHAL GEEVER a/k/a JUSTIN SANE**, and **HARDWORK DISTRIBUTION, INC.**, and **DOE 1** | |
| Defendants | |

Plaintiff Kristina Sarhadi ("Sarhadi"), by and through her undersigned attorneys, brings this action against Defendants Justin Cathal Geever a/k/a Justin Sane ("Geever") and Hardwork Distribution, Inc. ("Hardwork") (collectively "Defendants") and she alleges as follows:

**PRELIMINARY STATEMENT**

1.      This ~~First~~Second Amended Complaint is filed pursuant to New York's Adult Survivors Act ("ASA") and New York Civil Practice Law and Rules ("CPLR") section 214-j. The ASA introduced a historic one-year window for survivors of sexual abuse in the State of New York to pursue lapsed claims.

2.      Sarhadi timely ~~brings~~brought her causes of action within the "retroactive revival window" of the ASA, which removes the previously applicable statute of limitations. Pursuant to the ASA, Defendants are liable for the intentional and negligent acts and omissions that resulted in the violent sexual assault of Sarhadi, which caused her serious psychological, physical, and emotional harm.

**NATURE OF THE ACTION**

3.      Plaintiff Kristina Sarhadi was sexually assaulted on October 1, 2010, by Defendant Justin Cathal Geever a/k/a Justin Sane, who, from its inception in or around 1988

until July 2023, was the lead singer and songwriter for the band Anti-Flag. (the "band" or "Anti-Flag").

4.     ~~When this lawsuit was originally filed on November 22, 2023, Geever was the President and owner~~At all times relevant and material hereto, Geever was an employee, agent, representative, and executive of Hardwork, an organization composed solely of the members of the band, created to profit off the band's activities.

5.     Anti-Flag, and Hardwork as its extension, promoted social causes, such as feminism and anti-violence initiatives.  However, Anti-Flag's progressive brand served as a guise under which Geever, with the band's complicity, could groom, assault, and rape female fans.

6.     ~~In October 2010, Geever~~In October 2010, Geever, in his capacity as Hardwork's employee, agent, representative, and/or executive, and following events approved, sponsored, sanctioned, funded, and/or ratified by Hardwork, lured Sarhadi back to his motel room to listen to a song he recorded with another well-known punk musician, then forced himself onto her, strangled her, forced her to perform oral sex on him, and raped her.

7.     This action alleges physical, psychological, and emotional injuries suffered as a result of conduct that would constitute a sexual offense as defined in Article 130 of the New York Penal Law, including, *inter alia*, forcible touching, criminal sexual acts, sexual abuse, and rape.  *See* Penal Law §§ 130.20 – 130.65.

8.     The conduct alleged herein would constitute a sexual offense as defined in Article 130 of the New York Penal Law in that, at all relevant times, the conduct lacked consent from Sarhadi.

9.     The conduct lacked consent from Sarhadi because the sexual offenses were accomplished using forcible compulsion, coercion, and intimidation, and Geever continued assaulting Sarhadi despite her repeatedly telling him to stop.

10.     Since the 1990s, Geever has engaged in a prolific pattern of targeting and then physically and sexually abusing young women and underage girls. Geever's open and notorious predatory behavior was expressly and unambiguously known by Anti-Flag and Hardwork's employees, agents, representatives, and/or executives. Geever continued this heinous behavior long after he assaulted Sarhadi in 2010.

11.     In July 2023, Sarhadi spoke about her experience on a podcast, alluding to Geever and Anti-Flag but not naming them. As soon as the episode was released, Anti-Flag abruptly ended their European tour and broke up after 30 years.

12.     The band's view towards the trauma suffered by Sarhadi has oscillated over the last several months.since then. At first, the other members of Anti-Flag and executives of Hardwork, Christopher Barker ("Barker"), Christopher Head ("Head"), and Patrick C. Bollinger ("Bollinger") denied witnessing Geever's predatory behavior. They claimed they were proud to have been members of the band precisely because it had stood in favor of women's rights and progressive causes.

13.     After several other women publicly disclosed their violent and exploitative experiences with Geever, the bandAnti-Flag and Hardwork adjusted itstheir tone and condemned their frontman and president. The reversal may be related to the fact that the women, some of them underage girls at the time Geever assaulted them, publicly reported having spent many hours with the band on busses, in recording studios, and backstage, where the band members could not avoid seeing how Geever was intimate with these young fans.

14.     Though they are now criticizing Geever for misconduct that can no longer be credibly denied, Barker, Head, and Bollinger still claim to be surprised by the allegations, despite having known and spent almost three decades cheek by jowl with Geever touring around the country and the world.

15.     In fact, Anti-Flag's concerts, and other events approved, sponsored, sanctioned, funded, and/or ratified by Hardwork, served as Geever's own twisted playground to recruit serial conquests.  He would scan the front few rows to locate an attractive female fan, then point to her, lock eyes with her and sing directly to her periodically during the concert, all to recruit his next sexual target.  Once the show was over, and in front of the band, Geever would step down from the stage and assertively engage the girl or young woman.  With some this would lead to consensual sex;, with others, to underage or nonconsensual sex.

16.     On information and belief, women repeatedly approached the band members and Hardwork's employees, agents, representatives, and executives and told them directly about Geever's creepy and aggressive actions towards female fans.  The bandThey did nothing to curb their leader's misconduct, for fear of losing the fame, money, and status that flowed from being part of a famous punk band, all at the expense of the safety of girls and women they professed to extol.  Given how the band instantly dissolved as soon as Sarhadi went public with her allegations, which did not even name Anti-Flag, Hardwork, or Geever, it is likely the band and Hardwork had been fearing and preparing for exposure of Geever's sexual misconduct for years.

17.     Since the podcast that featured Sarhadi, at least 12 additional women have come forward to accuse Geever publicly of using his power as a famous performer which included his position with Hardwork to groom, sexually assault, and rape female fans.  While serving as the lead singer and creative force of Anti-Flag and Hardwork, Geever sexually assaulted many more women who have not spoken to the press but have spoken to other survivors.  The assaults mimic the same pattern laid out above.

