**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

KRISTINA SARHADI,

                            Plaintiff,                1:24-cv-31 (BKS/CFH)

v.

JUSTIN CATHAL GEEVER, also known as Justin Sane;
and HARDWORK DISTRIBUTION, INC.

                            Defendants.

---

**Appearances:**

*For Plaintiff*:
John F.O McAllister
McAllister Olivarius
641 Lexington Avenue, 13th Floor
New York, NY 10022

*For Defendant Hardwork Distribution, Inc.*:
Stuart P. Slotnick
Buchanan Ingersoll & Rooney PC
640 Fifth Avenue, 9th Floor
New York, NY 10019

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

**I.    INTRODUCTION**

Plaintiff Kristina Sarhadi brings this diversity action alleging claims of assault, battery/sexual battery, and intentional infliction of emotional distress against Defendant Justin Geever and claims of negligence and negligent infliction of emotional distress against Defendant Hardwork Distribution, Inc. (Dkt. No. 25). Presently before the Court are Defendant Hardwork's motion to dismiss for failure to state a claim, (Dkt. No. 28), and Plaintiff's motion for leave to file a second amended complaint (SAC), (Dkt. No. 36-1). The motions are fully briefed. (Dkt.

Nos. 28-1, 36-4, 37, 38, 39). For the following reasons, the Court grants Defendant Hardwork's motion to dismiss and denies Plaintiff's motion to amend.

## II. FACTS[1]

### A. Anti-Flag and Defendant Hardwork

Geever was the lead guitarist, singer, and songwriter for a well-known punk rock band with left-wing political views called Anti-Flag from 1988 until July 2023, when the band disbanded. (Dkt. No. 36-2, ¶ 31). At all relevant times, he was the registered President and owner of Hardwork, as well as Hardwork's agent, employee, and/or representative. (*Id.*).

Defendant Hardwork was formed in 2003 by Geever and the other members of Anti-Flag, who served as the company's directors. (*Id.* ¶ 32). Hardwork has "close involvement with Anti-Flag's tours and the recordings of their albums, as well as other Anti-Flag projects and affiliated projects such as members' solo musical performances." (*Id.* ¶ 47). Hardwork benefits financially from the activity of Anti-Flag and its members. (*Id.*).

From the time Anti-Flag formed, the band had a "'straight edge' platform" of anti-drugs, anti-alcohol, and pro-feminism. (*Id.* ¶ 38). In 2005, the band released a track titled, "Feminism is For Everybody" as part of a compilation album and donated proceeds from the sale of the album to Protect, a non-profit organization aimed at combating child abuse and exploitation. (*Id.* ¶ 43). Two years later, in 2007, the band released an EP titled, "A Benefit for Victims of Violent Crime." (*Id.* ¶ 44). Geever backed criticisms of the punk scene as sexist and predatory towards young women, saying that "sexualizing women and calling them the c-word is not something that should be tolerated." (*Id.* ¶ 45). Anti-Flag "created and maintained what was perceived as a

---

[1] These facts are drawn from the proposed second amended complaint. (Dkt. No. 36-2). The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations, *see Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020), but does not accept as true any legal conclusions, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

safe space for young female fans who attended Anti-Flag's shows, followed them on tour, and purchased their merchandise." (*Id.* ¶ 46).

In 2000, when Plaintiff Kristina Sarhadi was eleven years old, she began listening to Anti-Flag. (*Id.* ¶ 64). She felt like she was in a like-minded safe community and became deeply committed to the band because she "identified with its unusual, counter-cultural message and looked up to its members as brave, exciting exemplars of a better way of organizing society." (*Id.* ¶ 65). Anti-Flag became her favorite band, and she listened to their music, attended their concerts, and collected their merchandise until the assault in 2010. (*Id.* ¶ 66–67).

### B. The Underlying Incident

On September 22, 2010, Sarhadi attended an Anti-Flag concert in Brooklyn, New York. (*Id.* ¶ 68). As Sarhadi watched from the front row, Geever locked eyes with her and began singing to and winking at her. (*Id.* ¶ 71). After the concert, and in front of the other band members, Geever jumped off the stage, hugged Sarhadi, and asked for her name and where she was from. (*Id.* ¶ 72). Although Geever was flirtatious with Sarhadi, she did not reciprocate because she had a long-time boyfriend. (*Id.* ¶ 73). In each conversation they had, she made it clear that "she was in a committed relationship and not romantically interested in him." (*Id.*). That night, Geever invited Sarhadi to the upcoming Woodstock Film Festival to attend a screening of the film "Sounds Like a Revolution." (*Id.* ¶ 74). Geever, Anti-Flag, and their music were prominently featured in the film, with Geever receiving top billing. (*Id.*). Geever was scheduled to perform at the festival after the film screening. (*Id.*).

