## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **KRISTINA SARHADI,** | |
| Plaintiff, | Civil Action No. 1:24-cv-00031(BKS/CFH) |
| - against - | **DECLARATION OF JOHN F. O. McALLISTER IN SUPPORT OF PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT** |
| **JUSTIN CATHAL GEEVER a/k/a JUSTIN SANE**, and **HARDWORK DISTRIBUTION, INC.**, and **DOE 1,** | |
| Defendants. | |

I, John F. O. McAllister, pursuant to 28 U.S.C. § 1746 hereby declare as follows:

1.      I am a member of the Bar of this Court and am the Managing Partner of McAllister Olivarius, counsel for Plaintiff Kristina Sarhadi ("Plaintiff") in the above referenced action.  I make this declaration in support of Plaintiff's motion for default judgment against Defendant Justin Cathal Geever a/k/a Justin Sane ("Geever").  I am familiar with the facts and circumstances in this action.

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

3.      The Court has personal jurisdiction over Geever as the events or omissions giving rise to Plaintiff's claims occurred within the Northern District of New York.

4.      Defendant Geever is not an infant or incompetent person and is not in the military service within the purview of the Soldier's and Sailor's Civil Relief Act of 1940 as amended.  The determination that Defendant Geever is not in the military service is made based on his being served in Pittsburgh at a civilian address and the fact that he is a well-known singer and, until recently, was the frontman of the band Anti-Flag.

5.    On November 22, 2023, Plaintiff filed her Complaint in the Supreme Court of the State of New York, County of Ulster asserting claims of assault, battery, and intentional infliction of emotional distress against Geever.  Plaintiff's claims against Geever were revived pursuant to New York's Adult Survivors Act ("ASA"), CPLR § 214-j.  A true and correct copy of Plaintiff's Complaint is attached hereto as **Exhibit A**.

6.    Defendant Hardwork Distribution, Inc. ("Hardwork") removed this matter to this Court on January 9, 2024.  *See* ECF No. 1.

7.    On January 23, 2024, a Summons was issued to Geever.  A true and correct copy of the Summons is attached hereto as **Exhibit B**.

8.    Plaintiff attempted to serve Geever the Complaint on two separate occasions before service was effectuated on January 30, 2024 pursuant to Fed. R. Civ. P. 5.  *See* ECF No. 17.  A true and correct copy of the Affidavit of Service is attached hereto as **Exhibit C**.  Geever failed to answer or otherwise respond to Plaintiff's Complaint within the time prescribed by Fed. R. Civ. P. 12(a).

9.    Geever was subsequently served with Hardwork's Notice of Removal, Hardwork's Corporate Disclosure, and the Civil Cover Sheet via United States First Class Mail on February 26, 2024.  A true and correct copy of the Affidavit of Service of Hardwork's Notice of Removal, Corporate Disclosure, and Civil Cover Sheet is attached hereto as **Exhibit D**.

10.    On March 5, 2024, the Court granted Plaintiff's Motion for Extension of Time to Amend Complaint.  *See* ECF No. 23.

11.    Plaintiff filed her Amended Complaint on March 14, 2024.  A true and correct copy of Plaintiff's Amended Complaint is attached hereto as **Exhibit E**.

12.    On March 14, 2024, Plaintiff served her Amended Complaint on Geever by sending it via certified mail to his residential address, though service was not necessary since he was already in default for failing to appear.  A true and correct copy of the Affirmation of

Service is attached hereto as **Exhibit F**.  Geever failed to answer or otherwise respond to Plaintiff's Amended Complaint within the time prescribed by Fed. R. Civ. P. 12(a).

13.    Plaintiff's lawsuit against Geever was the subject of many articles published by reputable news sources.[1]  Geever, therefore, had notice of Plaintiff's claims separate and apart from service of Plaintiff's Complaint and Amended Complaint.

14.    On April 23, 2024, the Clerk of the Court issued a Certificate of Default.  A true and correct copy of the Clerk's Certificate of Default is attached hereto as **Exhibit G**.

15.    On April 23, 2024, the Court instructed Plaintiff to file her motion for default judgment within thirty (30) days of that Order.  ECF No. 30.  However, Plaintiff filed her Cross-Motion for Leave to Amend on May 21, 2024, which "restarted the clock" for purposes of finding any non-responsive Defendant in default.  ECF No. 36-37.  As such, she did not file her Motion for Default as to Geever.  The Court found good cause to extend Plaintiff's deadline to file the instant Motion on December 18, 2024.  ECF No. 40, at 19-20.

16.    On January 15, 2025, the Court granted Plaintiff's motion requesting an extension of time to file her Motion for Default Judgment, extending the deadline to January 31, 2025.  ECF No. 43.

17.    Fed. R. Civ. P. 55(b) and Local Rule 55.2 provides for an entry of default judgment following the entry of default by the Clerk of the Court under Fed. R. Civ. P. (55)(a) and Local Rule 55.1.

18.    As set forth above, Plaintiff has complied with Fed. R. Civ. P. 55(a) and Local Rule 55.1 and the Clerk of the Court has issued a Certificate of Default.

---

[1] Cheyenne Roundtree, *Anti-Flag's Justin Sane Sued for Sexual Assault*, ROLLING STONE, Nov. 22, 2023, https://www.rollingstone.com/music/music-news/anti-flag-justin-sane-sued-sexual-assault-1234879770/;    Jazz Monroe, *Anti-Flag's Justin Sane Sued for Raping Fan in 2010*, PITCHFORK, Nov. 23, 2023, https://pitchfork.com/news/anti-flags-justin-sane-sued-for-raping-fan-in-2010/;    August Billy, *Justin Sane, Formerly of Anti-Flag, Sued for Rape*, YAHOO ENTERTAINMENT, Nov. 26, 2023, https://shorturl.at/vaKQ4.

19.    The Court has the authority to set an award of damages without conducting an inquest.  *See Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contractors Inc.,* 699 F.3d 230, 234 (2d Cir. 2012) (citing Fed. R. Civ. P. 55(b)(2)); *Fustok v. Conticommodity Servs., Inc.,* 873 F.2d 38 (2d Cir. 1989) ("Fed. R. Civ. P. 55(b)(2) does not require a hearing devoted exclusively to damages") (cleaned up); *Estevez-Yalcin v. Children's Vill.*, No. 01-CV-8784 (KMK), 2007 U.S. Dist. LEXIS 69511 (S.D.N.Y. Sep. 12, 2007).

20.    Plaintiff is seeking an award of $1,250,000.00 in compensatory damages and $1,250,000 in punitive damages.  Plaintiff also seeks post judgment interest pursuant to 28 U.S.C. § 1961(a).

21.    Plaintiff has submitted testimonial and documentary evidence in support of her damages.

22.    A true and correct copy of the Declaration of the Plaintiff dated January 28, 2025 is attached hereto as **Exhibit H**.

23.    A true and correct copy of the Declaration of Plaintiff's sister, ████ ████, dated January 14, 2025 is attached hereto as **Exhibit I**.

24.    A true and correct copy of the Declaration of Plaintiff's partner, ████ ████, dated January 28, 2025 is attached hereto as **Exhibit J**.

25.    A true and correct copy of the Declaration of Dr. ████ ████ dated January 16, 2025 is attached hereto as **Exhibit K**.

26.    Plaintiff has submitted a concurrent request to file certain documents with redactions.

27.    Plaintiff's declaration and documentary evidence present a sufficient basis for the Court to award compensatory and punitive damages without ordering an inquest.  As such, Plaintiff respectfully requests this Honorable Court award compensatory and punitive damages, along with post judgment interest.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: New York, New York

January 30, 2025

_____

John F. O. McAllister

# **EXHIBIT A**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF ULSTER**

|  |  |
|---|---|
| **KRISTINA SARHADI**,<br><br>Plaintiff,<br><br>- against -<br><br>**JUSTIN CATHAL GEEVER** a/k/a **JUSTIN SANE**, **HARDWORK DISTRIBUTION, INC.**, and **DOE 1**,<br><br>Defendants. | Index No._____<br><br><br>**COMPLAINT AND DEMAND**<br>**FOR JURY TRIAL** |

Plaintiff Kristina Sarhadi ("Plaintiff"), by and through her undersigned attorneys, brings this action against Defendants Justin Cathal Geever a/k/a Justin Sane ("Geever"), Hardwork Distribution, Inc. ("Hardwork"), and Doe 1 (collectively "Defendants"), and she alleges as follows:

## PRELIMINARY STATEMENT

1.      This complaint is filed pursuant to New York's Adult Survivors Act ("ASA"), New York Civil Practice Law and Rules ("CPLR") section 214-j.  The ASA has brought a historic one-year window for survivors of sexual abuse in the State of New York to pursue lapsed claims.

2.      Plaintiff timely brings her causes of action within the "retroactive revival window" of the ASA, which removes the previously applicable statute of limitations.  Pursuant to the ASA, Defendants are liable for the intentional and negligent acts and omissions that resulted in Plaintiff being a victim of sexual assault and caused her serious psychological, physical, and emotional harm.

## NATURE OF THE ACTION

3.     Plaintiff Kristina Sarhadi is a survivor of adult sexual assault at the hands of Defendant Justin Cathal Geever, who goes by the stage name Justin Sane.

4.     Defendant Geever forced himself onto Plaintiff, strangled her, forced her to perform oral sex on him, and raped her one night in October 2010.

5.     This action alleges physical, psychological, and emotional injuries suffered as a result of conduct that would constitute a sexual offense as defined in Article 130 of the New York Penal Law, including, *inter alia*, forcible touching, criminal sexual acts, sexual abuse, and rape.  *See* Penal Law §§ 130.20 – 130.65.

6.     The conduct alleged herein would constitute a sexual offense as defined in Article 130 of the New York Penal Law in that, at all relevant times, the conduct lacked consent from Plaintiff.

7.     The conduct lacked consent from Plaintiff because the sexual offenses were accomplished using forcible compulsion, coercion, and intimidation, and Defendant Geever continued assaulting Plaintiff despite her repeatedly telling him to stop.

8.     On information and belief, Defendant Geever engaged in a pattern of targeting and then physically and sexually abusing young women and underage girls over a period of nearly two decades before Plaintiff met him.

9.     Currently, on information and belief, at least 12 additional women have come forward to accuse Defendant Geever publicly of using his power as a famous music performer to engage in predatory behavior, sexual assault, and statutory rape, and there are many other women who have attested to his misconduct.

10.     On information and belief, the Defendant entities were aware of Defendant Geever's practice of sexually assaulting young women and girls, and they aided and abetted such behavior.

2

11.     As a result of Defendant Geever's sexual assault, as well as the Defendant entities' negligent acts and omissions, Plaintiff has suffered severe emotional, physical, and psychological distress, including shame, guilt, economic loss of earning capacity, and emotional loss.

12.     Plaintiff brings this action to recover for the injuries she has endured because of the actions of Defendants and to make sure no one else is forced to suffer the abuse and physical and mental trauma she felt and continues to feel to this day.

## PARTIES

13.     Plaintiff is and at all relevant times was a citizen of the United States and a resident of the state of New York.

14.     At all times relevant to the wrongful conduct set forth herein, Plaintiff was over the age of 18.

15.     Plaintiff is an adult female currently residing in Ulster County, New York.

16.     On information and belief, Defendant Geever is and at all relevant times was a citizen of the United States and a resident of Allegheny County, Pennsylvania.

17.     Defendant Geever is an adult male.  Defendant Geever was the lead guitarist, singer, and songwriter for a punk rock band with left-wing political views called Anti-Flag from 1988 until July 2023 when the band disbanded.  On information and belief, Defendant Geever is the registered President of Defendant Hardwork and is affiliated with and/or an employee or agent of Doe 1.

18.     On information and belief, Defendant Hardwork is a domestic business corporation incorporated in Pennsylvania and headquartered in Pittsburgh, Pennsylvania.  On information and belief, Defendant Hardwork was formed in 2003 by Defendant Geever and other members of Anti-Flag.  On information and belief, Defendant Geever is the registered

3

President of Defendant Hardwork, and other members of the band serve as Vice President, Secretary, and Treasurer.

19.    Plaintiff is informed and believes and thereon alleges that the true name and capacity, whether individual, corporate, associate, or otherwise of the Defendant named herein as Defendant Doe 1 is unknown to Plaintiff, who therefore sues Defendant Doe 1 by such fictitious name, and who will amend the Complaint to show its true name and capacity when such name has been ascertained pursuant to CPLR § 1024.  Plaintiff is informed and believes and thereon alleges that Doe 1 is legally responsible in some manner for the events, happenings, and/or tortious and unlawful conduct that caused the injuries and damages alleged in this Complaint.

20.    Whenever reference is made to any Defendant entity, such reference includes that entity, its parent companies, subsidiaries, affiliates, predecessors, and successors.  In addition, whenever reference is made to any act, deed, or transaction of any entity, the allegation means that the entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

21.    The limitations of Article 16 of the CPLR do not apply because one or more of the exceptions set forth in CPLR § 1601 and/or § 1602 apply.

## JURISDICTION AND VENUE

22.    This Court has jurisdiction over Defendants pursuant to CPLR § 302 as Defendants committed the tortious acts and omissions within the State of New York.

23.    Venue for this action is proper in the County of Ulster pursuant to CPLR § 503 because Ulster is the County in which Plaintiff currently resides and where a substantial part of the events giving rise to the claim occurred.

Case 1:24-cv-00031-BKS-PJE    Document 44-1    Filed 01/30/25    Page 11 of 100

24.     This Court has jurisdiction over this action because the amount of damages Plaintiff seeks exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction.

## FACTUAL ALLEGATIONS

25.     At all times material, Geever was a prominent and influential figure in the punk rock music industry, specifically his public activism on the subject of protecting women from violence.

26.     Sometime in 1988, Anti-Flag formed with Geever as the lead guitarist, singer, and songwriter.  The band's "straight edge" platform was anti-drugs, anti-alcohol, and promoted feminism.

27.     Beginning in 2000, when Plaintiff was 11 years old, she began listening to Anti-Flag.  She went to numerous concerts with her friends, and she appreciated the band's political views concerning social justice, politics, and feminism.

28.     Anti-Flag, and Geever in particular, wrote and sang lyrics consistent with these views, which attracted young female fans by making them feel like they were in a like-minded, safe community.  These views, especially feminism, distinguished Anti-Flag from other bands in the punk rock scene, and the fans, including Plaintiff, believed whole-heartedly that the band members practiced what they preached.

29.     Anti-Flag was Plaintiff's favorite band, and she listened to their music throughout her teenage years and through college.

30.     Unbeknownst to Plaintiff, on information and belief, dating back to the 1990s, Defendant Geever had a history of targeting, grooming, and physically and sexually assaulting young women and underage girls.  Throughout Plaintiff's teenage and young adult life, she remained unaware of Defendant Geever's history of sexual abuse towards women and girls.

31. On September 22, 2010, after graduating college, Plaintiff attended an Anti-Flag concert at a venue called the Bell House in Brooklyn, New York.

32. Plaintiff watched from the front row. Geever then locked eyes with her and began singing to her and winking at her.

33. After the concert, Geever jumped off the stage, hugged Plaintiff, and asked for her name and where she was from.

34. Geever was initially flirtatious toward Plaintiff; however, the flirty nature was not reciprocated because Plaintiff had a long-time boyfriend, which she told Geever in their first conversation and each one thereafter. Plaintiff made it clear to Geever that she was in a committed relationship and not romantically interested in him.

35. Geever subsequently invited Plaintiff to a film festival where he planned to perform the following week.

36. As a loyal fan of Anti-Flag and trusting in Geever's strong feminist stance, Plaintiff felt safe in his presence and agreed to meet him at the festival.

37. Plaintiff also knew that Geever had a serious girlfriend who, on information and belief, may have been his fiancé, which further diffused any concerns she might have about his intentions. Plus, he was almost twice her age.

38. On October 1, 2010, Plaintiff arrived at the screening at the Bearsville Theatre in Woodstock, New York.

39. Plaintiff waited for Geever to let her in at the gate, as he said he would, but Geever never came, and Plaintiff missed the screening.

40. Plaintiff did, however, attend Geever's acoustic performance at the festival in the same theatre. She once again sat in the front row for his performance.

41. After his performance, Geever asked Plaintiff to accompany him to the afterparty.

6

42.     She drove, and once in her grandfather's Buick, Geever began showering Plaintiff with compliments.  Plaintiff made it clear that she had a boyfriend and was in a committed relationship.

43.     They talked about music and concerts, and Plaintiff thought they were developing a friendship.  Geever also mentioned the death of his nephew and his partner cheating on him and moving to London, which garnered Plaintiff's sympathy.

44.     Once they arrived at the house party, Geever paraded Plaintiff around as one of his fans, prompting her to praise him as a rock star.  She eventually became annoyed and bored with his behavior and went outside to converse with others.

45.     When the party was over and Plaintiff was ready to leave, Geever mentioned that he had recorded a song with Billy Bragg, and he wanted her to be the first to hear it.

46.     Geever told Plaintiff that the song was on his laptop at his motel.  Plaintiff agreed to go with him to his motel, The Lodge, in order to hear the song.

47.     On the way to his motel, The Lodge, Geever turned emotional again while talking about his nephew and his partner.