18.     Hardwork, through its employees, agents, representatives, and executives, was aware of Geever's practice of sexually assaulting young women and girls, and the companyit

aided and abetted such behavior by, among other acts and omissions, allowing Geever to lead the band and perform at shows despite knowing that he used his fame and Anti-Flag's feminist stance to disguise that he was a sexual predator.

19.     ~~As of the filing of the original complaint in this lawsuit~~At all times relevant and material hereto, the Pennsylvania Department of State listed Geever as President and owner of ~~Defendant~~ Hardwork, with the other band members serving as officers.

20.     Other band members are or were officers of Hardwork as follows: Christopher Head, lead guitarist for Anti-Flag, is or was the Vice President; Christopher Barker a/k/a Chris No. 2, vocalist and bassist for the band, is or was the Secretary; and Patrick C. Bollinger a/k/a Pat Thetic, drummer for the band, is or was the Treasurer ~~of the company~~.

21.     On information and belief, the other band members and officers of Hardwork, while acting within the scope of their agency for the company, were put on notice of Geever's overt sexual misconduct prior to and after the assault of Sarhadi, and they were in a position to stop Geever from continuing to have access to young female fans.  They did nothing to prevent Geever from sexually assaulting girls and women in the course of being an officer of Hardwork and as frontman for Anti-Flag, and Hardwork's failure to act in any reasonable way led to more assaults and more victims.

22.     As a result of Geever's sexual assault, as well as Hardwork's negligent acts and omissions, Sarhadi has suffered, and continues to suffer, severe emotional, physical, and psychological distress, including shame, guilt, economic loss of earning capacity, and emotional loss.

23.     Since the filing of this lawsuit on November 22, 2023, ~~the other band members~~Hardwork and Geever have engaged in tactics to evade liability and responsibility for the harm they have caused multiple women, including Sarhadi.  On information and belief, Barker, Head, and Bollinger have sought to isolate themselves from Geever and

diminish their potential liability for his acts by buying him out of Hardwork and perhaps other jointly owned entities.

24.    Despite being aware of the lawsuit, Geever has purposefully and unlawfully attempted to avoid service.  His commercial lawyer, Michael Johnson of Kay Griffins Evans, PLLC, contacted Sarhadi's counsel on Geever's behalf to engage in settlement negotiations but has since gone silent.  Johnson orally agreed to help serve Geever, but then refused to provide Geever's contact information or whereabouts.  In the meantime, Sarhadi has effected proper service of the original pleading on Geever's last known address, where, on information and belief, Geever still resides.

25.    Moreover, on information and belief, Geever has unlawfully sought to hide his assets by transferring funds overseas to an Irish bank account.  Geever has an Irish passport, and, on information and belief, ~~he plans to flee to Europe within the next few days~~has fled to Galway, Ireland.

26.    On information and belief, Mary Geever, Geever's sister and practicing attorney, has ~~recently~~ entered into a Power of Attorney representing Geever.  Sarhadi and her counsel reserve all rights to request that Mary Geever become authorized to accept service on Geever's behalf.

27.    Sarhadi brings this action to recover for the injuries she has endured because of the actions of Defendants and to decrease the chance that others suffer the abuse and physical and mental trauma she felt and continues to feel to this day.  She also brings this action on behalf of the many women and girls who have been hurt by Geever's behavior and by ~~Anti-Flag's~~his and Hardwork's betrayal of ~~its~~the pro-female message they professed, and for those survivors who may not have the capacity to seek legal recourse.

**PARTIES**

6

28.     Plaintiff Kristina Sarhadi is an adult woman and, at all relevant times, was a citizen of the United States and a resident of the state of New York.  Sarhadi currently resides in Ulster County, New York.

29.     At all times relevant to the wrongful conduct set forth herein, Sarhadi was over the age of 18.

30.     On information and belief, ~~Defendant Justin Cathal~~ Geever is an adult man and, at all relevant times, was a citizen of the United States and a resident of Allegheny County, Pittsburgh, Pennsylvania.

31.     Geever is or was the lead guitarist, singer, and songwriter for a well-known punk rock band with left-wing political views called Anti-Flag from 1988 until July 2023, when the band disbanded.  At ~~the time this lawsuit was originally filed~~all times relevant and material hereto, Geever was the registered President and owner of Hardwork, as well as Hardwork's agent, employee, and/or representative.

32.     On information and belief, Defendant Hardwork ~~Distribution, Inc.,~~ is a domestic business corporation incorporated in Pennsylvania and headquartered in Pittsburgh, Pennsylvania.  On information and belief, Hardwork was formed in 2003 by Geever and other members of Anti-Flag, including Barker, Head, and Bollinger.  On information and belief, at ~~the time of filing the original lawsuit~~all times relevant and material hereto, Geever was the registered President and owner of Hardwork, and Barker, Head, and Bollinger served as the company's Secretary, Vice President, and Treasurer, respectively.

33.     At all times relevant and material hereto, Hardwork served as an agent and representative of Anti-Flag and its members.

~~33.~~34.  Whenever reference is made to Hardwork, such reference includes that entity, its parent companies, subsidiaries, affiliates, predecessors, and successors.  In addition, whenever reference is made to any act, deed, or transaction of any entity, the allegation

means that the entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

34.35.  The limitations of Article 16 of the CPLR do not apply because one or more of the exceptions set forth in CPLR § 1601 and/or § 1602 apply.

## JURISDICTION AND VENUE

35.36.  This Court has jurisdiction over Defendants pursuant to 28 U.S.C. § 1332 because there is complete diversity between the Plaintiff and Defendants, and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

36.37.  Venue for this action is proper in the Northern District of New York under 28 U.S.C. § 1441(a) because the Supreme Court of the State of New York, County of Ulster, where this suit was originally filed, is located within this District.  Ulster is the County in which Plaintiff currently resides and where a substantial part of the events giving rise to the claim occurred.

37.  Amending the original Complaint is proper under the Federal Rules of Civil Procedure, Rule 15(a)(1)(B), since no responsive pleading or motion has been filed in the case.