Sarhadi decided to go to the film festival and on October 1, 2010, she arrived at the theater in Rosendale, New York. (*Id.* ¶ 80). She felt safe to go, because she trusted in Geever's strong feminist stance, was a loyal fan and customer of Anti-Flag and Hardwork, knew that Geever had a serious girlfriend, and he was twice her age. (*Id.* ¶¶ 78–79). She waited at the gate

3

for Geever to let her in, as he had promised, but he never showed up and Sarhadi missed the screening. (*Id.* ¶ 81). Sarhadi did, however, meet Geever after the screening and they travelled together to a separate theater in Woodstock, New York, where Geever did a solo acoustic performance as "part of his, Anti-Flag's, and Hardwork's involvement in the film and festival." (*Id.* ¶ 82).

After the performance, Geever asked Sarhadi to accompany him to the film's afterparty at a private house nearby. (*Id.* ¶ 84). Sarhadi agreed and drove the two of them to the party. (*Id.* ¶ 85). When the party was over, Geever mentioned that he had recorded a song with Billy Bragg, another famous singer, and wanted her to be the first to hear it. (*Id.* ¶ 88). He said the song was on his laptop at his motel, and Sarhadi agreed to go with him to hear the song. (*Id.* ¶ 89). Geever then suggested that they stop at a bar and drink together, despite his and Anti-Flag's pro-sobriety messaging. (*Id.* ¶ 91). At the time, Sarhadi was "straight edge," meaning she did not drink alcohol or do drugs. (*Id.*). Geever acknowledged their mutual "straight edge" stance, but he suggested they should "break edge" that night since they were each dealing with unfortunate personal circumstances—Geever with a deceased nephew and cheating partner and Sarhadi with a long-distance boyfriend. (*Id.* ¶¶ 90–91). Geever's motel had a bar, and upon arrival, he ordered beers and pickleback shots for both of them. (*Id.* ¶ 92). Geever "continued drinking and dancing in the bar." (*Id.* ¶ 93).

After a while, Geever and Sarhadi walked to his motel room to listen to the song. (*Id.* ¶ 94). Geever then closed the curtains, locked the door, screamed "Football Tackle!" and tackled Sarhadi from behind onto the bed. (*Id.* ¶¶ 96–97). Geever had a "strange, scary look, as if he had turned into a different person." (*Id.* ¶ 98). He began restraining and strangling Sarhadi and forced her to perform oral sex on him. (*Id.* ¶ 99). When Sarhadi could breathe, she repeatedly pleaded

4

with him to stop. (*Id.* ¶ 100). She was crying and was shocked by his mean and violent behavior. (*Id.* ¶ 101). Geever then non-consensually penetrated Sarhadi's vagina with his penis. (*Id.* ¶ 102). Afterwards, Geever passed out on top of her and Sarhadi was able to escape the motel room without waking him. (*Id.* ¶¶ 103–04).

As a result of this incident, Sarhadi alleges that she "suffered, continues to suffer, and will suffer in the future, psychological injuries"; she has been diagnosed with and treated for, *inter alia*, C-PTSD, clinical depression, ADHD resulting from trauma, emotional hyperarousal, and rejection sensitive dysphoria. (*Id.* ¶ 112).

    C.    **Hardwork's Knowledge of Geever's Abuse of Women**

Anti-Flag, the members of which were Hardwork executives, performed hundreds of concerts together and recorded thirteen studio albums. (*Id.* ¶¶ 47–48). While touring, the band shared tour busses and green rooms and stayed at the same hotels such that they were frequently together in close proximity. (*Id.* ¶ 49). Sarhadi alleges that Anti-Flag and Hardwork had "policies and procedures in place to limit Geever's ability to interact with women and girls" because they knew of his "propensity to commit sexual assault or otherwise engage in inappropriate and harassing behavior with women." (*Id.* ¶ 51). These policies included prohibiting and/or limiting Geever's ability to bring women and girls on its tours busses and other associated facilities and vehicles as well as prohibiting and/or limiting Geever's consumption of alcohol. (*Id.*). Sarhadi alleges that Anti-Flag and Hardwork members, employees, agents, representatives, and/or executives attempted to conceal or downplay Geever's propensity to commit sexual assault or engage in sexual misconduct despite the fact that they observed women and girls (1) interacting with Geever during and after band-affiliated events, (2) drinking alcohol supplied by Geever, and (3) waiting outside the tour bus for Geever per his instructions. (*Id.* ¶¶ 53–54).