48.     Geever told Plaintiff that they should stop at a bar and drink together, despite his and Anti-Flag's pro-sobriety messaging.  At the time, Plaintiff had been "straight edge," which means she did not do drugs or drink alcohol.  Geever acknowledged their mutual "straight edge" stance, but he suggested they should "break edge" that night, since they were each dealing with unfortunate personal circumstances.

49.     When they arrived at the bar in the motel, Geever ordered beers and pickleback shots.

50.     Geever continued drinking and dancing in the bar while Plaintiff waited patiently to listen to the song recorded with Billy Bragg.

7

51.     At some point in the night, Geever and Plaintiff walked to Geever's motel room to listen to the song.

52.     While in Geever's room, Plaintiff observed that it was tiny, had wooden bunk beds, white floors, and a dresser.  Plaintiff noticed that Geever's laptop bag laid on the dresser and remembered that Geever had told her the song was on his laptop.

53.     Plaintiff turned to Geever and was surprised to see that he was closing the curtains and locking the door.

54.     As Plaintiff looked back at the laptop bag and waited to hear the song, Geever screamed, "Football Tackle!" and suddenly tackled Plaintiff from behind onto the bed.

55.     Plaintiff initially thought Geever was playing around, but when she saw his face and his expressions, she knew something was wrong.

56.     Geever began restraining and strangling Plaintiff, and he forced her to perform oral sex on him.

57.     When she could breathe, she repeatedly pleaded with him to stop.

58.     She was shocked and crying.  He was mean and violent with Plaintiff; she did not matter and was just an object for him to dominate.

59.     Geever penetrated Plaintiff's vagina with his penis.  Plaintiff did not consent.

60.     When Geever finished with Plaintiff, he passed out on top of her.

61.     Plaintiff was then able to escape Geever's motel room without waking him.

### PLAINTIFF'S DAMAGES

62.     In addition to the damages mentioned above, as a direct and proximate result of Defendants' tortious acts and omissions, Plaintiff suffered, continues to suffer, and will suffer in the future, psychological injuries, including but not limited to, low self-esteem, anxiety, panic attacks, post-traumatic stress disorder, eating disorders, stress, insomnia, nightmares, depression, suicidality, shame, disassociation, intimacy issues, fear, and trust issues.  Plaintiff

8

has been diagnosed with and treated for, *inter alia*, C-PTSD, clinical depression, ADHD resulting from trauma, emotional hyperarousal, and rejection sensitivity dysphoria. All these injuries caused and will cause Plaintiff noneconomic damages. Plaintiff also suffered and continues to suffer economic damages in the form of loss of past and future income and costs of medical and mental health treatment.

63.      Defendants acted with an outrageous indifference to a highly unreasonable risk of harm and with a conscious indifference to the health, safety, and welfare of Plaintiff. Therefore, Plaintiff is entitled to punitive damages against Defendants.

## FIRST CAUSE OF ACTION
## ASSAULT

### *Plaintiff Against Defendant Geever*

64.      Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs as if set forth here in full.

65.      Defendant Geever's conduct constitutes a sexual offense as defined in Article 130 of New York Penal Law, including, but not limited to, the following: sexual misconduct (N.Y. Penal Law § 130.20); rape (N.Y. Penal Law §§ 130.25 – 130.35); forcible touching (N.Y. Penal Law § 130.52); and/or sexual abuse (N.Y. Penal Law §§ 130.55 – 130.65).

66.      Defendant Geever's predatory, abusive, and manipulative behavior, as well as his unlawful touching, acts, and conduct against Plaintiff created a reasonable apprehension in Plaintiff of harmful or offensive contact as to her person, all of which was done intentionally by Defendant Geever to Plaintiff without her consent.

67.      When Plaintiff was alone with Defendant Geever in his small motel room, Defendant Geever's physical conduct placed Plaintiff in imminent apprehension of harmful and offensive contact.

68.      Plaintiff did not consent to Defendant Geever's harmful and offensive contact, and she made her lack of consent known when she could.

9

Case 1:24-cv-00031-BKS-PJE    Document 44-1    Filed 01/30/25    Page 16 of 100

69.     Defendant Geever knew that these acts and his conduct would cause Plaintiff to apprehend harmful or offensive contact, and Plaintiff reasonably apprehended that harmful or offensive contact would occur.

70.     Defendant Geever was capable of carrying out the attempted conduct and did carry out the rape of Plaintiff.

71.     As a direct and proximate result of the above-described conduct, Plaintiff has suffered, and will continue to suffer, great pain of mind and body, shock, emotional distress, discomfort, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life.  She was prevented, and will continue to be prevented, from performing daily activities and obtaining the full enjoyment of life.  She has sustained, and will continue to sustain, loss of earnings and earning capacity.  She has incurred, and will continue to incur, expenses for medical and psychological treatment, therapy, and counselling.

72.     Plaintiff is therefore entitled to monetary relief, in the form of compensatory damages, to remedy the severe emotional distress suffered as a result of Defendant Geever's intentional and outrageous conduct.

73.     Defendant Geever's conduct was intentional, extreme, and outrageous, entitling Plaintiff to an award of punitive damages.

74.     This action falls within the exceptions of Article 16 of the CPLR.

**SECOND CAUSE OF ACTION**
**BATTERY/SEXUAL BATTERY**

***Plaintiff Against Defendant Geever***

75.     Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs as if set forth here in full.

76.     In or around October 2010, Defendant Geever engaged in a course of unpermitted, harmful, and offensive bodily sexual contact upon the person of Plaintiff.

10

Case 1:24-cv-00031-BKS-PJE    Document 44-1    Filed 01/30/25    Page 17 of 100

77. Defendant Geever intended to commit an act of unwanted contact and/or caused imminent apprehension of such an act against Plaintiff. He did so by, *inter alia*:

    a. locking Plaintiff in his motel room and isolating her in close quarters;

    b. tackling and physically restraining Plaintiff on the bed;

    c. choking Plaintiff with his hands for his own sexual gratification;

    d. forcing oral sex on Plaintiff; and

    e. forcibly penetrating Plaintiff with his penis.

78. Plaintiff was 21 years old at the time of the sexual assault.

79. Plaintiff did not consent to the harmful bodily contact and made her lack of consent known repeatedly to Defendant Geever as he sexually assaulted her.

80. Defendant Geever's conduct constitutes a sexual offense as defined in Article 130 of New York Penal Law, including, but not limited to, the following: sexual misconduct (N.Y. Penal Law § 130.20); rape (N.Y. Penal Law §§ 130.25 – 130.35); forcible touching (N.Y. Penal Law § 130.52); and/or sexual abuse (N.Y. Penal Law §§ 130.55 – 130.65).

81. As a direct and proximate result of the foregoing, Plaintiff sustained physical, emotional, and psychological injuries, along with pain and suffering.

82. This action falls within the exceptions of Article 16 of the CPLR.

### THIRD CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### *Plaintiff Against Defendant Geever*

83. Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs as if set forth here in full.

84. Defendant Geever's conduct constitutes a sexual offense as defined in Article 130 of New York Penal Law, including, but not limited to, sexual misconduct (N.Y. Penal Law § 130.20); rape (N.Y. Penal Law §§ 130.25 – 130.35); forcible touching (N.Y. Penal Law § 130.52); and/or sexual abuse (N.Y. Penal Law §§ 130.55 – 130.65).

11

85.     The wrongful actions of Defendant Geever in sexually abusing Plaintiff were extreme and outrageous and should shock the conscience of the Court.

86.     Defendant Geever's outrageous conduct included, *inter alia*:

    a.  locking Plaintiff in his motel room and isolating her in close quarters;

    b.  tackling and physically restraining Plaintiff on the bed;

    c.  choking Plaintiff with his hands for his own sexual gratification;

    d.  forcing oral sex on Plaintiff;

    e.  ignoring Plaintiff's cries for him to stop; and

    f.  forcibly penetrating Plaintiff with his penis.

87.     Through his above-described abuse, Defendant Geever intentionally caused severe emotional distress to Plaintiff, or disregarded the substantial probability of causing severe emotional distress to Plaintiff.  Defendant Geever engaged in this conduct by using his position as a famous pro-feminist musician to sexually exploit and abuse Plaintiff.

88.     Defendant Geever knew that Plaintiff was going to be sexually assaulted when he invited her to his motel room when she was 21 years old.

89.     Defendant Geever's misconduct was so shocking and outrageous that it exceeded the reasonable bounds of decency as measured by what the average member of the community would tolerate and demonstrates an utter disregard by Defendant Geever of the consequences that would follow.

90.     Defendant Geever knew that his reckless, extreme, and outrageous conduct would inflict severe emotional and psychological distress, including personal physical injury, on Plaintiff.  Plaintiff, as a young adult, did in fact suffer severe emotional and psychological distress and personal physical injury, including severe mental anguish, humiliation, and emotional and physical distress.  Plaintiff's emotional distress continues to be severe.

12

91.     Defendant Geever's misconduct cannot be fairly described as merely negligent, but instead reflects outrageous behavior and an intentional or reckless indifference to the extreme distress that it would cause Plaintiff.

92.     Plaintiff should be awarded compensatory damages against Defendant Geever in an amount to be determined at trial, but no less than any required jurisdictional amount of this Court.

93.     Plaintiff's injuries were proximately caused by Defendant Geever's wrongful conduct, which arose from his malicious, evil, and sadistic motives.  Therefore, Plaintiff also seeks punitive damages for this cause of action in a sum to be determined at trial.

94.     This action falls within the exceptions to Article 16 of the CPLR.

## FOURTH CAUSE OF ACTION
## NEGLIGENCE

### *Plaintiff Against Defendant Hardwork and Defendant Doe 1*

95.     Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs as if set forth here in full.

96.     Defendant Geever's conduct constitutes a sexual offense as defined in Article 130 of New York Penal Law, including, but not limited to, sexual misconduct (N.Y. Penal Law § 130.20); rape (N.Y. Penal Law §§ 130.25 – 130.35); forcible touching (N.Y. Penal Law § 130.52); and/or sexual abuse (N.Y. Penal Law §§ 130.55 – 130.65).

97.     Prior to the sexual assault described above, Defendants Hardwork and Doe 1 knew or should have known that Defendant Geever habitually and routinely engaged in sexual misconduct with young women and underage girls throughout the country.

98.     Prior to the sexual assault described above, Defendants Hardwork and Doe 1 knew or should have known that Defendant Geever was a serial sexual predator and/or sexually assaulted children and women.

13

99.     Defendants Hardwork and Doe 1 owed Plaintiff a duty to protect her from harm because Defendant Geever's actions created a foreseeable risk of harm to Plaintiff.

100.     Defendants Hardwork and Doe 1 owed Plaintiff a duty because they were in a position to control Defendant Geever's access to young women and underage fans.

101.     Defendants Hardwork and Doe 1 owed Plaintiff a duty because they invited Plaintiff onto the premises and facilities they funded (performance venues, motel) and Defendant Geever posed a dangerous condition at these facilities.

102.     Defendants Hardwork and Doe 1 had a duty of reasonable care to enact policies and procedures to protect fans, such as Plaintiff, from sexual assault by performers and other persons in authority, such as Defendant Geever.

103.     Defendants Hardwork and Doe 1 knew or should have known that Defendant Geever had a history of grooming and assaulting female fans in motel rooms, as well as Defendant Geever's propensity generally of sexually assaulting women, before Defendant Geever sexually assaulted Plaintiff.

104.     Defendants Hardwork and Doe 1 knew or should have known that Defendant Geever used the power, influence, status, and facilities provided by Defendants to access and sexually assault women.

105.     Plaintiff met Defendant Geever at multiple live performances, and after one performance, he engaged in the illegal, harmful, and offensive sexual assault of Plaintiff in a motel room.

106.     Defendants Hardwork and Doe 1 created a foreseeable risk of harm to Plaintiff. As a young woman who Defendant Geever targeted in the venues, facilities, and motel rooms provided by Defendants Hardwork and Doe 1, Plaintiff was a foreseeable victim.

107.     Defendants Hardwork and Doe 1 knew or should have known that the young women exposed to Defendant Geever were at risk of sexual assault by Defendant Geever.

Case 1:24-cv-00031-BKS-PJE    Document 44-1    Filed 01/30/25    Page 21 of 100

108.    Defendants Hardwork and Doe 1 knew or should have known, and had the opportunity to learn of, the intentional and malicious conduct of Defendant Geever, and thereby ratified and joined in said conduct by failing to terminate, bar, disinvite, publicly admonish, or discipline Defendant Geever and/or by failing to warn anyone of Defendant Geever's known behaviors and/or preventing contact between Defendant Geever and female fans.

109.    Rather than take any action to keep Plaintiff and individuals in her position safe, Defendants Hardwork and Doe 1 promoted and financially benefitted from Defendant Geever's predatory and violent character.

110.    Defendants Hardwork and Doe 1 breached their duties to Plaintiff.  Defendants' failures include, but are not limited to, failure to protect Plaintiff from a known danger, failure to warn Plaintiff of the risk Defendant Geever posed, and failure to take reasonable measures in light of what they knew or should have known.

111.    Defendants Hardwork and Doe 1 breached their duties to Plaintiff by providing, arranging, promoting, and permitting Defendant Geever to use his performances as the lead singer of Anti-Flag as a means to access, groom, and sexually assault young women and girls.

112.    By failing to address Defendant Geever's sexual assaults of women, Defendants Hardwork and Doe 1 permitted, approved, encouraged, and/or ratified Defendant Geever's sexual assault of Plaintiff.

113.    As a direct and proximate result of the foregoing acts of negligence, Plaintiff sustained physical, emotional, and psychological injuries, along with pain and suffering.

114.    This action falls within the exceptions to Article 16 of the CPLR.

### FIFTH CAUSE OF ACTION
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

***Plaintiff Against Defendant Hardwork and Defendant Doe 1***

115.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs as if set forth here in full.

Case 1:24-cv-00031-BKS-PJE    Document 44-1    Filed 01/30/25    Page 22 of 100

116.    Defendant Geever's conduct constitutes a sexual offense as defined in Article 130 of New York Penal Law, including, but not limited to, sexual misconduct (N.Y. Penal Law § 130.20); rape (N.Y. Penal Law §§ 130.25 – 130.35); forcible touching (N.Y. Penal Law § 130.52); and/or sexual abuse (N.Y. Penal Law §§ 130.55 – 130.65).

117.    As alleged herein, Defendants Hardwork and Doe 1 owed Plaintiff a duty which they breached.

118.    Defendants' breach unreasonably endangered Plaintiff's physical safety and/or caused Plaintiff to fear for her own safety.

119.    Defendants knew or should have known that Defendant Geever would sexually assault and/or rape Plaintiff.  Defendants' conduct was outrageous and extreme.

120.    The breach of Defendants' duty of care resulted in physical and emotional harm.

121.    As a direct and proximate result of the foregoing acts of negligence, Plaintiff sustained physical, emotional, and psychological injuries, along with pain and suffering.

122.    This action falls within the exceptions to Article 16 of the CPLR.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief against Defendants:

1.    for past, present, and future general damages in an amount to be determined at trial;

2.    for past, present, and future special damages, including but not limited to past, present and future lost earnings, economic damages, and others in an amount to be determined at trial;

3.    any appropriate statutory damages;

4.    for interest as allowed by law;

5.    for civil penalties as provided by law;

16

6.      an Order enjoining Defendant from future unlawful business practices including, but not limited to, exposing minors and vulnerable adults to sexual abuse and exploitation;

7.      for any applicable costs of said suit;

8.      for reasonable attorneys' fees;

9.      for any appropriate punitive of exemplary damages; and

10.     for such other and further relief as the Court may deem proper.

The amount of damages sought in this Complaint exceeds the jurisdictional limits of all lower courts, which would otherwise have jurisdiction.

### JURY DEMAND

Plaintiff respectfully hereby demand a trial by jury of all issues so triable.