## FACTUAL ALLEGATIONS

### I.   Creation of Anti-Flag and the band's feminist, anti-violence messaging

38.   Sometime in 1988, Anti-Flag formed with Geever as the lead guitarist, singer, and songwriter. The band's "straight edge" platform was anti-drugs, anti-alcohol, and pro-feminism.

39.   Anti-Flag released and performed music that highlighted and advocated for a variety of progressive causes, from animal rights to curbing climate change.

40.     In or around 1988, and again in 1992, on information and belief, Bollinger joined the band as a drummer.

41.     In or around 1997, on information and belief, Head joined the band as a guitarist, bassist, and backup vocalist.

42.     In or around 1999, on information and belief, Barker joined the band as a bassist and co-lead on vocals.

43.     In 2005, Anti-Flag became a voice for women's rights when the band released a track titled, "Feminism is For Everybody" as part of a compilation album.  Proceeds from the sale of the album went to Protect, a non-profit organization aimed at combating child abuse and exploitation.

44.     Two years later in 2007, the band released an EP titled, "A Benefit for Victims of Violent Crime."

45.     Throughout the band's career, its frontman Geever backed criticisms of the punk scene as sexist and predatory towards young women.  In 2017, when it was reported that a protester had shown a sign to Dickies frontman Leonard Graves Phillips that read, "Teen girls deserve respect, not gross jokes from disgusting old men!  Punk shouldn't be predatory," Geever told the *Pittsburgh Post-Gazette* that he "share[d] their point of view." Geever claimed that "my point of view is that sexualizing women and calling them the c-word is not something that should be tolerated."

46.     Anti-Flag, including Geever and its other members, represented that feminism, and particularly safety for girls and women, were core tenets of its value system.  For decades, Geever, Barker, Head, and Bollinger created and maintained what was perceived as a safe space for young female fans who attended Anti-Flag's shows, followed them on tour, and purchased their merchandise.

47.     In or around 2003, Geever and the other band members founded Defendant Hardwork.  On information and belief, Hardwork and its agents have close involvement with Anti-Flag's tours and the recording of their albums, as well as and other Anti-Flag projects and affiliated projects such as members' solo musical performances.  Upon information and belief, Hardwork benefits financially from the band's activity of Anti-Flag and its members.

## II.     Hardwork was aware of Geever's concealed his abuse of women but it was certainly known to his

### bandmates

48.     On information and belief, from 2006 until October 2010 when Sarhadi was assaulted, Anti-Flag and Hardwork executives performed over 450 concerts, including headlining major shows and featuring on the yearly Vans Warped Tour.  From 1996 to 2023, the band recorded 13 studio albums.

49.     On information and belief, while touring, the band shared tour busses, green rooms, and stayed at the same hotels.  The band was frequently together in the recording studio.  The touring and recording equate to around at least a hundred thousand hours where Geever, Barker, Head, and Bollinger were in close proximity, all while Geever, regularly and openly groomed and dated innumerable women, including underage ones, including sexual assaults such as Sarhadi's.

50.     At all times relevant and material hereto, Anti-Flag and Hardwork, through their members, employees, agents, representatives, and/or executives, had express and unambiguous notice, knowledge, and/or awareness, prior to his sexual assault of Sarhadi, that Geever was sexually assaulting and/or engaging in inappropriate relationships with women and girls following Anti-Flag concerts and Hardwork-affiliated events.

51.     At all times relevant and material hereto, Anti-Flag and Hardwork, with knowledge of Geever's propensity to commit sexual assault or otherwise engage in inappropriate and harassing behavior with women, had policies and procedures in place to

limit Geever's ability to interact with women and girls to prevent such abuses. Specifically, upon information and belief, Anti-Flag and Hardwork had policies prohibiting and/or limiting Geever's ability to bring women and girls on its tour busses and other associated facilities and vehicles. Further, upon information and belief, Anti-Flag and Hardwork had policies prohibiting and/or limiting Geever's consumption of alcohol, a tool Geever used in his assaults and other misconduct, aboard its tour busses and other associated facilities and vehicles.

52.     At all times relevant and material hereto, Anti-Flag and Hardwork should have known of Geever's propensity to commit sexual assault or otherwise engage in inappropriate and harassing behavior with women and girls. Specifically, Anti-Flag and Hardwork, through their agents, had express and unambiguous knowledge that Geever (1) consumed copious amounts of alcohol which was used as a tool to facilitate meetings and interactions with women and girls; and (2) engaged in actions to corner, isolate, and groom female attendees of Anti-Flag and Hardwork-affiliated events through flirtatious behavior and inappropriate contact.

53.     Upon information and belief, Anti-Flag and Hardwork members, employees, agents, representatives, and/or executives observed women and girls interacting with Geever during and after Anti-Flag and Hardwork-affiliated events, observed Geever suppling women and girls with alcohol, and observed women and girls, future Geever victims, waiting outside the tour bus for Geever at his instruction.

54.     At all times relevant and material hereto, Anti-Flag and Hardwork member, employees, agents, representatives, and/or executives attempted to conceal or downplay Geever's propensity to commit sexual assault or engage in sexual misconduct.

11

50.55.  Based on reliable press reports and information provided by women who have contacted Sarhadi so far, she believes that ~~approximately~~at least 60 women had sex with Geever when they were underage and/or without consent.

51.56.  Some survivors who were underage at the time report spending time with Barker, Head, and Bollinger in the course of Geever's grooming, and report that Barker, Head, and Bollinger acted awkwardly around them because they were so clearly underage.

52.57.  On information and belief, Geever assaulted a 17-year-old girl after a show in or around 1996 or 1997.  A few years later, in or around 2000, the girl spoke with Barker while Anti-Flag was performing in the Vans Warped Tour.  She confronted Barker, told him about her experience, and asked him whether Geever was aggressive in the same way to other fans.  He responded by asking the girl not to make him answer, as he was just trying to play in Geever's band.

53.58.  At a 2002 release party in Pittsburgh celebrating the release of the "Iron City Punk" CD, a witness watched the members of Anti-Flag mingle outside the venue with clearly underage girls who appeared to ~~the witness to~~ be between 14 and 15 years old.  Geever and other band members were hugging and inappropriately kissing them.  The witness said he is surprised that all the band members are not facing allegations of underage sex similar to Geever's.