Sarhadi believes, "[b]ased on reliable press reports and information provided by women who have contacted Sarhadi," that at least sixty women had sex with Geever when they were underage and/or without consent. (*Id.* ¶ 55). In 2000, three or four years after an assault, one of those women confronted Christopher Barker, the Anti-Flag vocalist and bassist, who is or was the Secretary of Hardwork. (*Id.* ¶¶ 20, 57). The woman told Barker about her experience and asked whether Geever was aggressive in the same way to other fans. (*Id.* ¶ 57). Barker asked the woman not to make him answer, because "he was just trying to play in Geever's band." (*Id.*). In 2010, prior to the underlying incident, Patrick C. Bollinger, the Anti-Flag drummer, who is or was the Treasurer of Hardwork, saw Geever grooming a female fan following a concert by suppling her with "copious amounts of alcohol and encouraging her to keep the party going." (*Id.* ¶¶ 20, 59). Bollinger told Geever, "don't do this," but Geever did not listen, took alcohol from the tour bus, took the woman away, and sexually assaulted her. (*Id.* ¶ 59). Plaintiff alleges that Barker, Bollinger, and Christopher Head, the Anti-Flag lead guitarist, who is or was the Vice President of Hardwork, spent time with "[s]ome survivors who were underage at the time" and "acted awkwardly around them because they were so clearly underage." (*Id.* ¶¶ 20, 56).

On July 19, 2023, Sarhadi discussed the assault on a podcast, and although she did not name Anti-Flag or Geever, she gave the details of that night she was assaulted and described "how she was betrayed by the 'anti-rape' lead singer of a political punk band." (*Id.* ¶ 105). Anti-Flag was in the middle of a European tour, but that same day the podcast episode was released, they announced the band was dissolving, took down their website, and deleted the band's social media accounts. (*Id.* ¶ 106). A week later, Geever categorically denied, via Instagram, that he was the person Sarhadi had described and his post included a message from Barker, Head, and Bollinger that they never witnessed Geever engage in predatory behavior towards women. (*Id.* ¶

6

107). However, after a *Rolling Stone* article highlighted the experience of Sarhadi and twelve other women, Barker, Head, and Bollinger condemned Geever's conduct and claimed that he had "deceived" them. (*Id.* ¶ 108).

## III.    LEGAL STANDARD

### A.    Motion to Dismiss – Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist. LEXIS 155140, at *5 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555). A court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B.    Motion to Amend – Fed. R. Civ. P. 15

Under Federal Rule of Civil Procedure 15(a), absent certain circumstances not at play here, a party may amend its pleading only with the opposing party's written consent or the court's leave. *See* Fed. R. Civ. P. 15(a)(1)–(2). Rule 15(a)(2) requires that a court "freely give leave when justice so requires." *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

"[W]hen a plaintiff properly amends her complaint after a defendant has filed a motion to dismiss that is still pending, the district court has the option of either denying the pending motion as moot or evaluating the motion in light of the facts alleged in the amended complaint." *Pettaway v. Nat'l Recovery Sols., LLC*, 955 F.3d 299, 303–04 (2d Cir. 2020). Here, Defendant Hardwork has had an opportunity to respond to the proposed amendments, (*see* Dkt. Nos. 37, 39), and the claims remain the same. (*See* Dkt. No. 36-3). Defendant Hardwork argues that its motion to dismiss should not be mooted, labelling the proposed amendments as "futile." (Dkt. No. 39, at 14–15). "Therefore, for the purpose of procedural efficiency," the Court will consider Defendant Hardwork's motion to dismiss in light of the proposed SAC, and "if the proposed amended complaint cannot survive the motion to dismiss, then [plaintiff's] cross-motion to amend will be denied as futile." *Conforti v. Sunbelt Rentals, Inc.*, 201 F. Supp. 3d 278, 291 (E.D.N.Y. 2016).

## IV.  DISCUSSION

### A.  Negligence

"To establish a prima facie case of negligence, a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Solomon v. New York*, 66 N.Y.2d 1026, 1027 (1985). Hardwork argues that it had no duty to Plaintiff, and that even if it did, it did not breach that duty. (Dkt. No. 28-1, at 13). Plaintiff responds that she has stated a claim for negligent supervision and retention as well as a claim for common law negligence. (Dkt. No. 38, at 10, 15).