Dated: November 22, 2023

Respectfully submitted,

**MCALLISTER OLIVARIUS**
Dr Ann Olivarius KC (Hon) OBE
Dr John F.O McAllister
641 Lexington Avenue, 13th Floor
New York, NY 10022
(212) 433-3456
aolivarius@mcolaw.com
jmcallister@mcolaw.com

-and-

**KBM LAW**
Karen Barth Menzies (*pro hac vice* to be filed)
6701 Center Drive West, 1400
Los Angeles, CA 90045
(310) 363-0030
kbm@kbmlaw.com

*Attorneys for Plaintiff*

# EXHIBIT B

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of New York

| | |
|---|---|
| Kristina Sarhadi<br><br>_____<br>*Plaintiff(s)*<br>v.<br>Justin Cathal Geever a/k/a Justin Sane, Hardwork<br>Distribution, Inc., and Doe 1,<br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.   1:24-CV-31 (GLS/CFH)

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Justin Cathal Geever a/k/a Justin Sane,
8036 Thompson Run Road
Pittsburgh, PA 15237

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Dr. John F. O. McAllister
McAllister Olivarius
641 Lexington Avenue, 13th Floor
New York, NY 10022

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*Clerk of Court*

Date:   _____01/23/2024_____            _____s/ Zach Cortese, Deputy Clerk_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.   1:24-CV-31 (GLS/CFH)

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:


| Print | Save As... | | Reset |

# EXHIBIT C

# AFFIDAVIT OF SERVICE

| Case: 1:24-CV-31 (GLS/CFH) | Court: UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK | County: NORTHERN DISTRICT, NY | Job: 10299094 |
|---|---|---|---|
| **Plaintiff / Petitioner:** Kristina Sarhadi | | **Defendant / Respondent:** Justin Cathal Geever a/k/a Justin Sane, Hardwork Distribution, Inc., and Doe 1, | |
| **Received by:** One Source Process, LLC | | **For:** McAllister Olivarius | |
| **To be served upon:** Justin Cathal Geever a/k/a Justin Sane | | | |

I, Don Anderson , being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:**   Justin Cathal Geever a/k/a Justin Sane, 8036 Thompson Run Road, Pittsburgh, PA 15237

**Manner of Service:**   Posted, Jan 30, 2024, 1:25 pm EST

**Documents:**   SUMMONS IN A CIVIL ACTION; PROOF OF SERVICE; COMPLAINT AND DEMAND FOR JURY TRIAL; CIVIL COVER SHEET; CIVIL CASE ASSIGNMENT & FILING ORDER; CIVIL CASE MANAGEMENT PLAN; CONSENT TO THE EXERCISE; NOTICE, CONSENT, AND REFERENCE OF A CIVIL ACTION TO A MAGISTRATE JUDGE; NOTICE TO PARTIES OF COURT-DIRECTED; APPEARANCE OF COUNSEL (Received Jan 24, 2024 at 10:48am EST)

**Additional Comments:**

1) Unsuccessful Attempt: Jan 27, 2024, 6:07 pm EST at 8036 Thompson Run Road, Pittsburgh, PA 15237
No answer no lights.

2) Unsuccessful Attempt: Jan 29, 2024, 8:12 am EST at 8036 Thompson Run Road, Pittsburgh, PA 15237
No answer, no answer at neighbor, no car.

3) Successful Attempt: Jan 30, 2024, 1:25 pm EST at 8036 Thompson Run Road, Pittsburgh, PA 15237
Attempt made, No answer. Amazon package on this attempt. I posted the documents to the front door. Deponent also enclosed a copy of same, in a postpaid sealed wrapper bearing the legend "personal and confidential" and not indicating on the outside thereof, by return address or otherwise, that the communication is from an attorney or concerns an action against the person to be served, properly addressed to said defendant at defendant's last known address: 8036 Thompson Run Road, Pittsburgh, PA 15237 and depositing said wrapper in a United States Post Office or an official depository under the exclusive care and custody of the United States Post Office within the State of Pennsylvania.

_____          02-01-24
Don Anderson                          Date

One Source Process, LLC
800 668 5548

*Subscribed and sworn to before me by the affiant who is personally known to me.*

_____          02-01-2024
Notary Public                          Date

Commission Expires
Commonwealth of Pennsylvania - Notary Seal
John M. O'Shea, Notary Public
Allegheny County
My Commission Expires September 26, 2024
Commission Number 1265266

# EXHIBIT D

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KRISTINA SARHADI,<br><br>          Plaintiff,<br><br><br>    v.<br><br><br><br>JUSTIN CATHAL GEEVER a/k/a<br>JUSTIN SANE, HARDWORK<br>DISTRIBUTION, INC., and DOE 1,<br><br>          Defendants. | Civil Action No.: 1:24-CV-00031-BKS-CFH<br><br><br>**AFFIDAVIT OF SERVICE BY MAIL** |

STATE OF NEW YORK    )
                       )ss.:
COUNTY OF NEW YORK  )

      Anthony Munoz, being duly sworn, deposes and says: that deponent is not a party to the

within action, is over 18 years of age and is employed at RICOH-USA, INC., 640 Fifth Avenue,

9th Floor, New York, New York 10019-6102.

      That on February 26, 2024, I served via United States First Class Mail, true and correct

copies of the Defendant Hardwork Distribution, Inc's **Notice of Removal** (dated January 9,

2024)(Doc. No. 1), Defendant Hardwork Distribution, Inc's **Rule 7.1 Corporate Disclosure**

**Statement** (Doc. No. 3) and **Civil Cover Sheet** (Doc. No. 1-2), in the above-captioned action,

along with a copy of the **United States District Court for the Northern District of New York**

**General Order #25 Civil Case Assignment & Filing Order** (Doc. No. 4), upon the Plaintiff

1

KRISTINA SARHADI, via her attorneys, and upon Co-Defendant JUSTIN CATHAL GEEVER

a/k/a JUSTIN SANE, at the following addresses:

> Dr. John F. O McAllister
> McALLISTER OLIVARIUS
> 641 Lexington Avenue, 13th Floor
> New York, NY 10022
> *Attorneys for Plaintiff*

> Justin Cathal Geever
> 8036 Thompson Run Rd
> Pittsburgh, PA 15237
> *Defendant*

Anthony Muñoz

Sworn to before me this
26th day of February, 2024.

Notary Public
JONAH E. PERRY JR.
Notary Public, State of New York
No. 01PE5086103
Qualified in New York County
Commission Expires October 6, 20 25

2

# EXHIBIT E

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **KRISTINA SARHADI,** | Civil Action No. 1:24-cv-00031 (GLS/CFH) |
| Plaintiff, | |
| - against - | **FIRST AMENDED COMPLAINT and DEMAND FOR JURY TRIAL** |
| **JUSTIN CATHAL GEEVER a/k/a JUSTIN SANE**, and **HARDWORK DISTRIBUTION, INC.**, and **DOE 1** | |
| Defendants | |

Plaintiff Kristina Sarhadi ("Sarhadi"), by and through her undersigned attorneys, brings this action against Defendants Justin Cathal Geever a/k/a Justin Sane ("Geever") and Hardwork Distribution, Inc. ("Hardwork") (collectively "Defendants") and she alleges as follows:

### PRELIMINARY STATEMENT

1.      This First Amended Complaint is filed pursuant to New York's Adult Survivors Act ("ASA") and New York Civil Practice Law and Rules ("CPLR") section 214-j. The ASA introduced a historic one-year window for survivors of sexual abuse in the State of New York to pursue lapsed claims.

2.      Sarhadi timely brings her causes of action within the "retroactive revival window" of the ASA, which removes the previously applicable statute of limitations. Pursuant to the ASA, Defendants are liable for the intentional and negligent acts and omissions that resulted in the violent sexual assault of Sarhadi, which caused her serious psychological, physical, and emotional harm.

FIRST AMENDED COMPLAINT          -1-

## NATURE OF THE ACTION

3.      Plaintiff Kristina Sarhadi was sexually assaulted on October 1, 2010, by Defendant Justin Cathal Geever a/k/a Justin Sane, who, from its inception in or around 1988 until July 2023, was the lead singer and songwriter for the band Anti-Flag.

4.      When this lawsuit was originally filed on November 22, 2023, Geever was the President and owner of Hardwork, an organization composed solely of the members of the band, created to profit off the band's activities.

5.      Anti-Flag, and Hardwork as its extension, promoted social causes, such as feminism and anti-violence initiatives.  However, Anti-Flag's progressive brand served as a guise under which Geever, with the band's complicity, could groom, assault, and rape female fans.

6.      In October 2010, Geever lured Sarhadi back to his motel room to listen to a song he recorded with another well-known punk musician, then forced himself onto her, strangled her, forced her to perform oral sex on him, and raped her.

7.      This action alleges physical, psychological, and emotional injuries suffered as a result of conduct that would constitute a sexual offense as defined in Article 130 of the New York Penal Law, including, *inter alia*, forcible touching, criminal sexual acts, sexual abuse, and rape.  *See* Penal Law §§ 130.20 – 130.65.

8.      The conduct alleged herein would constitute a sexual offense as defined in Article 130 of the New York Penal Law in that, at all relevant times, the conduct lacked consent from Sarhadi.

9.      The conduct lacked consent from Sarhadi because the sexual offenses were accomplished using forcible compulsion, coercion, and intimidation, and Geever continued assaulting Sarhadi despite her repeatedly telling him to stop.

10.     Since the 1990s, Geever has engaged in a prolific pattern of targeting and then physically and sexually abusing young women and underage girls.  Geever continued this heinous behavior long after he assaulted Sarhadi in 2010.

11.     In July 2023, Sarhadi spoke about her experience on a podcast, alluding to Geever and Anti-Flag but not naming them.  As soon as the episode was released, Anti-Flag abruptly ended their European tour and broke up after 30 years.

12.     The band's view towards the trauma suffered by Sarhadi has oscillated over the last several months.  At first, the other members of Anti-Flag, Christopher Barker ("Barker"), Christopher Head ("Head"), and Patrick C. Bollinger ("Bollinger") denied witnessing Geever's predatory behavior.  They claimed they were proud to have been members of the band precisely because it had stood in favor of women's rights and progressive causes.

13.     After several other women publicly disclosed their violent and exploitative experiences with Geever, the band adjusted its tone and condemned their frontman.  The reversal may be related to the fact that the women, some of them underage girls at the time Geever assaulted them, publicly reported having spent many hours with the band on busses, in recording studios, and backstage, where the band members could not avoid seeing how Geever was intimate with these young fans.

14.     Though they are now criticizing Geever for misconduct that can no longer be credibly denied, Barker, Head, and Bollinger still claim to be surprised by the allegations, despite having known and spent almost three decades cheek by jowl with Geever touring around the country and the world.

15.     In fact, Anti-Flag's concerts served as Geever's own twisted playground to recruit serial conquests.  He would scan the front few rows to locate an attractive female fan, then point to her, lock eyes with her and sing directly to her periodically during the concert,

all to recruit his next sexual target. Once the show was over, and in front of the band, Geever would step down from the stage and assertively engage the girl or young woman. With some this would lead to consensual sex; with others, to underage or nonconsensual sex.

16. On information and belief, women approached the band members and told them directly about Geever's creepy and aggressive actions towards female fans. The band did nothing to curb their leader's misconduct, for fear of losing the fame, money, and status that flowed from being part of a famous punk band, all at the expense of the safety of girls and women they professed to extol. Given how the band instantly dissolved as soon as Sarhadi went public with her allegations, which did not even name Anti-Flag or Geever, it is likely the band had been fearing and preparing for exposure of Geever's sexual misconduct for years.

17. Since the podcast that featured Sarhadi, at least 12 additional women have come forward to accuse Geever publicly of using his power as a famous performer to groom, sexually assault, and rape female fans. While serving as the lead singer and creative force of Anti-Flag and Hardwork, Geever sexually assaulted many more women who have not spoken to the press but have spoken to other survivors. The assaults mimic the same pattern laid out above.

18. Hardwork was aware of Geever's practice of sexually assaulting young women and girls, and the company aided and abetted such behavior by, among other acts and omissions, allowing Geever to lead the band and perform at shows despite knowing that he used his fame and Anti-Flag's feminist stance to disguise that he was a sexual predator.

19. As of the filing of the original complaint in this lawsuit, the Pennsylvania Department of State listed Geever as President and owner of Defendant Hardwork, with the other band members serving as officers.

FIRST AMENDED COMPLAINT                    -4-

20. Other band members are or were officers of Hardwork as follows: Christopher Head, lead guitarist for Anti-Flag, is or was the Vice President; Christopher Barker a/k/a Chris No. 2, vocalist and bassist for the band, is or was the Secretary; and Patrick C. Bollinger a/k/a Pat Thetic, drummer for the band, is or was the Treasurer of the company.

21. On information and belief, the other band members and officers of Hardwork, while acting within the scope of their agency for the company, were put on notice of Geever's overt sexual misconduct prior to and after the assault of Sarhadi, and they were in a position to stop Geever from continuing to have access to young female fans. They did nothing to prevent Geever from sexually assaulting girls and women in the course of being an officer of Hardwork and as frontman for Anti-Flag, and Hardwork's failure to act in any reasonable way led to more assaults and more victims.

22. As a result of Geever's sexual assault, as well as Hardwork's negligent acts and omissions, Sarhadi has suffered, and continues to suffer, severe emotional, physical, and psychological distress, including shame, guilt, economic loss of earning capacity, and emotional loss.

23. Since the filing of this lawsuit on November 22, 2023, the other band members and Geever have engaged in tactics to evade liability and responsibility for the harm they have caused multiple women, including Sarhadi. On information and belief, Barker, Head, and Bollinger have sought to isolate themselves from Geever and diminish their potential liability for his acts by buying him out of Hardwork and perhaps other jointly owned entities.

24. Despite being aware of the lawsuit, Geever has purposefully and unlawfully attempted to avoid service. His commercial lawyer, Michael Johnson of Kay Griffins Evans, PLLC, contacted Sarhadi's counsel on Geever's behalf to engage in settlement negotiations but has since gone silent. Johnson orally agreed to help serve Geever, but then refused to

provide Geever's contact information or whereabouts.  In the meantime, Sarhadi has effected proper service of the original pleading on Geever's last known address, where, on information and belief, Geever still resides.

25.     Moreover, on information and belief, Geever has unlawfully sought to hide his assets by transferring funds overseas to an Irish bank account.  Geever has an Irish passport, and, on information and belief, he plans to flee to Europe within the next few days.

26.     On information and belief, Mary Geever, Geever's sister and practicing attorney, has recently entered into a Power of Attorney representing Geever.  Sarhadi and her counsel reserve all rights to request that Mary Geever become authorized to accept service on Geever's behalf.

27.     Sarhadi brings this action to recover for the injuries she has endured because of the actions of Defendants and to decrease the chance that others suffer the abuse and physical and mental trauma she felt and continues to feel to this day.  She also brings this action on behalf of the many women and girls who have been hurt by Geever's behavior and by Anti-Flag's betrayal of its message, and for those survivors who may not have the capacity to seek legal recourse.

## **PARTIES**

28.     Plaintiff Kristina Sarhadi is an adult woman and, at all relevant times, was a citizen of the United States and a resident of the state of New York.  Sarhadi currently resides in Ulster County, New York.

29.     At all times relevant to the wrongful conduct set forth herein, Sarhadi was over the age of 18.

30.     On information and belief, Defendant Justin Cathal Geever is an adult man and, at all relevant times, was a citizen of the United States and a resident of Allegheny County, Pittsburgh, Pennsylvania.

31.     Geever is or was the lead guitarist, singer, and songwriter for a well-known punk rock band with left-wing political views called Anti-Flag from 1988 until July 2023, when the band disbanded.  At the time this lawsuit was originally filed, Geever was the registered President and owner of Hardwork.

32.     On information and belief, Defendant Hardwork Distribution, Inc., is a domestic business corporation incorporated in Pennsylvania and headquartered in Pittsburgh, Pennsylvania.  On information and belief, Hardwork was formed in 2003 by Geever and other members of Anti-Flag, including Barker, Head, and Bollinger.  On information and belief, at the time of filing the original lawsuit, Geever was the registered President and owner of Hardwork, and Barker, Head, and Bollinger served as the company's Secretary, Vice President, and Treasurer, respectively.

33.     Whenever reference is made to Hardwork, such reference includes that entity, its parent companies, subsidiaries, affiliates, predecessors, and successors.  In addition, whenever reference is made to any act, deed, or transaction of any entity, the allegation means that the entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

34.     The limitations of Article 16 of the CPLR do not apply because one or more of the exceptions set forth in CPLR § 1601 and/or § 1602 apply.

## JURISDICTION AND VENUE

35.     This Court has jurisdiction over Defendants pursuant to 28 U.S.C. § 1332 because there is complete diversity between the Plaintiff and Defendants, and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

36.     Venue for this action is proper in the Northern District of New York under 28 U.S.C. § 1441(a) because the Supreme Court of the State of New York, County of Ulster,

FIRST AMENDED COMPLAINT                    -7-

where this suit was originally filed, is located within this District. Ulster is the County in which Plaintiff currently resides and where a substantial part of the events giving rise to the claim occurred.

37.     Amending the original Complaint is proper under the Federal Rules of Civil Procedure, Rule 15(a)(1)(B), since no responsive pleading or motion has been filed in the case.

**FACTUAL ALLEGATIONS**

I.     **Creation of Anti-Flag and the band's feminist, anti-violence messaging**

38.     Sometime in 1988, Anti-Flag formed with Geever as the lead guitarist, singer, and songwriter. The band's "straight edge" platform was anti-drugs, anti-alcohol, and pro-feminism.

39.     Anti-Flag released and performed music that highlighted and advocated for a variety of progressive causes, from animal rights to curbing climate change.

40.     In or around 1988, and again in 1992, on information and belief, Bollinger joined the band as a drummer.

41.     In or around 1997, on information and belief, Head joined the band as a guitarist, bassist, and backup vocalist.

42.     In or around 1999, on information and belief, Barker joined the band as a bassist and co-lead on vocals.

43.     In 2005, Anti-Flag became a voice for women's rights when the band released a track titled, "Feminism is For Everybody" as part of a compilation album. Proceeds from the sale of the album went to Protect, a non-profit organization aimed at combating child abuse and exploitation.