59.     In 2010, prior to Geever's sexual assault of Plaintiff, Bollinger, in his capacity as Hardwork's employee, agent, representative, and executive, witnessed Geever grooming a female Anti-Flag fan following a concert that, upon information and belief, was approved, sponsored, sanctioned, funded, and/or ratified by Hardwork.  Specifically, Bollinger witnessed Geever supplying the woman with copious amounts of alcohol and encouraging her to keep the party going.  Bollinger told Geever "don't do this," referring to Geever's continued grooming and pursuit of the woman.  Geever rejected Bollinger's instructions and

went to grab alcohol from the Anti-Flag/Hardwork tour bus before taking the woman away. Geever proceeded to sexually assault the woman.

54.60.  In 2012, Anti-Flag played a show in Costa Rica.  After the show, several producers followed the band back to their hotel and witnessed Geever with a girl who was clearly underage.  Geever was not making any effort to hide this from anyone, including the other band members.  Troubled by this behavior, the local producers asked the girl if she had ID, and then told Geever they were going to send her home because she could not confirm her age.  Although Geever assured the producers that he would not contact the girl again, one found her waiting outside a restaurant, in a different location, where the band was to have dinner.  From then on, any time the producers were approached about booking Anti-Flag in Costa Rica, they opposed it.

55.61.  On at least one occasion, staff working on an Anti-Flag/Hardwork tour picked out an underage (appearing to be 14 years old) girl from the crowd to bring backstage to Geever while he was with the band.  This occurred after Geever had interacted with the fan during the show.  Venue staff, suspicious of what was happening, approached the girl, questioned her age, and led her back outside.  The band's staff, called "roadies"," asked her to stay and provided her with merchandise as bait.

56.62.  Barker, Head and Bollinger may have disapproved of Geever's conduct with young women, or even if they did not, reasonably worried it posed a risk to the band and Hardwork, but they still repeatedly turned a blind eye.  Their entire lives – income, fame, exciting lifestyle, future prospects – depended on keeping Geever happy so Anti-Flag and Hardwork could keep going.

57.63.  Based on reports of survivors given to band members, the band members, as officers of Hardwork, not to mention the President and owner of Hardwork, Geever—knew or should have known before Geever's assault of Sarhadi that he systematically targeted

underage girls and young women for sometimes violent sex.  The sheer scale of Geever's misconduct means that band members and Hardwork knew or should have known that he was a sexual predator.

### III.    Sarhadi grows up listening to Anti-Flag

~~58.~~64.   Beginning in 2000, Sarhadi started listening to Anti-Flag.  She was 11 years old, and Geever was around 27.

~~59.~~65.   Anti-Flag attracted young female fans like Sarhadi by making them feel like they were in a like-minded, safe community.   These views, especially feminism, distinguished Anti-Flag from other punk rock bands.  Many of its fans, including Sarhadi, became deeply committed to the band because they identified with its unusual, counter-cultural message and looked up to its members as brave, exciting exemplars of a better way of organizing society.

~~60.~~66. Anti-Flag was Sarhadi's favorite band, and she listened to their music throughout her teenage years and through college up until the assault in 2010.

~~61.~~67.   Sarhadi attended several Anti-Flag concerts and purchased and collected Anti-Flag merchandise.  ~~Her~~The concerts and Anti-Flag merchandise were, upon information and belief, approved, sponsored, sanctioned, funded, and/or ratified by Hardwork.  Sarhadi's 10-year diehard love of the band provided a direct financial benefit to Hardwork.

### IV.    Geever targets and assaults Sarhadi at Hardwork-affiliated events

~~62.~~68.   On September 22, 2010, after graduating from college, Sarhadi attended an Anti-Flag concert at a venue called the Bell House in Brooklyn, New York.

69.     At all times relevant and material hereto, Geever was serving as Hardwork's employee, executive, agent, and/or representative.   On September 22, 2020, Geever was acting in dual capacities: as Anti-Flag's lead singer and Hardwork's employee, executive, agent, and/or representative.

70.   Upon information and belief, Hardwork financially benefitted from Geever and Anti-Flag's September 22, 2010 performance.  Hardwork, upon information and belief, used the September 22, 2010 concert (and other Anti-Flag and affiliated projects such as members' solo musical endeavors) as a customer referral source.  These concerts and projects were vehicles for Hardwork to generate business and garner interest in Anti-Flag merchandise and other ventures.

63.71.  Sarhadi watched from the front row.  As he had done many times previously with his targets, Geever locked eyes with Sarhadi and began singing to and winking at her.

64.72.  After the concert, and in front of the other band members, Geever jumped off the stage, hugged Sarhadi, and asked for her name and where she was from.

65.73.  Geever was flirtatious toward Sarhadi; she did not reciprocate because she had a long-time boyfriend.  She told Geever about him in this first conversation and each one thereafter.  Sarhadi made it clear to Geever that she was in a committed relationship and not romantically interested in him.

66.74.  That night Geever invited Sarhadi to a film the Woodstock Film Festival (the "festival where he planned to perform the following week, and ") to attend the festival's screening of the film "Sounds Like a Revolution" that(the "film").  Geever, Anti-Flag, and their music were prominently featured the band.  Geever's in the film, with Geever receiving top billing.  As part of the film's festival participation, Geever had a scheduled performance was scheduled after following the screening.

75.   Upon information and belief, Geever and Anti-Flag's involvement in the film was approved, sponsored, sanctioned, and/or ratified by Hardwork and/or its employees, agents, representatives, or executives.

76.     Upon information and belief, Hardwork financially benefited from Geever and Anti-Flag's participation in the film and the festival through its generation of buzz and excitement over Anti-Flag's revolutionary and activist music, message, and merchandise.

77.     Upon information and belief, Geever and Anti-Flag's involvement in the film, festival, and subsequent press, performances, and events stemming from or related to the film was approved, sponsored, sanctioned, and/or ratified by Hardwork and/or its employees, agents, representatives, and/or executives.

67.78.  As a loyal fan of Anti-Flag and dedicated Hardwork customer, and trusting in Geever's strong feminist stance, Sarhadi felt safe in his presence and agreed to meet him at the festival.