#### 1.  Negligent Supervision and Retention

Both parties agree that a plaintiff alleging a negligent supervising and retention claim must plead the existence of an employee-employer relationship and that the employer knew or should have known of the employee's propensity for the conduct which caused the injury. (*See*

8

Dkt. No. 36-4, at 15 (quoting *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159, 161 (2nd Dep't 1997)); Dkt. No. 39, at 7 (citing *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004))).

Hardwork argues that Plaintiff fails to sufficiently allege that Hardwork and Geever were in an employer-employee relationship. (Dkt. No. 28-1 at 20). Plaintiff responds that the bar for alleging an employer-employee relationship is not high and that a "predominant factor" is the power to control the employee's conduct. (Dkt. No. 38, at 11). The SAC alleges that "Geever was the registered President and owner of Hardwork, as well as Hardwork's agent, employee, and/or representative," (Dkt. No. 36-2, ¶ 31), and that Hardwork had control over Geever, because it had "policies and procedures in place to limit Geever's ability to interact with women and girls to prevent such abuse." (*Id.* ¶¶ 51, 153). The Court agrees that "[o]n a motion to dismiss, the bar for alleging an employer-employee relationship is not high." *Canosa v. Ziff*, No. 18-cv-4115, 2019 WL 498865, at *15, 2019 U.S. Dist. LEXIS 13263, at *38 (S.D.N.Y. Jan. 28, 2019). While the Plaintiff's allegations of an employee-employer relationship are limited and conclusory, at this preliminary stage the Court declines to dismiss this claim for failure to plausibly allege an employer-employee relationship between Hardwork and Geever. *See id.* (finding sufficient allegations that the individual was employed by entity and they were in an employee-employer relationship where entity "had some degree of control" over the individual's employment contract).

The parties disagree on the third element of the test to be used in evaluating negligent supervision and retention claims. Defendant argues that the third element is "that the tort was committed on the employer's premises or with the employer's chattels." (Dkt. No. 39, at 7). (quoting *Doe v. Uber Techs., Inc.*, 551 F. Supp. 3d 341, 361 (S.D.N.Y. 2021) (quoting *Ehrens*,

9

385 F.3d at 235))). Defendant argues that "*Ehrens* has been cited over 250 times by both federal and state courts following the elements as laid out in *Ehrens*." (Dkt. No. 39, at 10).

Plaintiff, on the other hand, contends, (Dkt. No. 36-4, at 15), that the third element is "a connection or nexus between the plaintiff's injuries and the defendant's malfeasance." *Gonzales v. City of New York*, 133 A.D.3d 65, 70 (1st Dep't 2015). Plaintiff argues that "New York law does not require that the tort be conducted with an employer's chattels or an employer's premises," (*id.*), because "*Ehrens* incorrectly sets forth the applicable law in this state concerning the last element required for a negligent hiring, supervision or retention claim." *Sokola v. Weinstein*, 187 N.Y.S.3d 493, 503 (Sup. Ct., N.Y. County 2023), *appeal withdrawn*, 219 A.D.3d 1185 (1st Dep't 2023).

Neither of the parties, however, cited the New York Court of Appeals' formulation of the appropriate test:

> Where the negligence claim relates to an employer's retention and supervision of an employee, the complaint must include allegations that: (1) the employer had actual or constructive knowledge of the employee's propensity for the sort of behavior which caused the injured party's harm; (2) the employer knew or should have known that it had the ability to control the employee and of the necessity and opportunity for exercising such control; and (3) the employee engaged in tortious conduct on the employer's premises or using property or resources available to the employee only through their status as an employee, including intellectual property and confidential information.

*Moore Charitable Found. v. PJT Partners, Inc.*, 40 N.Y.3d 150, 157 (2023). The Court is bound to apply the law from the New York Court of Appeals. *See Adebiyi v. Yankee Fiber Control, Inc.*, 705 F. Supp. 2d 287, 291 n.4 (S.D.N.Y. 2010) ("[A] more recent decision regarding New York law from the New York Court of Appeals would trump an earlier decision from the Second Circuit[.]"); *see also M.H. v. Starbucks Coffee Co.*, No. 22-cv-10507, 2024 WL 3089931, at *4,

10

2024 U.S. Dist. LEXIS 109107, at *12–13 (S.D.N.Y. June 20, 2024) (applying *Moore Charitable Found.* and dismissing claim where plaintiff failed to allege the third prong). As such, the Court considers each *Moore Charitable Found.* element.