44.     Two years later in 2007, the band released an EP titled, "A Benefit for Victims of Violent Crime."

FIRST AMENDED COMPLAINT          -8-

45.     Throughout the band's career, its frontman Geever backed criticisms of the punk scene as sexist and predatory towards young women.  In 2017, when it was reported that a protester had shown a sign to Dickies frontman Leonard Graves Phillips that read, "Teen girls deserve respect, not gross jokes from disgusting old men!  Punk shouldn't be predatory," Geever told the *Pittsburgh Post-Gazette* that he "share[d] their point of view." Geever claimed that "my point of view is that sexualizing women and calling them the c-word is not something that should be tolerated."

46.     Anti-Flag, including Geever and its other members, represented that feminism, and particularly safety for girls and women, were core tenets of its value system.  For decades, Geever, Barker, Head, and Bollinger created and maintained what was perceived as a safe space for young female fans who attended Anti-Flag's shows, followed them on tour, and purchased their merchandise.

47.     In or around 2003, Geever and the other band members founded Defendant Hardwork.  On information and belief, Hardwork and its agents have close involvement with Anti-Flag's tours and the recording of their albums, and Hardwork benefits financially from the band's activity.

## II.     Geever's concealed his abuse of women but it was certainly known to his bandmates

48.     On information and belief, from 2006 until October 2010 when Sarhadi was assaulted, Anti-Flag performed over 450 concerts, including headlining major shows and featuring on the yearly Vans Warped Tour.  From 1996 to 2023, the band recorded 13 studio albums.

49.     On information and belief, while touring, the band shared tour busses, green rooms, and stayed at the same hotels.  The band was frequently together in the recording studio.  The touring and recording equate to around at least a hundred thousand hours where Geever, Barker, Head, and Bollinger were in close proximity, all while Geever, regularly and

openly groomed and dated innumerable women, including underage ones, including sexual assaults such as Sarhadi's.

50.     Based on reliable press reports and information provided by women who have contacted Sarhadi so far, she believes that approximately 60 women had sex with Geever when they were underage and/or without consent.

51.     Some survivors who were underage at the time report spending time with Barker, Head, and Bollinger in the course of Geever's grooming, and report that Barker, Head, and Bollinger acted awkwardly around them because they were so clearly underage.

52.     On information and belief, Geever assaulted a 17-year-old girl after a show in or around 1996 or 1997.  A few years later, in or around 2000, the girl spoke with Barker while Anti-Flag was performing in the Vans Warped Tour.  She confronted Barker, told him about her experience, and asked him whether Geever was aggressive in the same way to other fans.  He responded by asking the girl not to make him answer, as he was just trying to play in Geever's band.

53.     At a 2002 release party in Pittsburgh celebrating the release of the "Iron City Punk" CD, a witness watched the members of Anti-Flag mingle outside the venue with clearly underage girls who appeared to the witness to be between 14 and 15 years old.  Geever and other band members were hugging and inappropriately kissing them.  The witness said he is surprised that all the band members are not facing allegations of underage sex similar to Geever's.

54.     In 2012, Anti-Flag played a show in Costa Rica.  After the show, several producers followed the band back to their hotel and witnessed Geever with a girl who was clearly underage.  Geever was not making any effort to hide this from anyone, including the other band members.  Troubled by this behavior, the local producers asked the girl if she had ID, and then told Geever they were going to send her home because she could not confirm

her age. Although Geever assured the producers that he would not contact the girl again, one found her waiting outside a restaurant, in a different location, where the band was to have dinner. From then on, any time the producers were approached about booking Anti-Flag in Costa Rica, they opposed it.

55. On at least one occasion, staff working on an Anti-Flag tour picked out an underage (appearing to be 14 years old) girl from the crowd to bring backstage to Geever while he was with the band. This occurred after Geever had interacted with the fan during the show. Venue staff, suspicious of what was happening, approached the girl, questioned her age, and led her back outside. The band's staff, called "roadies" asked her to stay and provided her with merchandise as bait.

56. Barker, Head and Bollinger may have disapproved of Geever's conduct with young women, or even if they did not, reasonably worried it posed a risk to the band and Hardwork, but they still repeatedly turned a blind eye. Their entire lives – income, fame, exciting lifestyle, future prospects – depended on keeping Geever happy so Anti-Flag could keep going.

57. Based on reports of survivors given to band members, the band members, as officers of Hardwork, not to mention the President and owner of Hardwork Geever—knew or should have known before Geever's assault of Sarhadi that he systematically targeted underage girls and young women for sometimes violent sex. The sheer scale of Geever's misconduct means that band members and Hardwork knew or should have known that he was a sexual predator.

### III. Sarhadi grows up listening to Anti-Flag

58. Beginning in 2000, Sarhadi started listening to Anti-Flag. She was 11 years old, and Geever was around 27.

59.     Anti-Flag attracted young female fans like Sarhadi by making them feel like they were in a like-minded, safe community.   These views, especially feminism, distinguished Anti-Flag from other punk rock bands.   Many of its fans, including Sarhadi, became deeply committed to the band because they identified with its unusual, counter-cultural message and looked up to its members as brave, exciting exemplars of a better way of organizing society.

60.     Anti-Flag was Sarhadi's favorite band, and she listened to their music throughout her teenage years and through college up until the assault in 2010.

61.     Sarhadi attended several Anti-Flag concerts and purchased and collected Anti-Flag merchandise.   Her 10-year diehard love of the band provided a direct financial benefit to Hardwork.

### IV.   Geever targets and assaults Sarhadi

62.     On September 22, 2010, after graduating from college, Sarhadi attended an Anti-Flag concert at a venue called the Bell House in Brooklyn, New York.

63.     Sarhadi watched from the front row.   As he had done many times previously with his targets, Geever locked eyes with Sarhadi and began singing to and winking at her.

64.     After the concert, and in front of the other band members, Geever jumped off the stage, hugged Sarhadi, and asked for her name and where she was from.

65.     Geever was flirtatious toward Sarhadi; she did not reciprocate because she had a long-time boyfriend.   She told Geever about him in this first conversation and each one thereafter.   Sarhadi made it clear to Geever that she was in a committed relationship and not romantically interested in him.

66.     That night Geever invited Sarhadi to a film festival where he planned to perform the following week, and to attend the festival's screening of the film "Sounds Like a Revolution" that featured the band.   Geever's performance was scheduled after the screening.

FIRST AMENDED COMPLAINT            -12-

67.     As a loyal fan of Anti-Flag and trusting in Geever's strong feminist stance, Sarhadi felt safe in his presence and agreed to meet him at the festival.

68.     Sarhadi also knew that Geever had a serious girlfriend who, on information and belief, may have been his fiancée, which further diffused any concerns she might have about his intentions.  Plus, he was almost twice her age.

69.     On October 1, 2010, Sarhadi arrived at the film festival at the Rosendale Theatre in Rosendale, New York.

70.     Sarhadi waited for Geever to let her in at the gate as he had promised, but he never showed up, and Sarhadi missed the screening.

71.     Sarhadi did, however, meet Geever after the screening, and together, they traveled to the Bearsville Theater in Woodstock, New York, where Geever did a solo acoustic performance. She once again sat in the front row.

72.     Afterwards, Geever asked Sarhadi to accompany him to the afterparty, which was in a private house nearby.

73.     Sarhadi drove, and once in her grandfather's Buick, Geever began showering her with compliments.  Sarhadi made it clear once again that she had a boyfriend and was in a committed relationship.

74.     They talked about music and concerts, and Sarhadi thought they were developing a friendship.  Geever also mentioned the death of his nephew and his partner cheating on him and moving to London, which garnered Sarhadi's sympathy.

75.     Once they arrived at the house party, Geever paraded Sarhadi around as one of his fans, prompting her to praise him as a rock star.  After he worked the room clearly reveling in the adulation he sought, she became bored and annoyed with his aggressive self-regard and went outside to talk to others.

76.     When the party was over and Sarhadi was ready to leave, Geever mentioned that he had recorded a song with Billy Bragg, another famous singer, and wanted her to be the first to hear it.

77.     Geever told Sarhadi that the song was on his laptop at his motel.  Sarhadi agreed to go with him to his motel, The Lodge, to hear the song.

78.     On the way to the motel, Geever turned emotional again while talking about his dead nephew and cheating partner.

79.     Geever told Sarhadi that they should stop at a bar and drink together, despite his and Anti-Flag's pro-sobriety messaging.  At the time, Sarhadi had been "straight edge," meaning she did not drink alcohol or do drugs.  Geever acknowledged their mutual "straight edge" stance, but he suggested they should "break edge" that night, since they were each dealing with unfortunate personal circumstances.  Sarhadi had told him that her long-time boyfriend was studying abroad in Brazil, and she missed him.

80.     His motel had a bar, and when they got there Geever ordered beers and pickleback shots for both of them.

81.     Geever continued drinking and dancing in the bar while Sarhadi waited patiently to listen to the song recorded with Billy Bragg.

82.     At some point in the night, Geever and Sarhadi walked to Geever's motel room to listen to the song.

83.     While in Geever's room, Sarhadi observed that it was tiny, had wooden bunk beds, white floors, and a dresser.  Sarhadi noticed that Geever's laptop bag was on the dresser and remembered that he had told her the song was on his laptop.

84.     Sarhadi turned to Geever and was surprised to see that he was closing the curtains and locking the door.

FIRST AMENDED COMPLAINT              -14-

85.     As Sarhadi looked back at the laptop bag and waited to hear the song, Geever screamed, "Football Tackle!" and suddenly tackled her from behind onto the bed.

86.     Sarhadi thought Geever was playing around, but then saw his face and his expressions change.  He had a strange, scary look, as if he had turned into a different person.

87.     Geever began restraining and strangling Sarhadi, and he forced her to perform oral sex on him.

88.     When Sarhadi could breathe, she repeatedly pleaded with him to stop.

89.     She was shocked and crying.  He was mean and violent with Sarhadi; she did not matter and was just an object for him to dominate.

90.     Geever penetrated Sarhadi's vagina with his penis.  Sarhadi did not consent.

91.     When Geever finished with Sarhadi, he passed out on top of her.

92.     Sarhadi was then able to escape Geever's motel room without waking him.

**V.      Sarhadi discloses the incident, Anti-Flag disbands, and other women come forward**

93.     On July 19, 2023, Sarhadi discussed the assault on a podcast titled, "enough." Sarhadi did not name Anti-Flag or Geever, but gave the details of that night and how she was betrayed by the "anti-rape" lead singer of a political punk band.

94.     That same day, Anti-Flag, who were in the middle of a European tour, posted an update on their Patreon account announcing the band was dissolving.  They immediately took down their website and deleted the band's social media accounts without any explanation.

95.     A week later, Geever posted on his Instagram account categorically denying that he was the person Sarhadi had described.  The post included a message from band members (and officers of Hardwork) Barker, Head, and Bollinger.  They denied ever witnessing Geever engage in predatory behavior towards women and stated that "[i]t was a privilege for us to be in the band Anti-Flag."

96.     It was not until September that the other band members changed their approach and condemned Geever's conduct.  This was in the wake of an article in *Rolling Stone* that highlighted Sarhadi's experience, as well as the stories of 12 other women Geever had mistreated.  Three of the women in the *Rolling Stone* article said they were underage or just beyond when hanging around the band, but the band members professed not to know anything about what they now called Geever's "very sick" behavior of preying on young women.  Although the band members had been close with Geever since the mid-to-late 1990s, they now claimed that he had "deceived" them.

97.     Any sexual encounter between Geever and an underage girl lacks consent and, accordingly, is deemed rape.  This rape is a form of sexual violence.

98.     Despite prior knowledge, Hardwork allowed Geever to lead Anti-Flag, thereby enabling his access to female fans.  Had Hardwork, or Barker, Head, or Bollinger, attempted to address Geever's behavior in any way, they possibly could have prevented the foreseeable harm to Sarhadi.  Geever used Anti-Flag's shows, and their banner of feminism, as part of his modus operandi to attract, groom, and assault girls.  Hardwork, comprising the band and indistinguishable from it, had a duty to act reasonably to prevent this abuse.

99.     Hardwork failed to reasonably implement any measures to protect female fans from Geever, including but not limited to, warning concertgoers of his pattern of behavior or reporting the assaults to law enforcement.  Hardwork's failure directly and proximately caused harm to Sarhadi.

## PLAINTIFF'S DAMAGES

100.     In addition to the damages mentioned above, as a direct and proximate result of Defendants' tortious acts and omissions, Sarhadi suffered, continues to suffer, and will suffer in the future, psychological injuries, including but not limited to, low self-esteem, anxiety, panic attacks, post-traumatic stress disorder, eating disorders, stress, insomnia,

nightmares, depression, suicidality, shame, disassociation, intimacy issues, fear, and trust issues. Sarhadi has been diagnosed with and treated for, *inter alia*, C-PTSD, clinical depression, ADHD resulting from trauma, emotional hyperarousal, and rejection sensitivity dysphoria. All these injuries caused and will cause Sarhadi noneconomic damages. Sarhadi also suffered and continues to suffer economic damages in the form of loss of past and future income and costs of medical and mental health treatment.

101. Defendants acted with an outrageous indifference to a highly unreasonable risk of harm and with a conscious indifference to the health, safety, and welfare of Sarhadi. Therefore, Sarhadi is entitled to punitive damages against Defendants.

**FIRST CAUSE OF ACTION**

**ASSAULT**

***Sarhadi Against Geever***

102. Sarhadi incorporates and realleges each and every allegation set forth in the preceding paragraphs as if set forth here in full.

103. Geever's conduct constitutes a sexual offense as defined in Article 130 of New York Penal Law, including, but not limited to, the following: sexual misconduct (N.Y. Penal Law § 130.20); rape (N.Y. Penal Law §§ 130.25 – 130.35); forcible touching (N.Y. Penal Law § 130.52); and/or sexual abuse (N.Y. Penal Law §§ 130.55 – 130.65).

104. Geever's predatory, abusive, and manipulative behavior, as well as his unlawful touching, acts, and conduct against Sarhadi created a reasonable apprehension in her of harmful or offensive contact as to her person, all of which was done intentionally by Geever to Sarhadi without her consent.

105. When Sarhadi was alone with Geever in his small motel room, Geever's physical conduct placed Sarhadi in imminent apprehension of harmful and offensive contact.

106. Sarhadi did not consent to Geever's harmful and offensive contact, and she made her lack of consent known when she could.

107. Geever knew that these acts and his conduct would cause Sarhadi to apprehend harmful or offensive contact, and Sarhadi reasonably apprehended that harmful or offensive contact would occur.

108. Geever was capable of carrying out the attempted conduct and did carry out the rape of Sarhadi.

109. As a direct and proximate result of the above-described conduct, Sarhadi has suffered, and will continue to suffer, great pain of mind and body, shock, emotional distress, discomfort, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life. She was prevented, and will continue to be prevented, from performing daily activities and obtaining the full enjoyment of life. She has sustained, and will continue to sustain, loss of earnings and earning capacity. She has incurred, and will continue to incur, expenses for medical and psychological treatment, therapy, and counselling.

110. Sarhadi is therefore entitled to monetary relief, in the form of compensatory damages, to remedy the severe emotional distress suffered as a result of Geever's intentional and outrageous conduct.

111. Geever's conduct was intentional, extreme, and outrageous, entitling Sarhadi to an award of punitive damages.

112. This action falls within the exceptions of Article 16 of the CPLR.

## **SECOND CAUSE OF ACTION**

## **BATTERY/SEXUAL BATTERY**

### *Sarhadi Against Geever*

FIRST AMENDED COMPLAINT             -18-

113.    Sarhadi incorporates and realleges each and every allegation set forth in the preceding paragraphs as if set forth here in full.

114.    In or around October 2010, Geever engaged in a course of unpermitted, harmful, and offensive bodily sexual contact upon the person of Sarhadi.

115.    Geever intended to commit an act of unwanted contact and/or caused imminent apprehension of such an act against Sarhadi.  He did so by, *inter alia*:

      a.  locking her in his motel room and isolating her in close quarters;

      b.  tackling and physically restraining her on the bed;

      c.  choking her with his hands for his own sexual gratification;

      d.  forcing oral sex on her; and

      e.  forcibly penetrating her with his penis.

116.    Sarhadi was 21 years old at the time of the sexual assault.

117.    Sarhadi did not consent to the harmful bodily contact and made her lack of consent known repeatedly to Geever as he sexually assaulted her.

118.    Geever's conduct constitutes a sexual offense as defined in Article 130 of New York Penal Law, including, but not limited to, the following: sexual misconduct (N.Y. Penal Law § 130.20); rape (N.Y. Penal Law §§ 130.25 – 130.35); forcible touching (N.Y. Penal Law § 130.52); and/or sexual abuse (N.Y. Penal Law §§ 130.55 – 130.65).

119.    As a direct and proximate result of the foregoing, Sarhadi sustained physical, emotional, and psychological injuries, along with pain and suffering.

120.    This action falls within the exceptions of Article 16 of the CPLR.

## THIRD CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### *Sarhadi Against Geever*

121.    Sarhadi incorporates and realleges each and every allegation set forth in the preceding paragraphs as if set forth here in full.

122.    Geever's conduct constitutes a sexual offense as defined in Article 130 of New York Penal Law, including, but not limited to, sexual misconduct (N.Y. Penal Law § 130.20); rape (N.Y. Penal Law §§ 130.25 – 130.35); forcible touching (N.Y. Penal Law § 130.52); and/or sexual abuse (N.Y. Penal Law §§ 130.55 – 130.65).