68.79.  Sarhadi also knew that Geever had a serious girlfriend who, on information and belief, may have been his fiancée, which further diffused any concerns she might have about his intentions.  Plus, he was almost twice her age.

69.80.  On October 1, 2010, Sarhadi arrived at the film festival at the Rosendale Theatre in Rosendale, New York.

70.81.  Sarhadi waited for Geever to let her in at the gate as he had promised, but he never showed up, and Sarhadi missed the screening.

71.82.  Sarhadi did, however, meet Geever after the screening, and together, they traveled to the Bearsville Theater in Woodstock, New York, where Geever did a solo acoustic performance. She once again sat in the front row as part of his, Anti-Flag's, and Hardwork's involvement in the film and festival. She once again sat in the front row.  At all times relevant and material hereto, Geever was acting in the course and scope of his employment, agency, and/or affiliation with Hardwork.

83.    Upon information and belief, Geever's solo festival performance was approved, sponsored, sanctioned, ratified, funded, and/or supported by Hardwork and/or its employees, agents, and/or representatives.

~~72.~~84.  Afterwards, Geever asked Sarhadi to accompany him to the film's afterparty, which was in a private house nearby.  Upon information and belief, the afterparty was approved, sponsored, sanctioned, ratified, funded, and/or supported by Hardwork and/or its employees, agents, and/or representatives.

~~73.~~85.  Sarhadi drove, and once sitting in her grandfather's Buick, Geever began showering her with compliments.  Sarhadi made it clear once again that she had a boyfriend and was in a committed relationship.

~~74.~~86.  They talked about music and concerts, and Sarhadi thought they were developing a friendship.  Geever also mentioned the death of his nephew and his partner cheating on him and moving to London, which garnered Sarhadi's sympathy.

~~75.~~87.  Once they arrived at the ~~house party~~afterparty, Geever paraded Sarhadi around as one of his fans, prompting her to praise him as a rock star.  After he worked the room clearly reveling in the adulation he sought, she became bored and annoyed with his aggressive self-regard and went outside to talk to others.

~~76.~~88.  When the party was over and Sarhadi was ready to leave, Geever mentioned that he had recorded a song with Billy Bragg, another famous singer, and wanted her to be the first to hear it.

~~77.~~89.  Geever told Sarhadi that the song was on his laptop at his motel~~.~~, The Lodge. Upon information and belief, Hardwork approved, sanctioned, supported, funded, and/or ratified Geever's stay the motel.  Sarhadi agreed to go with him to ~~his motel, The Lodge, to~~ hear the song.

78.90.  On the way to the motel, Geever turned emotional again while talking about his dead nephew and cheating partner.

79.91.  Geever told Sarhadi that they should stop at a bar and drink together, despite his and Anti-Flag's pro-sobriety messaging.  At the time, Sarhadi had been "straight edge," meaning she did not drink alcohol or do drugs.  Geever acknowledged their mutual "straight edge" stance, but he suggested they should "break edge" that night, since they were each dealing with unfortunate personal circumstances.  Sarhadi had told him that her long-time boyfriend was studying abroad in Brazil, and she missed him.

80.92.  His motel had a bar, and when they got there Geever ordered beers and pickleback shots for both of them.

81.93.  Geever continued drinking and dancing in the bar while Sarhadi waited patiently to listen to the song recorded with Billy Bragg.

82.94.  At some point in the night, Geever and Sarhadi walked to Geever's motel room to listen to the song.

83.95.  While in Geever's room, Sarhadi observed that it was tiny, had wooden bunk beds, white floors, and a dresser.  Sarhadi noticed that Geever's laptop bag was on the dresser and remembered that he had told her the song was on his laptop.

84.96.  Sarhadi turned to Geever and was surprised to see that he was closing the curtains and locking the door.

85.97.  As Sarhadi looked back at the laptop bag and waited to hear the song, Geever screamed, "Football Tackle!" and suddenly tackled her from behind onto the bed.

86.98.  Sarhadi thought Geever was playing around, but then saw his face and his expressions change.  He had a strange, scary look, as if he had turned into a different person.

87.99.  Geever began restraining and strangling Sarhadi, and he forced her to perform oral sex on him.

~~88.~~100.When Sarhadi could breathe, she repeatedly pleaded with him to stop.

~~89.~~101.She was shocked and crying.  He was mean and violent with Sarhadi; she did not matter and was just an object for him to dominate.

~~90.~~102.Geever penetrated Sarhadi's vagina with his penis.  Sarhadi did not consent.

~~91.~~103.When Geever finished with Sarhadi, he passed out on top of her.

~~92.~~104.Sarhadi was then able to escape Geever's motel room without waking him.

### V.   Sarhadi discloses the incident, Anti-Flag disbands, and other women come forward

~~93.~~105.On July 19, 2023, Sarhadi discussed the assault on a podcast titled, "enough." Sarhadi did not name Anti-Flag or Geever, but gave the details of that night and how she was betrayed by the "anti-rape" lead singer of a political punk band.

~~94.~~106.That same day, Anti-Flag, who were in the middle of a European tour, posted an update on their Patreon account announcing the band was dissolving.  They immediately took down their website and deleted the band's social media accounts without any explanation.

~~95.~~107.A week later, Geever posted on his Instagram account categorically denying that he was the person Sarhadi had described.  The post included a message from band members (and officers of Hardwork) Barker, Head, and Bollinger.  They denied ever witnessing Geever engage in predatory behavior towards women and stated that "[i]t was a privilege for us to be in the band Anti-Flag."

~~96.~~108.It was not until September that the other band members changed their approach and condemned Geever's conduct.  This was in the wake of an article in *Rolling Stone* that highlighted Sarhadi's experience, as well as the stories of 12 other women Geever had mistreated.  Three of the women in the *Rolling Stone* article said they were underage or just beyond when hanging around the band, but the band members professed not to know anything about what they now called Geever's "very sick" behavior of preying on young

women.  Although the band members had been close with Geever since the mid-to-late 1990s, they now claimed that he had "deceived" them.