### a.   Employer's Knowledge of Employee's Propensity

Plaintiff alleges that Hardwork "was aware of Geever's practice of sexually assaulting young women and girls," (Dkt. No. 36-2, ¶ 18) because (1) other Hardwork officers witnessed inappropriate conduct, (*id.* ¶¶ 48–50, 56, 58–59), (2) Hardwork instituted policies and procedures to limit Geever's ability to interact with women and girls to prevent such abuse, (*id.* ¶ 51), and (3) at least one of Geever's other victims told a Hardwork officer about her assault, (*id.* ¶ 57). Hardwork argues that this element is not satisfied because there are no allegations that it "knew or should have known that Defendant Geever and Plaintiff, two of-age independent adults, would meet a week after the Anti-Flag concert and Defendant Geever would allegedly sexually assault Plaintiff." (Dkt. No. 28-1, at 18). However, the element does not require the employer to have knowledge that a particular individual would be harmed in some way. Rather, the question is whether Hardwork had knowledge of Geever's propensity for sexually assaulting young women. *See Moore Charitable Found.*, 40 N.Y.3d at 157–58.

Hardwork next argues that "Plaintiff's hearsay reports that alleged prior victim(s) of Geever spoke to the other band members fail to include any verifiable details and cannot support Plaintiff's claims." (Dkt. No. 28-1, at 18 n.5 (citation omitted)). However, "[o]n a motion to dismiss, where the allegations must be accepted as true and all reasonable inferences must be drawn in the claimant's favor, the fact that the pleadings may rely on hearsay does not warrant dismissal." *Connolly v. Wood-Smith*, No. 11-cv-8801, 2012 WL 7809099, at *6, 2012 U.S. Dist. LEXIS 187518, at *17 (S.D.N.Y. May 14, 2012), *report and recommendation adopted*, 2013 WL 1285168, 2013 U.S. Dist. LEXIS 44947 (S.D.N.Y. Mar. 28, 2013). Although a "bare

11

assertion that a defendant 'knew or should have known' of [a] fact or circumstance is insufficient," (*see* Dkt. No. 39, at 8 n.2 (quoting *Read v. Corning Inc.*, 371 F. Supp. 3d 87, 92 (W.D.N.Y. 2019))), Plaintiff provides more than a bare assertion here even if she cannot point to a police report, complaint, or claim filed before she filed the instant action, (*see* Dkt. No. 28-1, at 18 n.5). The allegations that Hardwork had policies in place to protect young women from Geever and that Hardwork officers witnessed inappropriate action by Geever plausibly suggest that Hardwork knew or should have known of Geever's propensity for sexually assaulting young women.

Lastly, the case law cited by Defendant for the proposition that it lacked the requisite knowledge is inapposite. (Dkt. No. 37, at 13–15). In *Uber Techs., Inc.*, the court dismissed the claim because there were no allegations that the employer knew a specific employee posed a danger, just allegations that the employer knew generally that employees were committing sexual assault. 551 F. Supp. 3d at 362. Here, however, Plaintiff's allegations are specific to Geever and instances of *his* prior misconduct. In *Doe v. Montefiore Med. Ctr.*, the court dismissed the claim because there was "no indication that [the employee] was ever physically violent with anyone" and so a series of emails demonstrating the employee's "aggressiveness, unpredictability, delusional paranoia, and possible need of mental health intervention" was insufficient to plausibly allege a known propensity. No. 12-cv-686, 2013 WL 624688, at *4, 2013 U.S. Dist. LEXIS 24036, at *10–12 (S.D.N.Y. Feb. 19, 2013), *aff'd*, 598 F. App'x 42 (2d Cir. 2015). Here, on the other hand, Plaintiff alleges that Hardwork officers knew Geever was physically and sexually violent with others before her. (*See e.g.*, Dkt. No. 36-2, ¶¶ 57, 59). Therefore, Plaintiff has plausibly alleged this element.