123.    The wrongful actions of Geever in sexually abusing Sarhadi were extreme and outrageous and should shock the conscience of the Court.

124.    Geever's outrageous conduct towards Sarhadi included, *inter alia*:

   a.   locking her in his motel room and isolating her in close quarters;

   b.   tackling and physically restraining her on the bed;

   c.   choking her with his hands for his own sexual gratification;

   d.   forcing oral sex on her;

   e.   ignoring her cries for him to stop; and

   f.   forcibly penetrating her with his penis.

125.    Through his above-described abuse, Geever intentionally caused severe emotional distress to Sarhadi, or disregarded the substantial probability of causing severe emotional distress to Sarhadi.  Geever engaged in this conduct by using his position as a famous pro-feminist musician to sexually exploit and abuse Sarhadi.

126.    Geever knew that he was going to sexually assault Sarhadi when he invited her to his motel room when she was 21 years old.

FIRST AMENDED COMPLAINT                -20-

127.    Geever's misconduct was so shocking and outrageous that it exceeded the reasonable bounds of decency as measured by what the average member of the community would tolerate and demonstrates an utter disregard by Geever of the consequences that would follow.

128.    Geever knew that his reckless, extreme, and outrageous conduct would inflict severe emotional and psychological distress, including personal physical injury, on Sarhadi. Sarhadi, as a young adult, did in fact suffer severe emotional and psychological distress and personal physical injury, including severe mental anguish, humiliation, and emotional and physical distress.  Sarhadi's emotional distress continues to be severe.

129.    Geever's misconduct cannot be fairly described as merely negligent, but instead reflects outrageous behavior and an intentional or reckless indifference to the extreme distress that it would cause Sarhadi.

130.    Sarhadi should be awarded compensatory damages against Geever in an amount to be determined at trial, but no less than any required jurisdictional amount of this Court.

131.    Sarhadi's injuries were proximately caused by Geever's wrongful conduct, which arose from his malicious, evil, and sadistic motives.  Therefore, Sarhadi also seeks punitive damages for this cause of action in a sum to be determined at trial.

132.    This action falls within the exceptions to Article 16 of the CPLR.

## FOURTH CAUSE OF ACTION

## NEGLIGENCE

### *Sarhadi Against Hardwork*

133.    Sarhadi incorporates and realleges each and every allegation set forth in the preceding paragraphs as if set forth here in full.

134. Geever's conduct constitutes a sexual offense as defined in Article 130 of New York Penal Law, including, but not limited to, sexual misconduct (N.Y. Penal Law § 130.20); rape (N.Y. Penal Law §§ 130.25 – 130.35); forcible touching (N.Y. Penal Law § 130.52); and/or sexual abuse (N.Y. Penal Law §§ 130.55 – 130.65).

135. Prior to the sexual assault described above, Hardwork knew or should have known that Geever habitually and routinely engaged in sexual misconduct with young women and underage girls throughout the country and internationally.

136. Prior to the sexual assault described above, Hardwork knew or should have known that Geever was a serial sexual predator and/or sexually assaulted children and women.

137. Hardwork, comprised of Geever, Barker, Head, and Bollinger, owed Sarhadi a duty to protect her from harm because Geever's actions created a foreseeable risk of harm to Sarhadi.

138. Hardwork owed Sarhadi a duty because it was in a position to control Geever's access to young women and underage fans.

139. Hardwork owed Sarhadi a duty because it invited Sarhadi onto the premises and facilities that, on information and belief, Hardwork directly or indirectly funded (performance venues, motel), and Geever posed a dangerous condition at these facilities.

140. Hardwork had a duty of reasonable care to enact policies and procedures to protect fans, such as Sarhadi, from sexual assault by performers and other persons in authority, such as Geever.

141. Hardwork knew or should have known that Geever had a history of grooming and assaulting female fans in motel rooms, as well as Geever's propensity generally of sexually assaulting women, before Geever sexually assaulted Sarhadi.

FIRST AMENDED COMPLAINT             -22-

142. Hardwork knew or should have known that Geever used power, influence, status, and facilities provided by Hardwork to access and sexually assault women.

143. Sarhadi met Geever at multiple live performances, wherein Geever represented Hardwork. After one performance, he engaged in the illegal, harmful, and offensive sexual assault of Sarhadi in a motel room.

144. Hardwork created a foreseeable risk of harm to Sarhadi. As a young woman who Geever targeted in the venues, facilities, and motel rooms provided by Hardwork, Sarhadi was a foreseeable victim.

145. Hardwork knew or should have known that the young women exposed to Geever were at risk of sexual assault by him.

146. Hardwork knew or should have known, and had the opportunity to learn of, the intentional and malicious conduct of Geever, and thereby ratified and joined in said conduct by failing to terminate, bar, disinvite, publicly admonish, or discipline Geever and/or by failing to warn anyone of Geever's known behaviors and/or preventing contact between Geever and female fans.

147. Rather than take any action to keep Sarhadi and women in her position safe, Hardwork ignored and financially benefitted from Geever's predatory and violent character.

148. Hardwork breached its duty to Sarhadi. Hardwork's failures include, but are not limited to, failure to protect Sarhadi from a known danger, failure to warn Sarhadi of the risk Geever posed, and failure to take reasonable measures in light of what Hardwork knew or should have known.

149. Hardwork breached its duty to Plaintiff by providing, arranging, promoting, and permitting Geever to use his performances as the lead singer of Anti-Flag as a means to access, groom, and sexually assault young women and girls.

150.    By failing to address Geever's sexual assaults of women, Hardwork permitted, approved, encouraged, and/or ratified Geever's sexual assault of Sarhadi.

151.    As a direct and proximate result of the foregoing acts of negligence, Sarhadi sustained physical, emotional, and psychological injuries, along with pain and suffering.

152.    This action falls within the exceptions to Article 16 of the CPLR.

## FIFTH CAUSE OF ACTION

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### *Sarhadi Against Hardwork*

153.    Sarhadi incorporates and realleges each and every allegation set forth in the preceding paragraphs as if set forth here in full.

154.    Geever's conduct constitutes a sexual offense as defined in Article 130 of New York Penal Law, including, but not limited to, sexual misconduct (N.Y. Penal Law § 130.20); rape (N.Y. Penal Law §§ 130.25 – 130.35); forcible touching (N.Y. Penal Law § 130.52); and/or sexual abuse (N.Y. Penal Law §§ 130.55 – 130.65).

155.    As alleged herein, Hardwork owed Sarhadi a duty, which it breached.

156.    Hardwork's breach unreasonably endangered Sarhadi's physical safety and/or caused Sarhadi to fear for her own safety.

157.    Hardwork knew or should have known that Geever would sexually assault and/or rape Sarhadi.  Hardwork's failure to implement any prevention measures amounts to outrageous and extreme conduct.

158.    The breach of Hardwork's duty of care resulted in physical and emotional harm to Sarhadi.

159.    As a direct and proximate result of the foregoing acts of negligence, Sarhadi sustained physical, emotional, and psychological injuries, along with pain and suffering.

160.    This action falls within the exceptions to Article 16 of the CPLR.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief against Defendants:

1.      for past, present, and future general damages in an amount to be determined at trial;

2.      for past, present, and future special damages, including but not limited to past, present and future lost earnings, economic damages, and others in an amount to be determined at trial;

3.      any appropriate statutory damages;

4.      for interest as allowed by law;

5.      for civil penalties as provided by law;

6.      an Order enjoining Defendants from future unlawful business practices including, but not limited to, exposing minors and vulnerable adults to sexual abuse and exploitation;

7.      for any applicable costs of this suit;

8.      for reasonable attorneys' fees;

9.      for any appropriate punitive of exemplary damages; and

10.     for such other and further relief as the Court may deem proper.

**DEMAND FOR JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and LR 38.1, Plaintiff respectfully hereby demand a trial by jury of all issues so triable.

Dated: March 14, 2024

Respectfully submitted,

FIRST AMENDED COMPLAINT                -25-

**MCALLISTER OLIVARIUS**
Dr John F.O McAllister
641 Lexington Avenue, 13th Floor
New York, NY 10022
(212) 433-3456
jmcallister@mcolaw.com

*Attorney for Plaintiff*

# EXHIBIT F

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF NEW YORK

**KRISTINA SARHADI,**

          Plaintiff,

  - against -

**JUSTIN CATHAL GEEVER a/k/a JUSTIN SANE**, and **HARDWORK DISTRIBUTION**, **INC.,** and **DOE 1**,

          Defendants

Civil Action No. 1:24-cv-00031 (GLS/CFH)

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2024, I electronically filed Plaintiff's Amended Complaint with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to Hardwork Distribution, Inc. In addition, I hereby certify that on March 15, 2024, a true and correct copy of Plaintiff's Amended Complaint and Notice of Voluntary Dismissal as to Claims against Doe 1 was served upon Justin Cathal Geever a/k/a Justin Sane by posting the same on the door of his property at 8036 Thompson Run Road, Pittsburgh, PA 15237. This was followed up by mail delivery to the same address on March 19, 2024.

Dated: March 19, 2024

Respectfully submitted,

**MCALLISTER OLIVARIUS**
Dr John F.O. McAllister
641 Lexington Avenue, 13th Floor
New York, NY 10022
(212) 433-3456

**-1-**

jmcallister@mcolaw.com

*Attorney for Plaintiff*

# EXHIBIT G

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

### CLERK'S CERTIFICATE OF ACTION TAKEN ON
### PLAINTIFF(S) REQUEST FOR ENTRY OF DEFAULT

---

Kristina Sarhadi

      vs.

                            CASE NUMBER: **1:24-cv-31 (BKS/CFH)**

Justin Cathal Geever, a/k/a Justin Sane,
Hardwork Distribution, Inc., and Doe 1,

---

      I, JOHN M. DOMURAD, CLERK, by Matthew Gerace, Deputy Clerk, certify that I have reviewed the Court's docket and have determined that proof of proper service for the party against whom judgment is being sought has been filed and that this party has not appeared in the action. Accordingly, entry of default is hereby noted and entered on this 23rd day of April, 2024 against Justin Cathal Geever.

Dated:       April 23, 2024    

                                         Clerk of Court

                                         By: s/ Matthew Gerace

                                         Deputy Clerk

# EXHIBIT H

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **KRISTINA SARHADI,** | |
| Plaintiff, | Civil Action No. 1:24-cv-00031(BKS/CFH) |
| - against - | **DECLARATION OF KRISTINA SARHADI IN SUPPORT OF PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT** |
| **JUSTIN CATHAL GEEVER a/k/a JUSTIN SANE**, and **HARDWORK DISTRIBUTION, INC.**, and **DOE 1** | |
| Defendants | |

I, Kristina Sarhadi, pursuant to 28 U.S.C. § 1746 hereby declare as follows:

1.      I am the Plaintiff in the above referenced matter.

2.      I am over the age of 18, am competent, and make this Declaration based upon my own personal knowledge.

3.      I began listening to Anti-Flag when I was 11 years old.  I was attracted to Anti-Flag's music because it and its lead singer, Defendant Justin Cathal Geever a/k/a Justin Sane ("Geever"), made me feel like I was in a like-minded, safe community.

4.      I was deeply committed to the band and its members because I identified with Anti-Flag's unusual, counter-cultural message and looked up to its members as brave, exciting exemplars of a better way of organizing society.  Geever and the band were vocal supporters of women and feminist causes.

5.      I attended several Anti-Flag concerts between 2000 and 2010 and purchased and collected Anti-Flag merchandise.

6.      On September 22, 2010, after graduating from college, I attended an Anti-Flag concert at the Bell House in Brooklyn, New York.  A true and correct copy of the ticket from this event is attached hereto as **Exhibit 1**.

1

7.    As I watched from the front row, Geever locked eyes with me and began singing to and winking at me. After the concert, Geever jumped off stage, hugged me, and asked me where I was from.  Geever was flirtatious towards me, but I did not reciprocate.  I told Geever that I was in a committed, long-term relationship with someone from Pittsburgh, a detail I was excited to share with him.  I had hoped that our shared knowledge of his hometown would be an easy talking point and would make it abundantly clear that I was not interested in anything romantic or sexual with him.

8.    Following the concert, Geever invited me to the Woodstock Film Festival (the "festival") the following week, showcasing "Sounds Like a Revolution" (the "film").  Geever, Anti-Flag, and their music were prominently featured in the film, with Geever receiving top billing.  As part of the film's festival participation, Geever had a scheduled acoustic performance following the screening.  A true and correct copy of the festival's press release identifying the film and Geever's participation is attached hereto as **Exhibit 2**.

9.    As a loyal, longtime fan of Anti-Flag and trusting of Geever's strong feminist stance, I felt safe and agreed to meet Geever at the festival.  I also knew that Geever had a fiancé which diffused any concerns I had about his intentions.  Plus, Geever was almost twice my age.

10.    On October 1, 2010, I arrived at the festival at the Rosendale Theatre in Rosendale, New York.  I texted Geever and waited for him to let me in, as he had promised a week earlier, but he never showed up and I missed the screening of the film.

11.    I eventually met Geever after the screening.  We relocated to the Bearsville Theater in Woodstock, New York where I watched Geever perform his acoustic set from the front row.  Videos of Geever's October 1, 2010 performance are available on YouTube.  *See* Woodstock Film Festival by SUNY New Paltz, *Justin Sane Performance at 2010 Woodstock Film Festival*, YouTube (Oct. 2, 2010); https://www.youtube.com/watch?v=ccjIFbh_4XU.

12.    Below is a photograph of Geever and I from October 1, 2010 in which he is wearing the same shirt as the video:



13.    During the performance, I met another Anti-Flag fan named Cindy.  Cindy, Geever, and I spent some time together after Geever's performance.  Geever and I discussed my then-boyfriend, John, who was living in Brazil.  I recall Geever eying Cindy and me, and I thought discussing my boyfriend would shift the focus.

14.    Geever asked me to accompany him to an afterparty at a nearby private residence.  I drove us to the party in my grandfather's Buick.  On the way, we stopped to drop Cindy off.  It was dark out, so I walked Cindy to the porch to make sure she was safely inside.  There, on Cindy's porch, Geever pulled me towards him and forcibly kissed me  I immediately pushed him away and reminded him of my boyfriend.

15.    During the drive, Geever showered me with compliments, telling me that I was the "nicest person" he's met this year.  I reminded Geever that I was in a committed relationship.  We talked about music and concerts, and I thought we were developing a

friendship.  Geever disclosed the death of his nephew to me and vented about his partner's infidelity.  I began to feel bad for him.

16.     At one point during the drive, Geever needed to use the restroom.  He directed me to pull over by some bushes in a parking lot so he could urinate outside.  When he returned to the car, Geever sat in the backseat and tried to convince me to join him.  I declined and tried to keep the mood lighthearted.  But I told him I was on my period in hopes of fully stopping his advances without hurting his feelings. Geever eventually got back into the front seat and we continued driving to the party.

17.     Geever mentioned that he had recorded a song with another famous artist, Billy Bragg, and wanted me to hear it.  I told Geever that I was a big fan of Bragg earlier in the evening.  I believe he used this to lure me into his room.  Geever told me that the song was on his laptop at his motel, The Lodge.  Geever told me that nobody in the world had heard the song before.  I agreed to drive Geever to the motel to hear the song but told him that I would give him two minutes because I was exhausted from working all day and wanted to go home.

18.     On the way to the motel, Geever turned emotional again while discussing his nephew and his partner.  He told me that we should stop at the motel bar and drink together. This was inconsistent with Anti-Flag and Geever's pro-sobriety message.  At the time, I was "straight edge," meaning I did not drink alcohol or do drugs.  Geever acknowledged our mutual "straight edge" stance, but he suggested we should "break edge" that night, since we were each dealing with unfortunate personal circumstances.  Geever proceeded to drink and dance around the bar while I waited to hear the song.

19.     I felt pressured by Geever to consume alcohol with him.  I ultimately agreed to have one beer and one pickleback shot.  I had never heard of a pickleback shot and had barely any experience with alcohol prior to October 1, 2010, but I trusted Geever.

20.     Geever and I eventually walked around the corner to his motel room to hear the song.  The room was small, had wooden bunk beds, wood floors, white walls, and a dresser.  I noticed Geever's laptop bag on the dresser.

21.     I was surprised to see Geever closing the room's curtains and locking the door.  As I approached the laptop bag on the dresser, excited to hear the unreleased song, Geever screamed "Football Tackle" and tackled me from behind onto the bed.  I initially thought Geever was playing around, but his face became scary, as if he was a different person.

22.     I resisted.  I attempted to squirm and kick to get away, but I was surprised at how strong he was.  I was in a state of shock right away since I did not know or understand what was happening.  I was crying but could not speak or scream since he was squeezing my throat.  His full body weight was on top of me and I could not breathe.  He forced me to perform oral sex on him.  When I could breathe, I begged him to stop.  Geever ignored my pleading and proceeded to violently rape me by inserting his penis in my vagina.

23.     The assault went on for a very long time.  I could not tell how much time was passing and lost consciousness at least once.  I thought I was going to die and that Geever was going to kill me.  I still see Geever's face in flashbacks and nightmares.