97.109.Any sexual encounter between Geever and an underage girl lacks consent and, accordingly, is deemed rape.  This rape is a form of sexual violence.

98.110.Despite prior knowledge, Hardwork allowed Geever to lead Anti-Flag, thereby enabling his access to female fans.  Had Hardwork, or Barker, Head, or Bollinger, attempted to address Geever's behavior in any way, they possibly could have prevented the foreseeable harm to Sarhadi.  Geever used Anti-Flag's shows, and their banner of feminism, as part of his modus operandi to attract, groom, and assault girls.  Hardwork, comprising the band and indistinguishable from it, had a duty to act reasonably to prevent this abuse.

99.111.Hardwork failed to reasonably implement any measures to protect female fans from Geever, including but not limited to, warning concertgoers of his pattern of behavior or reporting the assaults to law enforcement.  Hardwork's failure directly and proximately caused harm to Sarhadi.

### PLAINTIFF'S DAMAGES

100.112.    In addition to the damages mentioned above, as a direct and proximate result of Defendants' tortious acts and omissions, Sarhadi suffered, continues to suffer, and will suffer in the future, psychological injuries, including but not limited to, low self-esteem, anxiety, panic attacks, post-traumatic stress disorder, eating disorders, stress, insomnia, nightmares, depression, suicidality, shame, disassociation, intimacy issues, fear, and trust issues.  Sarhadi has been diagnosed with and treated for, *inter alia*, C-PTSD, clinical depression, ADHD resulting from trauma, emotional hyperarousal, and rejection sensitivity dysphoria.  All these injuries caused and will cause Sarhadi noneconomic damages.  Sarhadi also suffered and continues to suffer economic damages in the form of loss of past and future income and costs of medical and mental health treatment.

101.113.     Defendants acted with an outrageous indifference to a highly unreasonable risk of harm and with a conscious indifference to the health, safety, and welfare of Sarhadi.  Therefore, Sarhadi is entitled to punitive damages against Defendants.

## FIRST CAUSE OF ACTION

## ASSAULT

### *Sarhadi AgainstAs to Defendant* Geever

102.114.     Sarhadi incorporates and realleges each and every allegation set forth in the preceding paragraphs as if set forth here in full.

103.115.     Geever's conduct constitutes a sexual offense as defined in Article 130 of New York Penal Law, including, but not limited to, the following: sexual misconduct (N.Y. Penal Law § 130.20); rape (N.Y. Penal Law §§ 130.25 – 130.35); forcible touching (N.Y. Penal Law § 130.52); and/or sexual abuse (N.Y. Penal Law §§ 130.55 – 130.65).

104.116.     Geever's predatory, abusive, and manipulative behavior, as well as his unlawful touching, acts, and conduct against Sarhadi created a reasonable apprehension in her of harmful or offensive contact as to her person, all of which was done intentionally by Geever to Sarhadi without her consent.

105.117.     When Sarhadi was alone with Geever in his small motel room, Geever's physical conduct placed Sarhadi in imminent apprehension of harmful and offensive contact.

106.118.     Sarhadi did not consent to Geever's harmful and offensive contact, and she made her lack of consent known when she could.

107.119.     Geever knew that these acts and his conduct would cause Sarhadi to apprehend harmful or offensive contact, and Sarhadi reasonably apprehended that harmful or offensive contact would occur.

108.120.       Geever was capable of carrying out the attempted conduct and did carry out the rape of Sarhadi.

109.121.       As a direct and proximate result of the above-described conduct, Sarhadi has suffered, and will continue to suffer, great pain of mind and body, shock, emotional distress, discomfort, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life.  She was prevented, and will continue to be prevented, from performing daily activities and obtaining the full enjoyment of life.  She has sustained, and will continue to sustain, loss of earnings and earning capacity.  She has incurred, and will continue to incur, expenses for medical and psychological treatment, therapy, and counselling.

110.122.       Sarhadi is therefore entitled to monetary relief, in the form of compensatory damages, to remedy the severe emotional distress suffered as a result of Geever's intentional and outrageous conduct.

111.123.       Geever's conduct was intentional, extreme, and outrageous, entitling Sarhadi to an award of punitive damages.

112.124.       This action falls within the exceptions of Article 16 of the CPLR.

## SECOND CAUSE OF ACTION

## BATTERY/SEXUAL BATTERY

### *Sarhadi AgainstAs to Defendant* **Geever**

113.125.       Sarhadi incorporates and realleges each and every allegation set forth in the preceding paragraphs as if set forth here in full.

114.126.       In or around October 2010, Geever engaged in a course of unpermitted, harmful, and offensive bodily sexual contact upon the person of Sarhadi.

115.127.       Geever intended to commit an act of unwanted contact and/or caused imminent apprehension of such an act against Sarhadi.  He did so by, *inter alia*:

      a.   locking her in his motel room and isolating her in close quarters;

      b.   tackling and physically restraining her on the bed;

      c.   choking her with his hands for his own sexual gratification;

      d.   forcing oral sex on her; and

      e.   forcibly penetrating her with his penis.

~~116.~~128.     Sarhadi was 21 years old at the time of the sexual assault.

~~117.~~129.     Sarhadi did not consent to the harmful bodily contact and made her lack of consent known repeatedly to Geever as he sexually assaulted her.

~~118.~~130.     Geever's conduct constitutes a sexual offense as defined in Article 130 of New York Penal Law, including, but not limited to, the following: sexual misconduct (N.Y. Penal Law § 130.20); rape (N.Y. Penal Law §§ 130.25 – 130.35); forcible touching (N.Y. Penal Law § 130.52); and/or sexual abuse (N.Y. Penal Law §§ 130.55 – 130.65).

~~119.~~131.     As a direct and proximate result of the foregoing, Sarhadi sustained physical, emotional, and psychological injuries, along with pain and suffering.

~~120.~~132.     This action falls within the exceptions of Article 16 of the CPLR.

### THIRD CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*~~Sarhadi Against~~As to Defendant* **Geever**

~~121.~~133.     Sarhadi incorporates and realleges each and every allegation set forth in the preceding paragraphs as if set forth here in full.