### b.   Employer's Control

The second *Moore Charitable Found.* element is that "the employer knew or should have known that it had the ability to control the employee and of the necessity and opportunity for exercising such control." 40 N.Y.3d at 157. This is because "the critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results [by the employee]." *Bynog v. Cipriani Group, Inc.*, 1 N.Y.3d 193, 198 (2003). Plaintiff alleges that Hardwork "was in a position to control Geever's access to young women and underage fans," as evidenced by its "policies and procedures in place to limit Geever's ability to interact with women and girls to prevent such abuse." (Dkt. No. 36-2, ¶¶ 51, 153). In particular, Plaintiff alleges that "Anti-Flag and Hardwork had policies prohibiting and/or limiting [1] Geever's ability to bring women and girls on its tour busses and other associated facilities and vehicles" and "[2] Geever's consumption of alcohol, a tool Geever used in his assaults and other misconduct, aboard its tour busses and other associated facilities and vehicles." (*Id.* ¶ 51). Given these allegations, the Court finds it plausible that Hardwork knew of the need to control Geever and that it had the ability to do so. Because "[a]t this juncture, evidence of exactly what defendants knew . . . is primarily within their sole possession and control[,] . . . we find the allegations of notice sufficient to survive a motion to dismiss under our liberal pleading standards." *Moore Charitable Found.*, 40 N.Y.3d at 160.

### c.   Employer's Premises, Property, or Resources

Defendant argues that Plaintiff "failed to (and cannot) sufficiently plead that the tortious alleged assault occurred on the employer's premises[.]" (Dkt. No. 39, at 13). According to Defendant, "[Plaintiff] travelled with Defendant Geever to his solo concert in another town, she decided to join Defendant Geever at an after-party and drove them both there, she agreed to join

13

Defendant Geever for drinks at a bar, and finally she decided to accept Defendant Geever's invitation to join him at his motel room." (Dkt. No. 28-1, at 16; *see* Dkt. No. 36-2, ¶¶ 82, 84–85, 89, 91–94). As discussed below, Plaintiff has failed to plausibly allege that the motel room constitutes Hardwork premises.

The test in *Moore*, however, also includes whether the employee "us[ed] property or resources available to the employee only through their status as an employee[.]" *Moore*, 40 N.Y.3d at 157. Neither of the parties considered this factor. Here Plaintiff alleges that Hardwork "invited Sarhadi onto the premises and facilities that, on information and belief, Hardwork directly or indirectly approved, sponsored, sanctioned, ratified, funded, and/or supported such as performance venues and motels[.]." (Dkt. No. 36-2, ¶ 154). Specifically, Plaintiff alleges that Geever's solo acoustic performance was "part of his, Anti-Flag's, and Hardwork's involvement in the film and festival" and that "Geever and Anti-Flag's involvement in the film, festival, and subsequent press, performances, and events stemming from or related to the film was approved, sponsored, sanctioned, and/or ratified by Hardwork and/or its employees, agents representatives, and/or executives." (*Id.* ¶¶ 77, 82). These allegations regarding Hardwork's involvement, however, do not plausibly allege that Geever used property or resources available to him only through his status as an employee in order to perpetrate the assault. Similarly, Plaintiff's allegation that Hardwork "approved, sanctioned, supported, funded, *and/or* ratified Geever's stay [sic] the motel," (*Id.* ¶ 89 (emphasis added)), is conclusory and fails to plausibly allege that Geever used property or resources available to him only through his status as a Hardwork employee.[2]

---

[2] Plaintiff does not allege that Hardwork paid for the motel room to support and benefit Anti-Flag, and the Court has not considered whether such an allegation would be sufficient. (*See generally* Dkt. No. 36-2).

Plaintiff points to distinguishable and inapposite case law to argue that "New York courts have repeatedly found employers liable for negligent hiring, supervision, and retention involving employee's sexual assault." (Dkt. No. 36-4, at 15). For example, in *Waterbury v. New York City Ballet, Inc.*, the tortious conduct at issue was the disclosure of intimate images without the consent of their subject. 205 A.D.3d 154, 156–57 (1st Dep't 2022). The images were shared "during work hours and on work premises," and indeed, the court found the location of the tortious conduct significant, because of "the impact of the work environment on employee behavior, the control that employers exercise over their business premises, and the responsibility that comes with such control." *Id.* at 157, 163. That the court also considered whether there was a "substantial nexus between [defendant's] negligent supervision and the harm [plaintiff] suffered" is more probative of whether the basic causation element of negligence was satisfied than whether the premises element of a negligent supervision and retention claim was satisfied. *Id.* at 162. Likewise, in other cases where the sexual abuse occurred off-premises, the sexual abuse was preceded by time periods when the tortfeasor engaged in inappropriate behavior while on premises. *Johansmeyer v. New York City Dep't of Educ.*, 165 A.D.3d 634, 636 (2d Dep't 2018) (explaining that although liability may not generally be imposed where all of the improper acts occurred off premises, the tortfeasor "engaged in inappropriate behavior, including physical touching" with the plaintiff while on premises even if the sexual abuse ultimately occurred off premises); *Doe v. Congregation of the Mission of St. Vincent De Paul in Germantown*, No. 711854/2015, 2016 N.Y. Slip Op. 32061(U) (N.Y. Sup. Ct., Queens County 2016) (denying

motion to dismiss where sexual abuse occurred off-premises, but employee was there in official capacity and had previously engaged in sexual abuse of another girl on premises).[3]