24.     I did not consent or otherwise agree to engage in any sexual acts with Geever.

25.     After the rape, Geever passed out on top of me.  I waited in terror for what felt like a long time and slowly slid out from beneath him.  I was afraid that if I woke him, I would have to endure another rape or that he would kill me.  Fortunately, I was able to escape Geever's motel room without waking him.

26.     I was in a state of shock immediately following Geever's sexual assault. I don't remember finding my car or driving home.  In the days and weeks following the sexual assault, I forced myself to stick to previously scheduled plans.  I was afraid to stay home and reflect on what had happened to me.  My attempt to distract myself failed.  I was in a fog while with

friends, replaying the night in my head and deeply regretting not going home.  I experienced extreme and all-consuming pain.

27.      Since Anti-Flag and punk music in general were a major part of my social and community life, I began to avoid friends and stopped going to concerts regularly.  When friends attempted to listen to "our favorite band" or talk about anything related to Anti-Flag, I would become distressed or shut down.  Over time, I detached from my friend groups, the "safe community" I had felt at home in, and became more depressed, angry, and ashamed.

28.      Following Geever's rape, I spent the next 14 years studying holistic healing modalities in an attempt to find peace.  In 2023, I discovered that another woman had been victimized by Geever.  Realizing that I was not alone, I decided to publicly tell my story.

29.      On July 19, 2023, I publicly discussed Geever's sexual assault on a podcast titled *enough*.  I did not name Anti-Flag or Geever but gave the details of the night and how I was betrayed by the "anti-rape" lead singer of a political punk band.  That same day, Anti-Flag and Geever announced that the band was dissolving.  Anti-Flag also took down its website and deleted their social media accounts.

30.      In September 2023, *Rolling Stone* published an article highlighting Geever's sexual assault and published the accounts of 12 other women who were assaulted or mistreated by Geever, three of whom were underage or just beyond when they had been hanging around Anti-Flag and Geever.[1]  Following my public account on the *enough* podcast and in *Rolling Stone*, several women reached out to me detailing similar distressing stories about being harmed by Geever.

---

[1] Cheyenne Roundtree, *Anti-Flag's Ex-Members Say 'F-ck You' to 'Very Sick' Justin Sane Amid Sexual Assault Accusations*, ROLLING STONE, Sept. 7, 2023, https://www.rollingstone.com/music/music-news/anti-flags-ex-members-speak-out-against-justin-sane-assault-accusations-1234818094/.

31.    Following the *Rolling Stone* piece, Geever's Anti-Flag bandmates condemned Geever's "very sick" behavior.[2]

32.    Geever's rape has been the subject of significant press attention in publications like *Rolling Stone*, *Pitchfork*, *MSN*, and *Yahoo News*.[3]  It has also been heavily discussed on Reddit and X (formerly, Twitter).

33.    Since disclosing Geever's vile actions, I have been attacked and ridiculed on social media by Geever's supporters.  I have also been harassed and lied about, which directly affected my professional reputation, my mental health, my sense of safety, and my ability to earn income.

34.    I have been contacted by unknown supporters of Geever via email, phone calls, text message, social media, international messaging apps, and my non-profit's contact form. I was even falsely accused of exploiting survivors of sexual assault because I created a non-profit organization after publicly disclosing Geever's rape.

35.    In 2024, my non-profit was scheduled to put on a free workshop at a festival in Montreal, Canada.  Shortly before the festival, I was contacted by the festival's director who advised me that someone had reached out attacking my character.  Despite correcting the false claims, the day before my colleagues and I were scheduled to go to Montreal, and after six months of planning, my non-profit's workshop was canceled.

36.    Geever's supporters have also harassed my friends, coworkers, employers, previous schools, attorneys, and other victims of sexual assault.

---

[2] Cheyenne Roundtree, *Anti-Flag's Ex-Members Say 'F-ck You' to 'Very Sick' Justin Sane Amid Sexual Assault Accusations*, ROLLING STONE, Sept. 7, 2023, https://www.rollingstone.com/music/music-news/anti-flags-ex-members-speak-out-against-justin-sane-assault-accusations-1234818094/.

[3] Cheyenne Roundtree, *Anti-Flag's Justin Sane Sued for Sexual Assault*, Rolling Stone, November 22, 2023, https://www.rollingstone.com/music/music-news/anti-flag-justin-sane-sued-sexual-assault-1234879770/;    Jazz Monroe.    *Anti-Flag's Justin Sane Sued for Raping Fan in 2010*, Pitchfork, November 23, 2023, https://pitchfork.com/news/anti-flags-justin-sane-sued-for-raping-fan-in-2010/; Chad Childers, Anti-Flag Band Members Cleared in Justin Sane Sexual Assault Case, MSN, January 3, 2025, https://www.msn.com/en-us/music/news/anti-flag-band-members-cleared-in-justin-sane-sexual-assault-case/ar-AA1wUG37?ocid=BingNewsVerp; August Billy, Justin Sane, Formerly of Anti-Flag, Sued for Rape, Yahoo Entertainment, November 26, 2023, https://shorturl.at/KZlzv.

37.    As a direct result of Geever's conduct, I sustained serious and permanent psychological, mental, and emotional injuries.

38.    My injuries include, but are not limited to, pain and suffering, low self-esteem, anxiety, panic attacks, post-traumatic stress disorder, disordered eating, stress, insomnia, night terrors, depression, suicidality, shame, disassociation, intimacy and trust issues, fear, embarrassment, mental anguish, and loss of enjoyment of life.

39.    I have been diagnosed with and treated for C-PTSD, clinical depression, Major Depressive Disorder, Anxiety Disorder, migraines, ADHD resulting from trauma, emotional hyperarousal, and rejection sensitivity dysphoria.

40.    Immediately following the assault, I was ashamed and afraid to discuss the assault with my primary care physician, ███████████████, FNP ("███████████").  I was afraid that I would not be believed or that my parents would find out.  Mostly, I was afraid that I'd be forced to confront the most traumatic experience of my life.  I could barely cope with thinking about the assault, and could not imagine disclosing it to a medical professional.  I also knew that if I acknowledged what had happened, I would need to take action to hold him accountable. For many years I was afraid of not being believed and worried that I would be ridiculed and attacked if I spoke out.

41.    I did, however, report my symptoms to ███████████.  I told her that I was in a consistent state of depression and was physically fatigued.  I also discussed my nightmares and appetite changes that led to weight fluctuation.

42.    From 2013 to 2016, I underwent treatment with Dr. ███████████, a clinical psychologist located in Kingston, New York.  As with ███████████, I was afraid to disclose that Geever had assaulted me.  During my sessions, Dr. ██████ and I focused on current life circumstances, maintaining healthy relationships, and unspecified past trauma.  Dr. ██████

explained that I displayed symptoms of post-traumatic stress disorder relating to my past trauma.

43.    In 2014, I began treatment with Dr. ███████████ at Stone Ridge Family Medicine.  I sensed that Dr. ██████ knew that I was not okay and in need of emotional, physical, and psychological support.  Dr. █████ diagnosed me with clinical depression and prescribed Prozac.

44.    On or around December 1, 2014, Dr. ██████ confirmed that I was pregnant.  I was deeply depressed, still coping with Geever's sexual assault and its impact on my emotions and behaviors.  I felt like my life had fallen apart.  I was in no state to raise a child when I couldn't even vocalize my own suffering or meet my own needs.  I could not fathom the possibility of the increased fear and anxiety many women associate with pregnancy.  I was unable to tolerate the idea of being touched by strangers and being subjected to regular gynecological examinations after Geever raped me.  My partner and I made the decision to medically terminate the pregnancy with extreme sadness.  After the physical and emotional trauma of the process itself, I spent many weeks crying and mourning the loss of what could have been.  This may have been my only chance to become a mother, something I had desired my entire life.  Geever stole this opportunity from me.

45.    In 2018, I began treatment with Dr. █████████ at ███████████████ for increasing depression and emotional dysregulation.  Dr. ██████ suspected that my depression was a response to severe chronic stress and that my adrenal and hormonal symptoms were being adversely affected.  I underwent lab work which revealed chronic high levels of cortisol and cholesterol (despite the fact that I did not consume dietary cholesterol).  I eventually mustered up the courage to disclose Geever's rape to Dr. ██████.  She recommended various natural remedies for grief, anxiety, night terrors, mood swings, flashbacks, nausea, low libido, and fatigue.

46.    Contemporaneously with Dr. ███████, I treated with Dr. ████████████ at Nuvance (formerly, Maverick Family Health and Healthquest), after Dr. ██████ retired. Dr. ██████ continued to monitor my depression symptoms and increased my dosage of Prozac to 80 MG. Dr.██████ left Nuvance in 2021. I briefly treated with Dr. ███████ before transferring to a new primary care physician. During our initial appointment, Dr. ██████ prescribed Pristiq (Desvenlafaxine) for my symptoms of depression and suicidality.

47.    On September 7, 2021, I began seeing Dr. ████████████ at Drs. ████████ Family Medicine in Kingston, New York. I disclosed Geever's rape to Dr. ████████. I was diagnosed with Major Depressive Disorder and ADHD. Dr. ██████ remains my primary care physician. She has prescribed Pristiq (100 MG daily for Major Depressive Disorder) and Concerta (54 MG daily for symptoms of ADHD secondary to trauma).

48.    From 2023 to 2024, I treated with █████████████, LMFT ("████████"). I disclosed Geever's rape to █████████. My treatment with █████████ focused on regulating my emotions, lack of motivation or pleasure in life, bouts of crying and rage, escalating anger, chronic stress, and distrust of men.

49.    My damages are not limited to the diagnoses discussed above. My entire life changed following Geever's rape.

50.    Prior to the sexual assault, I was considered a Type A personality and organized in all areas of life. I lived a healthy lifestyle and was strict about my diet. I was secure and confident in myself and was outgoing with a large friend group. I considered myself to be resourceful, positive, and a community builder. I trusted others. I was always laughing and considered myself creative and ambitious. I desired to build a stable life for myself and was excited to one day start a family. Professionally, I exhibited leadership qualities and was commended by supervisors for my work ethic. I was able to work multiple jobs and complete multiple tasks simultaneously with little effort. I received praise for the quality of my work,

my communication skills, my ability to stay calm during conflict or crisis, and my strong set of values.

51.     After Geever's rape, I was a different person.  I have felt and continue to feel extreme sadness, anger, embarrassment, loneliness, and hopelessness most of the time.  I have become withdrawn, anti-social, hypervigilant, and distrustful of others to the point of paranoia.  I have difficulty coping with other people's anger or stress, yelling, or crying.  I find it difficult to express myself without being emotionally overwhelmed.  I am disorganized, chronically late, and am unable to meet deadlines or plan ahead.

52.     My body physically changed following Geever's rape.  I often have no appetite which has led to weight fluctuation.  I developed adult acne, frequent migraines and premature signs of aging.

53.     I have been unable to plan for my future because I am constantly struggling to feel better.  My ability to marry and family plan has been obliterated as a result of Geever's conduct.  I question my ability to start a family when I struggle to manage my day-to-day life.  Because of Geever's rape, I struggle with sex and intimacy with my partner, ███████ ("████████").

54.     I regularly experience night terrors in which I am confined to a small room and unable to escape, just like I was on the night of Geever's rape.  Alexander often wakes me up during these episodes because I am screaming or crying.    Frequently I am startled awake by the sound of my own cries and find that I am sweating and out of breath, as if I had spent the night running instead of sleeping.  I rarely feel rested.  It takes me hours to readjust from these episodes as I awake severely anxious and afraid.

55.     I experience flashbacks of Geever's rape.  During these events, I feel as if the assault is happening again.  I also have intrusive thoughts and memories of Geever's rape which, at their worst, occurred almost daily.

56.     My experience with Geever destroyed a sense of safety and community I had in the punk scene.  I found friendship and a chosen family through the Anti-Flag fandom and the punk scene broadly.  My Anti-Flag friends were like siblings to me.  We looked out for each other and taught each other.  I considered Geever and his bandmates as pseudo-parental figures. Geever, through his heinous sexual assault, stole my friends and chosen family from me.

57.     I stopped attending concerts and shows following Geever's rape.  I lost touch with my friends as seeing them was a reminder of Geever and the terror he put me through.  I turned inward and isolated myself.  I felt so alone and did not think that my friends and family would understand my experience.

58.     Following the assault, I left my job as a lead editor at a publishing company.  I did this despite being on track to be the youngest senior editor in the company's history.   I left this position because I was struggling to cope with the pain associated with Geever's rape.  I used my last paycheck to travel to California in an effort to try and feel better.  The trip to California did not fix me.

59.     I began bartending when I returned to New York from California and started using alcohol as a crutch to deal with the anguish from Geever's sexual assault.  I was charged with driving under the influence.  Alcohol use only exacerbated my shame and I found that nothing actually helped with my symptoms of depression, fear, or grief.

60.     In 2014, while I was still in the throes of accepting what had happened to me, I began engaging in behavior I can only describe as reckless and out of character.  My reckless behavior was not limited to self-medicating with alcohol and marijuana.  Despite being a terrible swimmer and deathly afraid of water, I jumped off a 40-foot cliff into an abandoned quarry.  I survived the fall but shattered my eye socket/orbital bone. My sinus cavity collapsed and the muscles in my right eye became trapped in fragmented bone.  I had two black eyes, a concussion, severe bruising, loss of vision (and then triple vision), and slurred speech. I needed

corrective surgery to repair my broken eye socket. The procedure was performed by Dr. ████████ of Mid-Hudson Oral and Maxillofacial Practice at Kingston Hospital. After the surgery, Dr. ████ inflated a balloon in my sinus cavity to re-form the structure of my face. I received treatment from Dr. ████ for several months following the assault. Prior to Geever's sexual assault, I had never intentionally engaged in any activity that could result in injury or cause serious harm to my body. In fact, I had never broken a bone up until that point.

61.    I began contemplating suicide following Geever's rape. I nearly followed through with an attempt in 2022. I left ████ a note asking him to take care of my cat, Button, and drove to Overlook Mountain in Woodstock, New York—the town in which Geever had raped me. I only brought my sharpest pair of scissors and enough marijuana to aid in numbing myself. I turned my phone off, walked toward the top of the mountain, and planned to smoke, cut my wrists vertically, and jump from the cliff. I don't know how long I sat at the top of that mountain or what exactly stopped me from killing myself.

62.    I have adjusted my entire life as a result of Geever's rape, in an effort to prevent this from ever happening to me again. I choose to work and travel alone due to my inability to trust that people are who they present themselves to be. I avoid crowds and being along with men. I never consider a person or place to be safe, and always feel that I might be in danger. I have multiple locks on my doors, never leave windows open at night, and carry personal protective devices like pepper spray at all times. As a result, I am chronically exhausted by my day-to-day life and the fears that come with it. I live in overwhelming terror my loved ones will be irreparably harmed by someone like Geever.

63.    In 2023, I founded an organization that helps other women identify and escape abusive power dynamics and find healing through self-empowerment. Though I have spent nearly fifteen years working toward my own healing, I continue to deal with the pain, suffering,

traumatic memories, shame, anger, mistrust, grief, betrayal, embarrassment, and hopelessness caused by Geever's rape.

64.     I will never forget the events of October 1, 2010.  While I continue striving to find peace and confidence again, sadly, the harm Geever caused me cannot be alleviated through medication, therapy, or other treatment.  It will live with me forever.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: Kingston, New York
        28/01/2025

_____
            Kristina Sarhadi

# EXHIBIT 1

## This is your ticket.
Present this entire page at the event.

**ticketweb**

© 2010 Ticketweb. All rights reserved.



| PURCHASED BY | LEVEL | SECTION |
|---|---|---|
| **Kristina M Sarhadi** | **GA** | |
| CONFIRMATION NUMBER | CREDIT CARD NUMBER | |
| **M8QR2L42J** | **MC** | **XXXX- 9828** |

THE BELL HOUSE

# ANTI-FLAG
PLUS
THE MENZINGERS / OUTERNATIONAL / CEREBRAL BALLZY

**THE BELL HOUSE**

149 7th Street, Brooklyn, NY

**WED 22 SEP 2010 7:00PM**

| PRICE | 15.00 |
|---|---|
| FEE | 3.38 |

GA

Online

20 SEP 2010

---

## Great minds think
# iLike™

> Get concert alerts in iTunes.
> Get music on Facebook.

**www.iLike.com**

---

Tickets. Check.
Flight? Hotel? Car? Click.


**Expedia.com**

---

HOLDER VOLUNTARILY ASSUMES ALL RISKS AND DANGER INCIDENTAL TO THE EVENT FOR WHICH THE TICKET IS ISSUED, WHETHER OCCURRING PRIOR TO, DURING OR AFTER THE EVENT. HOLDER VOLUNTARILY AGREES THAT THE MANAGEMENT, FACILITY, LEAGUE, PARTICIPANTS, PARTICIPATING CLUBS, TICKETWEB, AND ALL OF THEIR RESPECTIVE AGENTS, OFFICERS, DIRECTORS, OWNERS AND EMPLOYEES ARE EXPRESSLY RELEASED BY HOLDER FROM ANY CLAIMS ARISING FROM SUCH CAUSES. Outdoor Major League Baseball Rain Check: In the event a legal game, as defined by Major League Baseball, is not played for any reason, then this ticket may be exchanged for the same priced seat for any other regular same season baseball game for which tickets are available. This ticket is not subject to any refund and shall bear no cash value. If issued complimentarily, this ticket shall not be exchangeable.