~~122.~~134.     Geever's conduct constitutes a sexual offense as defined in Article 130 of New York Penal Law, including, but not limited to, sexual misconduct (N.Y. Penal Law § 130.20); rape (N.Y. Penal Law §§ 130.25 – 130.35); forcible touching (N.Y. Penal Law § 130.52); and/or sexual abuse (N.Y. Penal Law §§ 130.55 – 130.65).

123.135.     The wrongful actions of Geever in sexually abusing Sarhadi were extreme and outrageous and should shock the conscience of the Court.

124.136.     Geever's outrageous conduct towards Sarhadi included, *inter alia*:

    a.  locking her in his motel room and isolating her in close quarters;

    b.  tackling and physically restraining her on the bed;

    c.  choking her with his hands for his own sexual gratification;

    d.  forcing oral sex on her;

    e.  ignoring her cries for him to stop; and

    f.  forcibly penetrating her with his penis.

125.137.     Through his above-described abuse, Geever intentionally caused severe emotional distress to Sarhadi, or disregarded the substantial probability of causing severe emotional distress to Sarhadi.  Geever engaged in this conduct by using his position as a famous pro-feminist musician to sexually exploit and abuse Sarhadi.

126.138.     Geever knew that he was going to sexually assault Sarhadi when he invited her to his motel room when she was 21 years old.

127.139.     Geever's misconduct was so shocking and outrageous that it exceeded the reasonable bounds of decency as measured by what the average member of the community would tolerate and demonstrates an utter disregard by Geever of the consequences that would follow.

128.140.     Geever knew that his reckless, extreme, and outrageous conduct would inflict severe emotional and psychological distress, including personal physical injury, on Sarhadi.  Sarhadi, as a young adult, did in fact suffer severe emotional and psychological distress and personal physical injury, including severe mental anguish, humiliation, and emotional and physical distress.  Sarhadi's emotional distress continues to be severe.

129.141.      Geever's misconduct cannot be fairly described as merely negligent, but instead reflects outrageous behavior and an intentional or reckless indifference to the extreme distress that it would cause Sarhadi.

130.142.      Sarhadi should be awarded compensatory damages against Geever in an amount to be determined at trial, but no less than any required jurisdictional amount of this Court.

131.143.      Sarhadi's injuries were proximately caused by Geever's wrongful conduct, which arose from his malicious, evil, and sadistic motives.  Therefore, Sarhadi also seeks punitive damages for this cause of action in a sum to be determined at trial.

132.144.      This action falls within the exceptions to Article 16 of the CPLR.

## FOURTH CAUSE OF ACTION

## NEGLIGENCE

### Sarhadi AgainstAs to Defendant Hardwork

133.145.      Sarhadi incorporates and realleges each and every allegation set forth in the preceding paragraphs as if set forth here in full.

134.146.      Geever's conduct constitutes a sexual offense as defined in Article 130 of New York Penal Law, including, but not limited to, sexual misconduct (N.Y. Penal Law § 130.20); rape (N.Y. Penal Law §§ 130.25 – 130.35); forcible touching (N.Y. Penal Law § 130.52); and/or sexual abuse (N.Y. Penal Law §§ 130.55 – 130.65).

147.      At all times relevant and material hereto, Geever served as Hardwork's employee, agent, executive, and/or representative.

148.      At all times relevant and material hereto, Hardwork used Geever and Anti-Flag, including their participation in the film and the festival, as a means to collect and retain customers and income for its merchandise, promotion, and touring operation.

149.   At all times relevant and material hereto, Hardwork authorized, approved, sanctioned, sponsored, funded, and/or ratified Geever's involvement in Anti-Flag, the festival, the film, and the afterparty, all of which were used as mechanisms for Geever to gain access to, groom, and, assault women, including Sarhadi.

135.150.   Prior to the sexual assault described above, Hardwork, by and through its employees, agents, executives, and/or representatives, knew or should have known that Geever habitually and routinely engaged in sexual misconduct with young women and underage girls throughout the country and internationally.

136.151.   Prior to the sexual assault described above, Hardwork, by and through its employees, agents, executives, and/or representatives, knew or should have known that Geever was a serial sexual predator and/or sexually assaulted children and women.

137.152.   Hardwork, comprised of Geever, Barker, Head, and Bollinger, owed Sarhadi and other similarly situated women and underage girls a duty to protect herthem from harm while they attended Hardwork affiliated concerts, events, and parties because Geever's actions created a foreseeable risk of harm to Sarhadi.

138.153.   Hardwork owed Sarhadi and other similarly situated women and underage girls a duty because it was in a position to control Geever's access to young women and underage fans.

139.154.   Hardwork owed Sarhadi a duty because it invited Sarhadi onto the premises and facilities that, on information and belief, Hardwork directly or indirectly approved, sponsored, sanctioned, ratified, funded (, and/or supported such as performance venues, motel), and motels, and Geever posed a dangerous condition at these facilities.

140.155.   Hardwork had a duty of reasonable care to enact policies and procedures to protect fans, such as Sarhadi, from sexual assault by its employees, agents, executives, representatives, performers, and other persons in authority, such as Geever.

141.156.    Hardwork knew or should have known that Geever had a history of grooming and assaulting female fans in motel rooms, as well as Geever's propensity generally of sexually assaulting women, before Geever sexually assaulted Sarhadi.

142.157.    Hardwork knew or should have known that Geever used power, influence, status, and facilities provided by Hardwork to access and sexually assault women.

143.158.    Sarhadi met Geever at multiple live performances, wherein or events in which either (1) Geever represented Hardwork.; (2) Hardwork approved, sponsored, sanctioned, ratified, funded, and/or supported Geever and Anti-Flag's participation; and/or (3) Hardwork received a financial or economic benefit through Geever and Anti-Flag's participation through the generation of new customers.  After one performance, heGeever engaged in the illegal, harmful, and offensive sexual assault of Sarhadi in a motel room.

144.159.    Hardwork created a foreseeable risk of harm to Sarhadi.  As a young woman who Geever targeted in the venues, facilities, and motel rooms provided by Hardwork, Sarhadi was a foreseeable victim.