Accordingly, the SAC fails to plausibly allege the third *Moore Charitable Found* element and Plaintiff's motion to amend must be denied as futile. *See M.H.,* 2024 WL 3089931, at *4, 2024 U.S. Dist. LEXIS 109107, at *13 (dismissing claim where plaintiff did not allege that her assault occurred on defendant's premises or with its property or resources).

### 2.     Common Law Negligence

Plaintiff argues that Hardwork owed Plaintiff, "a customer, attendee, and invitee to events and spaces controlled, approved, sponsored, sanctioned, funded, and/or ratified by Hardwork and/or its employees, agents, representatives and executives" a duty to ensure that she "would be free from foreseeable harm from an individual Hardwork knew or should have known posed a risk to Plaintiff and others similarly situated." (Dkt. No. 36-4, at 14). Plaintiff's legal reasoning is rooted in a theory of premises liability. (Dkt. No. 38, at 18 ("Hardwork, in its capacity as the possessor and controller of the motel room in which Geever occupied and owner of the business that Plaintiff visited and financially supported, owed Plaintiff a duty to maintain the premises in a reasonably safe condition, free from dangers known to it.")). The only case law cited by Plaintiff to support her argument that Hardwork had a duty is case law about premises liability. (*Id.* at 16–19).

New York landowners do owe people on their property a duty of reasonable care under the circumstances to maintain their property in a safe condition and minimize foreseeable dangers on their property, because "the person in possession and control of property is best able

---

[3] *Doe* is also inapposite, because it stated the outdated "employer's premises or with the employer's chattels" test as the third element, and never even reached that analysis. *Doe,* 2016 N.Y. Slip Op. 32061(U), at *7.

16

to identify and prevent any harm to others." *Butler v. Rafferty*, 100 N.Y.2d 265, 270 (2003); *see also Maheshwari v. City of New York*, 2 N.Y.3d 288, 294 (2004); *Polomie v. Golub Corp.*, 226 A.D.2d 979, 980 (3d Dep't 1996). Likewise, businesses owe a duty to business visitors to keep the premises reasonably safe. *Richling v. Rockwood & Co.*, 296 N.Y. 858, 859 (1947). However, Plaintiff does not point to any case law where a hotel patron was held liable on a theory of premises liability for torts committed against the patron's guest. Moreover, Plaintiff has failed to plausibly allege that Hardwork was the owner, possessor, or controller of the motel room or that the motel room constituted business premises. (*See* Dkt. No. 36-2). Plaintiff's conclusory allegation that Hardwork "directly or indirectly approved, sponsored, sanctioned, ratified, funded, and/or supported" Geever's use of the motel, (*id.* ¶ 154), is a "threadbare recital[ ] of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 663. Accordingly, the Court cannot find that Plaintiff has plausibly plead that Defendant Hardwork had a duty under premises liability.[4] Therefore, the Court grants Defendant Hardwork's motion to dismiss Plaintiff's common law negligence claim.

### B. Negligent Infliction of Emotional Distress

Plaintiff's final claim against Defendant Hardwork is for negligent infliction of emotional distress (NIED). (Dkt. No. 36-2, ¶¶ 169–77). Under New York law, the "direct duty" theory of NIED requires "(1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81

---

[4] Because the Court finds that Plaintiff did not plausibly allege a duty, the Court does not consider Defendant Hardwork's argument that if it did have a duty, it did not breach that duty. (*See* Dkt. No. 28-1, at 17–19).

(2d Cir. 2021). Here, Defendant Hardwork argues that the first and third elements are not satisfied. (Dkt. No. 28-1, at 23).