IN THE EVENT OF A CANCELLATION OR RESCHEDULING OF THE APPLICABLE EVENT, MANAGEMENT SHALL NOT BE REQUIRED TO ISSUE A REFUND PROVIDED THAT YOU ARE GIVEN THE RIGHT, WITHIN TWELVE MONTHS OF THE DATE OF THE ORIGINAL EVENT, TO ATTEND A RESCHEDULED PERFORMANCE OF THE SAME EVENT OR TO EXCHANGE THIS TICKET FOR A TICKET, COMPARABLE IN PRICE AND LOCATION, TO ANOTHER SIMILAR EVENT AS DESIGNATED BY MANAGEMENT EXCEPT AS OTHERWISE PROVIDED BY LAW.

Certain maximum resale premiums and restrictions may apply such as: PA - $5 or 25% of the ticket price, whichever is greater, plus lawful taxes; MA - $2; CT - a reasonable charge, but not more than $3; NJ - $3 or 20% of the ticket price (or 50% of acquisition price if registered broker or season ticket holder), whichever is greater, plus lawful taxes. Purchaser may be able, in some instances, to purchase tickets directly from the venue box office without paying TicketWeb's convenience fee.In NY: If the venue to which this ticket grants admission seats 6000 or fewer persons, this ticket may not be resold for more than 20% above the price printed on the face of this ticket, whereas if the venue to which this ticket grants admission seats more than 6000 persons, this ticket may not be resold for more than 45% above the price printed on the face of this ticket; this ticket may not be resold within one thousand five hundred feet from the physical structure of this place of entertainment under penalty of law if capacity exceeds 5,000.

Management reserves the right, without the refund of any portion of the ticket purchase price, to refuse admission to or eject any person whose conduct is deemed by management to be disorderly, who uses vulgar or abusive language or who fails to comply with these or other management rules. Breach of any of the foregoing will automatically terminate this license. NO REFUNDS. NO EXCHANGES EXCEPT AS PROVIDED HEREIN. EVENT DATE & TIME SUBJECT TO CHANGE. ALL RIGHTS RESERVED. This ticket is a revocable license and admission may be refused upon refunding the face amount of the ticket.Unlawful resale or attempted resale is grounds for seizure and cancellation without compensation. Tickets obtained from unauthorized sources may be lost, stolen or counterfeit, and if so are void.

Holder agrees by use of this ticket, not to transmit or aid in transmitting any description, account, picture, or reproduction of the game, performance, exhibition or event for which this ticket is issued. Holder acknowledges that the event may be broadcast or otherwise publicized, and hereby grants permission to utilize holder's image or likeness in connection with any live or recorded transmission or reproduction of such event.

In conformance with some local requirements or certain facility rules, alcoholic beverages, illegal drugs, controlled substances, cameras, recording devices, bundles and containers of any kind may not be brought into the premises. This ticket cannot be replaced if lost, stolen or destroyed, and is valid only for the event and seat for which it is issued. This ticket is not redeemable for cash. It is unlawful to reproduce this ticket in any form. Unless indicated otherwise, prices include all applicable taxes and/or cash discounts (if available).

 Thank you for choosing TicketFast®.

---

# Best of Citysearch

- Are fast-food fries really the best?
- Who serves the best cup of coffee?
- Where is the best Mexican food in town?

**The results are in - find out who won.**

**Best of Citysearch – Citysearch.com**

## Important Instructions:

- The barcode only allows one entry per scan.
- Unauthorized duplication or sale of this ticket may prevent your admittance to the event.

**Ticket #:  1**

| Level: | Sec: GA | Row: | Seat: |
|---|---|---|---|


979691382712

Keep this ticket in a safe place as you would money or regular tickets. TicketWeb is not responsible for any inconvenience caused by unauthorized duplication. In the event that duplicate copies appear, the Facility reserves the right to refuse entry to all ticket holders and may credit the original purchaser the face value which will constitute full remuneration. The event date and time is subject to change without notice. By using this ticket you agree to the terms and conditions associated with this ticket.

## This is your ticket.
Present this entire page at the event.

**ticketweb**

© 2010 Ticketweb. All rights reserved.

| PURCHASED BY | LEVEL | SECTION |
| --- | --- | --- |
| **Kristina M Sarhadi** | | **GA** |
| CONFIRMATION NUMBER | | CREDIT CARD NUMBER |
| **M8QR2L42J** | **MC** | **XXXX- 9828** |

THE BELL HOUSE

# ANTI-FLAG
PLUS
THE MENZINGERS / OUTERNATIONAL / CEREBRAL BALLZY

**THE BELL HOUSE**

149 7th Street, Brooklyn, NY

**WED 22 SEP 2010 7:00PM**

| PRICE | 15.00 |
| --- | --- |
| FEE | 3.38 |

GA

Online

20 SEP 2010

9794397723448



## Great minds think
# iLike™

> Get concert alerts in iTunes.
> Get music on Facebook.

**www.iLike.com**

Tickets. Check.
Flight? Hotel? Car? Click.

**Expedia.com**

HOLDER VOLUNTARILY ASSUMES ALL RISKS AND DANGER INCIDENTAL TO THE EVENT FOR WHICH THE TICKET IS ISSUED, WHETHER OCCURRING PRIOR TO, DURING OR AFTER THE EVENT. HOLDER VOLUNTARILY AGREES THAT THE MANAGEMENT, FACILITY, LEAGUE, PARTICIPANTS, PARTICIPATING CLUBS, TICKETWEB, AND ALL OF THEIR RESPECTIVE AGENTS, OFFICERS, DIRECTORS, OWNERS AND EMPLOYEES ARE EXPRESSLY RELEASED BY HOLDER FROM ANY CLAIMS ARISING FROM SUCH CAUSES. Outdoor Major League Baseball Rain Check: In the event a legal game, as defined by Major League Baseball, is not played for any reason, then this ticket may be exchanged for the same priced seat for any other regular same season baseball game for which tickets are available. This ticket is not subject to any refund and shall bear no cash value. If issued complimentarily, this ticket shall not be exchangeable.

IN THE EVENT OF A CANCELLATION OR RESCHEDULING OF THE APPLICABLE EVENT, MANAGEMENT SHALL NOT BE REQUIRED TO ISSUE A REFUND PROVIDED THAT YOU ARE GIVEN THE RIGHT, WITHIN TWELVE MONTHS OF THE DATE OF THE ORIGINAL EVENT, TO ATTEND A RESCHEDULED PERFORMANCE OF THE SAME EVENT OR TO EXCHANGE THIS TICKET FOR A TICKET, COMPARABLE IN PRICE AND LOCATION, TO ANOTHER SIMILAR EVENT AS DESIGNATED BY MANAGEMENT EXCEPT AS OTHERWISE PROVIDED BY LAW.

Certain maximum resale premiums and restrictions may apply such as: PA - $5 or 25% of the ticket price, whichever is greater, plus lawful taxes: MA - $2: CT - a reasonable charge, but not more than $3: NJ - $3 or 20% of the ticket price (or 50% of acquisition price if registered broker or season ticket holder), whichever is greater, plus lawful taxes. Purchaser may be able, in some instances, to purchase tickets directly from the venue box office without paying TicketWeb's convenience fee.In NY: if the venue to which this ticket grants admission seats 6000 or fewer persons, this ticket may not be resold for more than 20% above the price printed on the face of this ticket, whereas if the venue to which this ticket grants admission seats more than 6000 persons, this ticket may not be resold for more than 45% above the price printed on the face of this ticket: this ticket may not be resold within one thousand five hundred feet from the physical structure of this place of entertainment under penalty of law if capacity exceeds 5,000.

Management reserves the right, without the refund of any portion of the ticket purchase price, to refuse admission to or eject any person whose conduct is deemed by management to be disorderly, who uses vulgar or abusive language or who fails to comply with these or other management rules. Breach of any of the foregoing will automatically terminate this license. NO REFUNDS. NO EXCHANGES EXCEPT AS PROVIDED HEREIN.  EVENT DATE & TIME SUBJECT TO CHANGE. ALL RIGHTS RESERVED. This ticket is a revocable license and admission may be refused upon refunding the face amount of the ticket.Unlawful resale or attempted resale is grounds for seizure and cancellation without compensation. Tickets obtained from unauthorized sources may be lost, stolen or counterfeit, and if so are void.

Holder agrees by use of this ticket, not to transmit or aid in transmitting any description, account, picture, or reproduction of the game, performance, exhibition or event for which this ticket is issued. Holder acknowledges that the event may be broadcast or otherwise publicized, and hereby grants permission to utilize holder's image or likeness in connection with any live or recorded transmission or reproduction of such event.

In conformance with some local requirements or certain facility rules, alcoholic beverages, illegal drugs, controlled substances, cameras, recording devices, bundles and containers of any kind may not be brought into the premises. This ticket cannot be replaced if lost, stolen or destroyed, and is valid only for the event and seat for which it is issued. This ticket is not redeemable for cash. It is unlawful to reproduce this ticket in any form. Unless indicated otherwise, prices include all applicable taxes and/or cash discounts (if available).

# Best of Citysearch

• Are fast-food fries really the best?
• Who serves the best cup of coffee?
• Where is the best Mexican food in town?

**The results are in - find out who won.**

**Best of Citysearch – Citysearch.com**

## Important Instructions:

- The barcode only allows one entry per scan.
- Unauthorized duplication or sale of this ticket
  may prevent your admittance to the event.          **Ticket #: 2**

| Level: | Sec: GA | Row: | Seat: |
| --- | --- | --- | --- |



979439723448

Keep this ticket in a safe place as you would money or regular tickets. TicketWeb is not responsible for any inconvenience caused by unauthorized duplication. In the event that duplicate copies appear, the Facility reserves the right to refuse entry to all ticket holders and may credit the original purchaser the face value which will constitute full remuneration. The event date and time is subject to change without notice. By using this ticket you agree to the terms and conditions associated with this ticket.

 Thank you for choosing TicketFast®.

# EXHIBIT 2

If link breaks, please visit http://www.woodstockfilmfestival.com/press/releases/2010_08_lineup.htm



CONTACT:    Ilene Marder, Communications Director, press@woodstockfilmfestival.com, (845) 246-1122

Gabriel Meyers, Press Director, press@woodstockfilmfestival.com, (845) 679-4265

**VIEW PROGRAM ONLINE AT** http://www.woodstockfilmfestival.com/festival2010/films_all.php
**Hi-Rez Photos** available at http://gallery.me.com/wffpr#100232

## WOODSTOCK FILM FESTIVAL UNVEILS 2010 LINE-UP
**Challenging the Way We Think About the World...**
**WEDNESDAY, SEPT. 29 –SUNDAY OCT. 3**
**More than 150 Films, Panels, Performances, Special Events**

**–A Record 60 Premieres:**
**Strong Program of Political & Music Films**
John Lennon –Ray Charles –Phil Ochs
Afghanistan –Gerrymandering
Windfarms –Animal Rights –Gulf Coast Water

**SPOTLIGHT FILMS INCLUDE:**
**HENRY'S CRIME (U.S. Premiere) –Directed by Malcolm Venville**
features Keanu Reeves and Vera Farmiga
–Keanu Reeves recipient of WFF Excellence in Acting Award

**WEDNESDAY NIGHT SPECIAL SCREENING:**
**LENNON NYC –Directed by Michael Epstein**

**CLOSING NIGHT FILM:**
**STONE (New York Premiere) –Directed by John Curran**
**features Robert De Niro, Edward Norton**

–Each of these films will be followed by Q & A with attending director.

**FOCUS ON MUSIC:** What's Woodstock Without Music? WFF's popular music programming includes screenings and live performances, iconic musicians, music as political dissent, music videos, and bands struggling to be heard, along with the annual BMI Music panel.

–**RAY CHARLES AMERICA** (World Premiere) –Directed by Alexis Manya Spraic. Few American icons resonate on as many levels as Ray Charles. He was not only one of the greatest artists in American history, but had one of the greatest stories. Few came from less -–dirt poor, blind and, ultimately, orphaned -–to achieve more. This absorbing doc examines the social and political context of Charles' work, and how his unique approach to music, and his ability to transcend racial barriers changed the cultural landscape as we know it. Containing unreleased music, and never before seen footage, this doc chronicles Charles' impact in broader stories of love, politics, art and business.

- **PHIL OCHS: THERE BUT FOR FORTUNE** (World Premiere) –Directed by Kenneth Bowser. Music bio-documentary delves deep into the life of musical icon Phil Ochs. Civil rights. Freedom of Speech. The Vietnam War. Watergate. He wrote a song about them all, in large part creating the musical protest culture of the 60's and 70's. Through interviews with family and many well-known musicians who considered themselves fans of Phil Ochs, comes a vivid and compelling portrait of a controversial musical figure whose protest marked a generation. Director Kenneth Bowser will be in attendance for the Q & A, along with Michael Ochs, Phil's brother.

–**SOUNDS LIKE A REVOLUTION** (U.S. Premiere) –Directed by Summer Love and Jane Michener. This powerful doc presents a unique historical perspective behind the new wave of protest music sweeping America and offers new hope for the future. Featuring interviews with David Crosby, Pete Seeger, Ani Difranco, Justin Sane, and Henry Rollins, the film focuses on the music and work of today's politically-minded musicians, including Michael Franti, the Dixie Chicks and Paris, who, despite the daunting obstacles placed in their way, continue to motivate and inspire America's youth for a positive revolutionary change.
\* **MUSIC PERFORMANCE** by Justin Sane, lead singer of Anti-Flag will add his political punk rock sound to Woodstock's long history of political music at The Bearsville Theater, 10pm Friday, Oct. 1, following the screening.

- **DON'T QUIT YOUR DAYDREAM** (East Coast Premiere) –Directed by Clark Stiles and Merritt Lear. A musical adventure featuring director Stiles and his band The Good Listeners, as they embark on a last ditch, cross country, album-recording extravaganza to save their musical identity and hopefully their careers. They collaborate with mostly local, unknown and eclectic talent across the USA, to create a diverse new album, featuring an amazing compilation of talented musicians and songs. **Adrian Grenier** (Entourage, Love in the Time of Money, The Devil Wears Prada) returns to the WFF as a producer of the film as well as a performer.
\* **MUSIC PERFORMANCE** by The Good Listeners with Adrian Grenier at the Bearsville Theater, Thursday night, Sept. 30, following the screening of the film at 8:15pm.

- **ROSCOE HOLCOMB: FROM DAISY KENTUCKY** –Directed by John Cohen. Director Cohen, a long–time member of the New Lost City Ramblers, explores the life, philosophy and music of Eastern Kentucky banjo player, coal miner and construction worker Roscoe Holcomb, who is becoming legendary in the bluegrass movement, and is cited as inspiration to many country and bluegrass greats.
\* **MUSIC PERFORMANCE** by John Cohen, performing music by Holcomb featured in this short doc, following the Saturday, Oct. 2, 9:15pm screening at the Woodstock Community Center.

- **NEDA'S EYES** (WORLD PREMIERE/World Cinema) –Directed by Planet Pictures. Last year the world's attention was captured by the tragic killing of Neda Agha-Soltan, an iconic, young martyr of the Iranian election protests. A non-violent protester shot by the Iranian government on June 20th, 200, her face became an icon for the world peace movement. This short film beautifully depicts her sacrifice and the struggle of non-violent protest in Iran. This short screens before Sounds Like a Revolution.
\* **MUSIC PERFORMANCE** by Sussan Deyhim, a composer, vocalist, and performance artist who combines her voice with technical wizardry in order to create a unique sonic and vocal language that summons rituals, and a sense of the unknown. Deyhim's wide-ranging collaborations have included Peter Gabriel, Branford Marsalis, and Jerry Garcia. She has performed at the Lincoln Center Summer Festival, Carnegie Hall, The Old Vic, and other major venues. At the Colony Cafe, Friday, Oct 1, 10:00 pm.

- **DON'T GO IN THE WOODS** –(see Special Screenings/Fright Night)
\* **MUSIC PERFORMANCE by Don't Go in The Woods Band, Friday, Oct. 1st, following the screening and Q & A, at the** Catamount at the Emerson Resort and Spa.

# EXHIBIT I

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **KRISTINA SARHADI,** | |
| Plaintiff, | Civil Action No. 1:24-cv-00031(BKS/CFH) |
| - against - | **DECLARATION OF** ███████ |
| | **IN SUPPORT OF PLAINTIFF'S** |
| **JUSTIN CATHAL GEEVER a/k/a** | **MOTION FOR DEFAULT JUDGMENT** |
| **JUSTIN SANE**, and **HARDWORK** | |
| **DISTRIBUTION**, **INC.**, and **DOE 1** | |
| Defendants | |

I, ███████, pursuant to 28 U.S.C. § 1746 hereby declares as follows:

1.     I am over the age of 18, am competent, and make this Declaration based upon my own personal knowledge.

2.     I am the sister of the Plaintiff, Kristina Sarhadi ("Kristina").

3.     I hold master's degrees in psychology and nursing.  In 2014, I became a nurse practitioner (APRN) with specialty in psychiatry/mental health.

4.     I am the owner of ███████ in Salt Lake City, Utah.  I work with adults suffering from depression, anxiety, trauma, post-traumatic stress disorder (PTSD), attention deficit/hyperactivity disorder (ADHD), obsessive-compulsive disorder (OCD), mood disorders, and other mental health disorders.  I also specialize in the management of mental health medications.

5.     I have observed Kristina's severe and permanent mental, psychological, and emotional injuries.  I have seen, firsthand, two versions of Kristina: Kristina before Geever's sexual assault, and Kristina after Geever's sexual assault.

6.     Prior to 2010, Kristina was outgoing and social, with a large, diverse friend group.  She was always goal focused and very intelligent.  Kristina was able to set goals and achieve them, including attending Vassar College, and thrived in the academic environment.

1

Kristina had been similar to her sisters in temperament and was able to remain in a rational state of mind and move on from dramatic situations.

7.     Kristina began displaying a clear and noticeable change of personality and presentation.

8.     The first noticeable change in Kristina was executive dysfunction.  Executive dysfunction is a behavioral symptom that disrupts a person's ability to manage their own thoughts, emotions, and actions.  Kristina started to display an inability to meet deadlines and adhere to scheduled obligations.  Approximately four years ago, Kristina began reporting disorganization, poor focus and concentration, and an almost paralyzing lack of motivation. She was unable to multitask or complete tasks without overwhelm and burnout.  While she has been able to hold a job, Kristina has reported inconsistent drive and work performance.

9.     When Kristina first reported these symptoms, I believed she was describing symptoms of ADHD.  I believe that Kristina's symptoms are manifestations of PTSD as it is not uncommon for ADHD symptoms to mirror PTSD symptoms.  It is noteworthy that standard pharmacological ADHD treatments lacked efficacy for Kristina.

10.     Additionally, Kristina began displaying new and intense mood episodes in the form of fear, anxiety, depression, sadness, grief, and rage.  Kristina's mood is very sensitive and easily escalated.

11.     Kristina has developed a fear of others.  She often views strangers as inherently dangerous or neglectful.  I have personally observed Kristina display a paranoid insistence that others are unsafe and would describe many of her current relationships as hypervigilant. Kristina's perception of others as dangerous has affected her ability to form new relationships. She has also lost trust in people she has known for ages.

12.    Kristina has described a paradoxical mix of racing thoughts and actions with a loss of care for her life, a need to feel like her old "normal" self, and a complete disregard about having a future that looks "normal."

13.    Our family has, at times, been concerned about her physical safety in moments of intense emotional breakdowns.

14.    Kristina has used the word "spiraling" (a loss of mental control) to describe her mood and stability on many occasions since 2010.

15.    I have also observed Kristina displaying chronic fatigue and low energy.

16.    One of the biggest shifts in Kristina has been her shift from living a "straight edge" clean lifestyle to engaging in more reckless behavior.  Prior to Geever's sexual assault, Kristina strictly avoided drugs and alcohol.  She took care of herself and her body, focusing on clean living without chemicals or animal products.  After Geever's assault, Kristina began drinking and using marijuana to cope with the trauma and pain.  Kristina lacked concern for herself and her future.

17.    Kristina used to be a positive person with hopes, dreams, and plans for her future.  Today, Kristina appears sad, hopeless, and angry.  She expresses a negative view of the world and the people in it.

I declare under the penalty of perjury that the foregoing is true and correct.


Dated:  Salt Lake City, UT
         14/01/2025

# EXHIBIT J

**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **KRISTINA SARHADI,** | |
| Plaintiff, | Civil Action No. 1:24-cv-00031(BKS/CFH) |
| - against - | **DECLARATION OF ███████** |
| | **███████████ IN SUPPORT OF** |
| **JUSTIN CATHAL GEEVER a/k/a** | **PLAINTIFF'S MOTION FOR** |
| **JUSTIN SANE**, and **HARDWORK** | **DEFAULT JUDGMENT** |
| **DISTRIBUTION, INC.**, and **DOE 1** | |
| Defendants | |

I, ███████, pursuant to 28 U.S.C. § 1746 hereby declare as follows:

1.      I am over the age of 18, am competent, and make this Declaration based upon my own personal knowledge.  I am not under the influence of any drugs or alcohol at the time of my signing of this Declaration.

2.      I am the partner of Kristina Sarhadi ("Kristina").  We have been together since April 28, 2014.

3.      In July 2023, Kristina disclosed to me that she was sexually assaulted by Defendant Justin Geever a/k/a Justin Sane ("Geever"), the lead singer of Anti-Flag.  I was aware that Kristina was a fan of Anti-Flag and involved in the punk scene prior to her disclosure.  To the best of my recollection, Kristina first spoke about Anti-Flag in 2015.

4.      Kristina described Geever's assault as non-consensual and violent.  I understood Geever to be a despicable person that used his celebrity to groom women.

5.      Kristina regularly experiences night terrors.  She relates these episodes to Geever's sexual assault.  Kristina cries and screams in her sleep.  Her face appears distressed, anguished, and anxious during these events.  I am often forced to wake her up and calm her down because of pain she appears to be experiencing.  The night terrors have a significant and obvious toll on Kristina.  It often takes her several hours to return to "normal" following these

events. It seems as if Kristina is crawling out of a pit of despair every morning. She wakes up visibly anxious.

6. I have witnessed Kristina become triggered when she recalls or is reminded of Geever's assault. She is triggered when she hears about other incidents of sexual assault or rape in the news or on television.

7. By virtue of our residence in the Hudson Valley region, Kristina is exposed to roads and locations that remind her of Geever and his assault. This exposure is triggering. Kristina displays physical manifestations when she is triggered: her fist and jaw clench and she appears absolutely repulsed. She completely shuts down and becomes quiet. Her mood changes. The anguish, pain, and negativity she feels when she is triggered is palpable.

8. Kristina struggles every day with the effects of Geever's sexual assault. She often laments that she would be having a good day if "this" – meaning Geever's sexual assault – did not happen to her. It is clear that Geever's sexual assault is constantly on Kristina's mind and is preventing her from truly enjoying her life.

9. Kristina has expressed suicidal ideation on multiple occasions. On one occasion, Kristina told me she was "just going to kill" herself. Believing that she was a danger to herself, I lunged to grab her car keys from her. On another occasion, on April 12, 2022, Kristina left a note asking me to take care of her cat. The note implied that she was not planning on returning. Kristina has attributed suicidal ideation to Geever's sexual assault.

10. I have also witnessed Kristina display an inability to control her emotions. Her responses to events she finds annoying or frustrating are excessive and inconsistent with the underlying event.

11. My relationship with Kristina is often strained because of her trauma. Our emotional states frequently conflict with each other, leading to significant difficulties with enjoying time spent together. Kristina is forced to expend an unreasonable amount of time and

effort to attain a positive mental/emotional state. Due to the stress of this process, any inkling of negativity that may arise from my own human emotional fluctuations will result in a disproportionately catastrophic and negative emotional response from Kristina that often requires multiple days to alleviate.

12.     Kristina and I were engaged to be married in 2020. We called off our engagement because Kristina's emotional responses to various factors were disproportionate to an appropriate emotional response. This led me to believe that she was dissatisfied with me as a person, as she had not yet disclosed to me the root cause of her emotional turmoil. These occurrences pushed me away from her to seek the company of others.

13.     I have watched Kristina struggle mentally, physically, emotionally, and socially for the duration of our relationship.

14.     I've witnessed Kristina feelings of sadness, anger, depression, hopelessness, shame, embarrassment, and anxiety.

15.     Kristina has become unintentionally introverted and nearly incapable of genuinely trusting others. Her world view has become increasingly negative despite her desire to be positive and her many attempts to feel better. As long as I've known her, she has always opted to help those around her in need before helping herself. In hindsight, it is now painfully clear to me that she does this to avoid her past trauma and to protect herself from the insurmountable task of working through her own grievous psychological injuries.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: Kingston, New York

Jan 28, 2025

# EXHIBIT K

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **KRISTINA SARHADI,** | |
| Plaintiff, | Civil Action No. 1:24-cv-00031(BKS/CFH) |
| - against - | **DECLARATION OF DR. ▮▮▮▮** |
| | **▮▮▮▮▮▮ IN SUPPORT OF** |
| **JUSTIN CATHAL GEEVER a/k/a** | **PLAINTIFF'S MOTION FOR** |
| **JUSTIN SANE**, and **HARDWORK** | **DEFAULT JUDGMENT** |
| **DISTRIBUTION, INC.,** and **DOE 1** | |
| Defendants | |

I, ▮▮▮▮▮▮▮, pursuant to 28 U.S.C. § 1746 hereby declare as follows:

1.  I am over the age of 18, am competent, and make this Declaration based upon my own personal knowledge.

2.  I am a Health and Care Professions Council (HCPC) registered Clinical Psychologist. I hold a First Class BSc (Hons) degree in Applied Psychology and Neuroscience from Keele University, United Kingdom, and a Doctorate in Clinical Psychology (DClinPsy) from the University of Oxford, United Kingdom.

3.  I have worked clinically for over 10 years, and I have specialized in the assessment, diagnosis, treatment, and research of posttraumatic stress disorder (PTSD) for over five years.

4.  My most recent clinical employment was as a Highly Specialist Clinical Psychologist within a traumatic stress service in the National Health Service (NHS) in the United Kingdom. I also work within my own private practice providing assessment and treatment for a range of mental health conditions. I work across the lifespan with neurotypical and neurodivergent individuals. I have provided external lectureship for the University of Southampton, UK, and Colombo University, Sri Lanka, as well as to private organizations, on the topic of PTSD, C-PTSD, and vicarious trauma.

5.      I have also provided training and clinical supervision to clinical psychologists, teachers, and social workers in Slovakia and in Ukraine on assessing and managing PTSD in children and adults who have been affected by conflict and war.

6.      I met with Plaintiff, Kristina Sarhadi ("Sarhadi"), on January 9 and 10, 2025. The purpose of these meetings was to evaluate Sarhadi's current mental health state and recommend a treatment plan, if applicable.

7.      Following my meetings with Plaintiff, I prepared a report detailing Plaintiff's diagnoses and recommended course of treatment.  A true and correct copy of my report is attached hereto as **Exhibit 1**.

8.      Plaintiff reported that she was sexually assaulted by Defendant Justin Geever a/k/a Justin Sane on October 1, 2010. Ex. 1, Sec. 6.

As part of my evaluation, I used the Clinician-Administered PTSD Scale for DSM-5 (CAPS-5) to determine whether Plaintiff met the diagnostic criteria for post-traumatic stress disorder.  *Id.*, Sec. 7.1.  Administration of the CAPS-5 evaluation involves the exploration of: (1) the "index" trauma (the worst event) (Criterion A); (2) symptomology within four PTSD clusters: intrusion symptoms (Criterion B), avoidance symptoms (Criterion C), negative changes to mood and cognition symptoms (Criterion D), and arousal and reactivity symptoms (Criterion E); (3) establishing a duration of more than one month (Criterion F); and (4) establishing a functional impairment and distress (Criterion G).  *Id.*, Sec. 7.1.5-7.1.9.  In order to meet the criteria for PTSD, a person must display at least one symptom of intrusion, one symptom of avoidance, two symptoms of negative alterations of mood and cognition, and at least two symptoms of hyperarousal that are functionally related to the trauma.  *Id.*, Sec. 7.1. For a symptom to be rated as present, it must meet a threshold determined by the combination of frequency and intensity of distress.

9. It is my professional opinion that Plaintiff meets the diagnostic criteria for PTSD. Specifically:

   a. Plaintiff unambiguously identified the trauma index as being Geever's sexual assault (Criterion A). *Id.*, Sec. 7.1.5.

   b. Plaintiff's intrusion symptoms (Criterion B) include intrusive memories, flashbacks, nightmares of the trauma or associated content, and emotional and physical reactivity to reminders of the trauma. *Id.*, Sec. 7.16.

   c. Plaintiff's avoidance symptoms include avoidance of internal (thoughts, feelings, and memories) and external reminders (places, people, and situations) of the traumatic experience (Criterion C). *Id.*, Sec. 7.17.

   d. Plaintiff displays negative changes to mood and cognition including the inability to remember key parts of traumatic events, changes in beliefs about self, others, and the world, and persistent negative affect (Criterion D). *Id.*, Sec. 7.1.8.

   e. Plaintiff's arousal and reactivity symptoms include partaking in risky behavior, demonstration of irritable behavior, hypervigilance, an exaggerated startle response, difficulty with concentration, and problems with sleep (Criterion E). *Id.*, Sec. 7.1.9.

   f. Plaintiff reported persistent debilitating symptoms since she was sexually assaulted which have impacted her daily functioning (Criterion F). *Id.*, Sec. 7.1.10.

   g. The distress Plaintiff experienced as a result of Geever's sexual assault has impacted her relationship with others (Criterion G). *Id.*, Sec. 7.1.11.

10. It is my professional opinion that Plaintiff meets the diagnostic criteria for C-PTSD. *Id.*, Sec. 7.2. In addition to the core symptoms of PTSD discussed above, C-PTSD

includes three additional symptoms: (1) difficulties with managing and regulating emotions, (2) persistent negative beliefs about oneself and associated emotions such as shame and feelings of worthlessness; and (3) difficulties sustaining relationships, trusting others, and feeling safe with other people. *Id.*; *see also* Appendix I: ICD-11 Complex Post-Traumatic Stress Disorder diagnostic criteria. Plaintiff displays symptoms of each of the aforementioned three additional symptoms. Ex. 1, Sec. 7.2.1-7.2.3.

11.    It is my professional opinion that Plaintiff meets the DSM-5 diagnostic criteria for a Major Depressive Disorder. *Id.*, Sec. 7.3. To meet the diagnostic criteria for Major Depressive Disorder, an individual must meet 5 or more symptoms during the same two-week period and represent a change from previous functioning. At least one symptom must be depressed mood or loss of interest or pleasure. The symptoms must cause clinically significant distress or impairment in social, occupational, or other important areas of functioning. The episode must not be attributable to other psychological effects of a substance or to another medical condition. Plaintiff displays 8 of 9 symptoms required to meet the criteria for a Major Depressive Disorder (only five symptoms are required to meet. Specifically:

   a. Plaintiff feels debilitatingly depressed for days at a time and often feels empty and hopeless. *Id.*, Sec. 7.3.1.

   b. Plaintiff has lost interest in activities she used to love doing which causes her significant distress and impacts on her social functioning. *Id.*, Sec. 7.3.2.

   c. Plaintiff lost weight unintentionally, regularly lacks appetite, and struggles to pay attention to food intake. *Id.*, Sec. 7.3.3.

   d. Plaintiff suffers from significantly disrupted sleep which impacts daily functioning. *Id.*, Sec. 7.3.4.

e. Plaintiff struggles with a lack of motivation, fatigue, and exhaustion daily, all of which contribute to daily distress and an inability to function in important areas of her life. *Id.*, Sec. 7.3.6.

f. Plaintiff experiences persistent feelings of self-blame and guilt. *Id.*, Sec. 7.3.7.

g. Plaintiff reports inability to function day to day because of a lack of concentration and indecisiveness. *Id.*, Sec. 7.3.8.

h. Plaintiff reports passive suicidal ideation. *Id.*, Sec. 7.3.9.

12. Other difficulties experienced by Plaintiff following the sexual assault include disordered eating and substance use. *Id.*, Sec. 7.4.

13. The effects of the sexual assault on Plaintiff are set forth in Sec. 8 of my report and demonstrate significant distress and impairment in social and occupational functioning, and distinct changes in identity and sense of self.

14. It is my professional opinion that Plaintiff would benefit from therapeutic, medical, and pharmacological treatment for the debilitating mental health difficulties stemming from the sexual assault. *Id.*, Sec. 9. Specifically, Plaintiff would benefit from:

a. Trauma-Focused Cognitive Behavioral Therapy (TF-CBT) or Eye-Movement Desensitization and Reprocessing (EMDR) to treat C-PTSD. I estimate that such treatment costs $325/session (or $169,000 total).

b. Cognitive Behavioral Therapy (CBT) treatment for Major Depressive Disorder. I estimate that such treatment costs $325/session (or $33,800 total).

c. Compassion-Focused Therapy (CFT) for future trauma re-triggering situations and symptoms of PTSD and debilitating states of shame and self-criticism. I estimate that such treatment costs $325/session (or $84,500 total).

d. Collateral couples therapy with her partner or future partner to aid in forming and maintaining relationships, particularly feeling safe and developing the

ability to trust.  I estimate the cost of this therapy to be $425/session ($88,400 in total).

e.  Family therapy to aid in rebuilding of family relationships following a decade of isolation and alienation. I estimate that the cost of this therapy is $425/session ($44,200 in total).

f.  Continued psychiatric care and ongoing pharmacological treatment and medication management.  I estimate that these visits would cost $425 per visit and an additional $5,000/year for medication ($101,000 in total).

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: January 16, 2025

_____
Dr ███████████, DClinPsy

# SEALED EXHIBIT 1