145.160.    Hardwork knew or should have known that the young women exposed to Geever were at risk of sexual assault by him.

146.161.    Hardwork knew or should have known, and had the opportunity to learn of, the intentional and malicious conduct of Geever, and thereby ratified and joined in said conduct by failing to terminate, bar, disinvite, publicly admonish, or discipline Geever and/or, by failing to warn anyone of Geever's known behaviors and/or preventing, failing to report Geever's misconduct to law enforcement, and/or failing to prevent contact between Geever and female fans.

147.162.    Rather than take any action to keep Sarhadi and women in her position safe, Hardwork ignored and financially benefitted from Geever's predatory and violent character.

148.   Hardwork breached its duty to Sarhadi.  Hardwork's failures include, but are not limited to, failure(1) failing to supervise Geever; (2) negligently hiring and retaining Geever; (3) failing to protect Sarhadi from a known danger, failure; (4) failing to warn Sarhadi of the risk Geever posed, and failure; (5) failing to take reasonable measures in light of what Hardwork knew or should have known.

149.163.   about Geever's sexual misconduct and failing to report Geever's misconduct to law enforcement; (6) failing to ensure that the October 1, 2010 events and motel, events and locations Hardwork breachedauthorized, approved, sanctioned, sponsored, funded, and/or ratified in the course and scope of its duty to Plaintiff byoperations, were safe and free of foreseeable dangers; (7) failing to adequately institute policies and procedures to ensure that Hardwork-affiliated events and spaces were safe and free from foreseeable harms; (8) failing to enforce existing policies and procedures to ensure that Hardwork-affiliated events were safe and free from foreseeable harms; and (9) providing, arranging, promoting, and permitting Geever to use his performances as the lead singer of Anti-Flag, position at Hardwork, and participation in the film and related events as a means to access, groom, and sexually assault young women and girls.

150.164.   By failing to address Geever's sexual assaults of women, Hardwork permitted, approved, encouraged, and/or ratified Geever's sexual assault of Sarhadi.

165.   Hardwork received a financial benefit for failing to publicly acknowledge, address, and rectify Geever's foreseeable sexual misconduct and silencing and/or discouraging victims from coming forward.

151.166.   As a direct and proximate result of the foregoing acts of negligence, Sarhadi sustained physical, emotional, and psychological injuries, along with pain and suffering, extreme emotional distress, humiliation, mental anguish, and loss of enjoyment of life, as well as economic losses, in amounts to be proven at trial.

167.   The conduct described herein by Hardwork was willful, wanton, and malicious.   At all relevant times, Hardwork acted with conscious disregard of Sarhadi's rights, feelings, and well-being, and acted with the knowledge of or reckless disregard to the fact that its conduct was certain to cause injury and/or humiliation to Sarhadi and other similarly situated individuals.

152.168.      This action falls within the exceptions to Article 16 of the CPLR.

## FIFTH CAUSE OF ACTION

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### *Sarhadi AgainstAs to Defendant* **Hardwork**

153.169.      Sarhadi incorporates and realleges each and every allegation set forth in the preceding paragraphs as if set forth here in full.

154.170.      Geever's conduct constitutes a sexual offense as defined in Article 130 of New York Penal Law, including, but not limited to, sexual misconduct (N.Y. Penal Law § 130.20); rape (N.Y. Penal Law §§ 130.25 – 130.35); forcible touching (N.Y. Penal Law § 130.52); and/or sexual abuse (N.Y. Penal Law §§ 130.55 – 130.65).

155.171.      As alleged herein, Hardwork owed Sarhadi a duty, which it breached.

156.172.      Hardwork's breach unreasonably endangered Sarhadi's physical safety and/or caused Sarhadi to fear for her own safety.

157.173.      Hardwork knew or should have known that Geever would sexually assault and/or rape Sarhadi.   Hardwork's failure to implement any prevention measures amounts to outrageous and extreme conduct.

158.174.      The breach of Hardwork's duty of care resulted in physical and emotional harm to Sarhadi.

175.   As a direct and proximate result of the foregoing acts of negligence, Sarhadi sustained physical, emotional, and psychological injuries, along with pain and suffering.,

extreme emotional distress, humiliation, mental anguish, and loss of enjoyment of life, as well as economic losses, in amounts to be proven at trial.

159.176.      The conduct described herein by Hardwork was willful, wanton, and malicious. At all relevant times, Hardwork acted with conscious disregard of Sarhadi's rights, feelings, and well-being, and acted with the knowledge of or reckless disregard to the fact that its conduct was certain to cause injury and/or humiliation to Sarhadi and other similarly situated individuals.

160.177.      This action falls within the exceptions to Article 16 of the CPLR.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief against Defendants:

1.      for past, present, and future general damages in an amount to be determined at trial;

2.      for past, present, and future special damages, including but not limited to past, present and future lost earnings, economic damages, and others in an amount to be determined at trial;

3.      any appropriate statutory damages;

4.      for interest as allowed by law;

5.      for civil penalties as provided by law;

6.      an Order enjoining Defendants from future unlawful business practices including, but not limited to, exposing minors and vulnerable adults to sexual abuse and exploitation;

7.      for any applicable costs of this suit;

8.      for reasonable attorneys' fees;

9.      for any appropriate punitive of exemplary damages; and

10.      for such other and further relief as the Court may deem proper.

## DEMAND FOR JURY ~~DEMAND~~TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and LR 38.1, Plaintiff respectfully hereby demand a trial by jury of all issues so triable.

Dated: ~~March 14, 2024~~   New York, New York

~~Respectfully submitted,~~

~~MCALLISTER OLIVARIUS~~
~~Dr John F.O McAllister~~
~~641 Lexington Avenue, 13th Floor~~
~~New York, NY 10022~~
~~(212) 433-3456~~
~~jmcallister@mcolaw.com~~

~~*Attorney for Plaintiff*~~

May 21, 2024

**McALLISTER OLIVARIUS**

/s/ *John F.O. McAllister*
John F.O. McAllister
641 Lexington Avenue
13th Floor
New York, NY 10022
Telephone: (212) 433-3456
jmcallister@mcolaw.com

*Attorneys for Plaintiff*

32