With respect to the first element, the duty "must be specific to the plaintiff, and not some amorphous, free-floating duty to society." *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996) ("While the [tortfeasor] may have had a generalized duty to prevent unreasonable risks of harm to passers-by, this duty was not specific to the [plaintiffs]."). Where there is no evidence that the defendant "even knew of [plaintiff's] existence," it is unlikely that there was a specific, unique duty. *Id.* at 697. Plaintiff argues that Hardwork owed her a duty because (1) she was an invitee on the premises (motel room) controlled by Hardwork and (2) she was a customer and business invitee of Hardwork. (Dkt. No. 38, at 23). As discussed above, Plaintiff has failed to plausibly allege that Hardwork controlled the motel room and there is no basis for a duty rooted in premises liability here.

Similarly, Plaintiff has not plausibly alleged that she was a "customer and business invitee of Hardwork" in the motel room. And, in any event, she has failed to plausibly allege a duty owed by Hardwork for an NIED claim. Some district courts in our circuit have ruled that a duty applying equally to all of Hardwork's customers cannot be the basis for an NIED claim. *See Druschke v. Banana Republic, Inc.*, 359 F. Supp. 2d 308, 315 (S.D.N.Y. 2005) (finding that NIED requires a duty "that is far more specific than the more generalized duty" "that stores, like other premises owners, owe . . . to visitors."); *see also Kelly v. Chase Manhattan Bank*, 717 F. Supp. 227, 235 (S.D.N.Y. 1989) (finding no special duty where alleged duty would have applied to *all* employees of an employer); *Kraft v. City of New York*, 696 F. Supp. 2d 403, 424 (S.D.N.Y. 2010) (finding that a duty owed to the general public is insufficient to prove a specific duty owed to plaintiff). The case on which Plaintiff relies, *Bennice v. Cosmoprof*, No. 23-cv-666, 2024 WL

532443, 2024 U.S. Dist. LEXIS 21998 (N.D.N.Y. Feb. 8, 2024), is not applicable here. (Dkt. No. 38, at 23–24)). In *Bennice*, the district court found that "a customer" or "business invitee" is "owed a specific duty of care requiring defendants to warn her of dangers that are known of, or reasonably should be known of *on the premises*." 2024 WL 532443, at *7, 2024 U.S. Dist. LEXIS 21998, at *16 (emphasis added). As discussed throughout this opinion, Plaintiff did not suffer harm on Defendant Hardwork's premises.[5] Therefore, the Court agrees that Plaintiff has not plausibly alleged a breach of a specific duty owed to her, and accordingly, her NIED claim must be dismissed.

## V.     LEAVE TO AMEND AND REMAINING PROCEEDINGS

Because "the proposed amended complaint cannot survive [Hardwork's] motion to dismiss," Plaintiff's motion to amend is denied as futile. *Conforti*, 201 F. Supp. 3d at 291. Because the first amended complaint has even fewer allegations regarding Hardwork, Hardwork's motion to dismiss is granted.

With respect to Defendant Geever, the Court notes that the clerk previously entered Defendant Geever's default as to the first amended complaint and that any motion for default judgment was due on May 23, 2024. (Dkt. Nos. 29–30). Instead of filing a motion for default judgment, Plaintiff filed her cross motion to amend her complaint on May 21, 2024. (Dkt. No. 36-1). Had the Court granted Plaintiff's motion, the SAC would have become the operative complaint, and the entry of default would have become moot. *Vasquez v. Young Chow Garden, Inc.*, No. 17-cv-5605, 2018 WL 11452581, at *1, 2018 U.S. Dist. LEXIS 247620, at *3–4 (S.D.N.Y. Nov. 16, 2018). In light of this decision denying Plaintiff's motion to amend, the

---

[5] Because the Court finds that Plaintiff did not plausibly allege breach of duty, the Court does not consider Defendant Hardwork's argument that there was no direct causal connection between the breach and the emotional harm. (Dkt. No. 28-1, at 23).

Court finds that good cause exists here to extend the deadline for filing a motion for default judgment. Accordingly, any motion for a default judgment must be made within thirty (30) days from the date of this order in compliance with the instructions in the Court's prior text order. (Dkt. No. 30.)

## VI. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant Hardwork's motion to dismiss (Dkt. No. 28) is **GRANTED** under Fed. R. Civ. P. 12(b)(6) for failure to state a claim; and it is further

**ORDERED** that Plaintiff's motion for leave to amend (Dkt. No. 36-1) is **DENIED**; and it is further

**ORDERED** that any motion for a default judgment as to Defendant Geever, pursuant to Rule 55(b) and Local Rule 55.2, must be made within thirty (30) days from the date of this Order.

**IT IS SO ORDERED.**

Dated: <u>December 18, 2024</u>
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge