**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

KRISTINA SARHADI,

                                        Plaintiff,                          1:24-cv-31 (BKS/PJE)

v.

JUSTIN CATHAL GEEVER, also known as Justin Sane,

                                        Defendant.

**Appearances:**

*For Plaintiff*:
John F.O McAllister
McAllister Olivarius
641 Lexington Avenue, 13th Floor
New York, NY 10022

**Hon. Brenda K. Sannes, Chief United States District Judge:**

                    **MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION**

        Plaintiff Kristina Sarhadi brings this diversity action alleging claims of assault,

battery/sexual battery, and intentional infliction of emotional distress against Defendant Justin

Geever. (Dkt. No. 25).[1] Defendant Geever has not answered the Complaint or otherwise

appeared in this action. Presently before the Court is Plaintiff's motion for default judgment as to

Geever and motion to seal. (Dkt. Nos. 44–45). For the following reasons, the Court grants

Plaintiff's motion for default judgment and grants Plaintiff's motion to seal.

---

[1] The Court dismissed Plaintiff's claims against Defendant Hardwork Distribution, Inc. on December 18, 2024. (Dkt. No. 40).

## II.     FACTS[2]

### A.     Anti-Flag

Geever was the lead guitarist, singer, and songwriter for a well-known punk rock band with left-wing political views called Anti-Flag from 1988 until July 2023, when the band disbanded. (Dkt. No. 25, ¶ 31). From the time Anti-Flag formed, the band had a "'straight edge' platform" of anti-drugs, anti-alcohol, and pro-feminism. (*Id.* ¶ 38). In 2005, the band released a track titled, "Feminism is For Everybody" as part of a compilation album and donated proceeds from the sale of the album to Protect, a non-profit organization aimed at combating child abuse and exploitation. (*Id.* ¶ 43). Two years later, in 2007, the band released an EP titled, "A Benefit for Victims of Violent Crime." (*Id.* ¶ 44). Geever backed criticisms of the punk scene as sexist and predatory towards young women, saying that "sexualizing women and calling them the c-word is not something that should be tolerated." (*Id.* ¶ 45). Anti-Flag "created and maintained what was perceived as a safe space for young female fans who attended Anti-Flag's shows, followed them on tour, and purchased their merchandise." (*Id.* ¶ 46).

In 2000, when Plaintiff Kristina Sarhadi was eleven years old, she began listening to Anti-Flag. (*Id.* ¶ 58). She felt like she was in a like-minded safe community and became deeply committed to the band because she "identified with its unusual, counter-cultural message and looked up to its members as brave, exciting exemplars of a better way of organizing society." (*Id.* ¶ 59). Anti-Flag became her favorite band, and she listened to their music, attended their concerts, and collected their merchandise until the assault in 2010. (*Id.* ¶¶ 60–61).

---

[2] The facts are taken from the Amended Complaint. (Dkt. No. 25). Because Defendant Geever has failed to respond to the Complaint, the well-pleaded allegations therein are deemed admitted and assumed to be true for purposes of this Motion. *See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992).

### B.    The Underlying Incident

On September 22, 2010, Sarhadi attended an Anti-Flag concert in Brooklyn, New York. (*Id.* ¶ 62). As Sarhadi watched from the front row, Geever locked eyes with her and began singing to and winking at her. (*Id.* ¶ 63). After the concert, Geever jumped off the stage, hugged Sarhadi, and asked for her name and where she was from. (*Id.* ¶ 64). Although Geever was flirtatious with Sarhadi, she did not reciprocate because she had a long-time boyfriend. (*Id.* ¶ 65). In each conversation they had, she made it clear that "she was in a committed relationship and not romantically interested in him." (*Id.*). That night, Geever invited Sarhadi to an upcoming film festival to attend a screening of the film "Sounds Like a Revolution." (*Id.* ¶ 66).

Sarhadi decided to go to the film festival and on October 1, 2010, she arrived at the theater in Rosendale, New York. (*Id.* ¶ 69). She felt safe to go, because she trusted in Geever's strong feminist stance, was a loyal fan of Anti-Flag, knew that Geever had a serious girlfriend, and he was twice her age. (*Id.* ¶¶ 67–68). She waited at the gate for Geever to let her in, as he had promised, but he never showed up and Sarhadi missed the screening. (*Id.* ¶ 70). Sarhadi did, however, meet Geever after the screening and they travelled together to a separate theater in Woodstock, New York, where Geever did a solo acoustic performance. (*Id.* ¶ 71).

After the performance, Geever asked Sarhadi to accompany him to an afterparty at a private house nearby. (*Id.* ¶ 72). Sarhadi agreed and drove the two of them to the party. (*Id.* ¶ 73). When the party was over, Geever mentioned that he had recorded a song with Billy Bragg, another famous singer, and wanted her to be the first to hear it. (*Id.* ¶ 76). He said the song was on his laptop at his motel, and Sarhadi agreed to go with him to hear the song. (*Id.* ¶ 77). Geever then suggested that they stop at a bar and drink together, despite his and Anti-Flag's pro-sobriety messaging. (*Id.* ¶ 79). At the time, Sarhadi was "straight edge," meaning she did not drink alcohol or do drugs. (*Id.*). Geever acknowledged their mutual "straight edge" stance, but he

suggested they should "break edge" that night since they were each dealing with unfortunate personal circumstances—Geever with a deceased nephew and cheating partner and Sarhadi with a long-distance boyfriend. (*Id.* ¶¶ 78–79). Geever's motel had a bar, and upon arrival, he ordered beers and pickleback shots for both of them. (*Id.* ¶ 80). Geever "continued drinking and dancing in the bar." (*Id.* ¶ 81).

After a while, Geever and Sarhadi walked to his motel room to listen to the song. (*Id.* ¶ 82). Geever then closed the curtains, locked the door, screamed "Football Tackle!" and tackled Sarhadi from behind onto the bed. (*Id.* ¶¶ 84–85). Geever had a "strange, scary look, as if he had turned into a different person." (*Id.* ¶ 86). He began restraining and strangling Sarhadi and forced her to perform oral sex on him. (*Id.* ¶ 87). When Sarhadi could breathe, she repeatedly pleaded with him to stop. (*Id.* ¶ 88). She was crying and was shocked by his mean and violent behavior. (*Id.* ¶ 89). Geever then non-consensually penetrated Sarhadi's vagina with his penis. (*Id.* ¶ 90). Afterwards, Geever passed out on top of her and Sarhadi was able to escape the motel room without waking him. (*Id.* ¶¶ 91–92).

On July 19, 2023, Sarhadi discussed the assault on a podcast, and although she did not name Anti-Flag or Geever, she gave the details of that night she was assaulted and described "how she was betrayed by the 'anti-rape' lead singer of a political punk band." (*Id.* ¶ 93). Anti-Flag was in the middle of a European tour, but that same day the podcast episode was released, they announced the band was dissolving, took down their website, and deleted the band's social media accounts. (*Id.* ¶ 94). A week later, Geever categorically denied, via Instagram, that he was the person Sarhadi had described. (*Id.* ¶ 95).

As a result of this incident, Sarhadi alleges that she "suffered, continues to suffer, and will suffer in the future, psychological injuries"; she has been diagnosed with and treated for,

*inter alia*, C-PTSD, clinical depression, ADHD resulting from trauma, emotional hyperarousal, and rejection sensitive dysphoria. (*Id.* ¶ 100).

### C.     Plaintiff's Injuries[3]

Plaintiff has submitted a declaration in support of this motion attesting that "[a]s a direct result of Geever's conduct, [she] sustained serious and permanent psychological, mental, and emotional injuries, including "low self-esteem, anxiety, panic attacks, post-traumatic stress disorder, disordered eating, stress, insomnia, night terrors, depression, suicidality, shame, disassociation, intimacy and trust issues, fear, embarrassment, mental anguish, and loss of enjoyment of life." (Dkt. No. 44-1, at 72, ¶¶ 37–38). She has been diagnosed with and treated for "C-PTSD, clinical depression, Major Depressive Disorder, Anxiety Disorder, migraines, ADHD resulting from trauma, emotional hyperarousal, and rejection sensitivity dysphoria." (*Id.* at 72, ¶ 39).

Immediately after the assault, Plaintiff told her primary care physician that she "was in a consistent state of depression," "was physically fatigued," was having nightmares, and was experiencing appetite changes that led to weight fluctuation, although Plaintiff was "ashamed and afraid to discuss the assault." (*Id.* at 72, ¶¶ 40–41). From 2013 to 2016, Plaintiff underwent treatment with a clinical psychologist, and although Plaintiff remained too afraid to disclose the assault, they discussed "current life circumstances, maintaining healthy relationships, and unspecified past trauma." (*Id.* at 72–73, ¶ 42). The psychologist informed Plaintiff that she displayed symptoms of post-traumatic stress disorder relating to her past trauma. (*Id.*). In 2014, Plaintiff began treatment with another provider, was diagnosed with clinical depression, and prescribed Prozac. (*Id.* at 73, ¶ 43). In December 2014, Plaintiff learned she was pregnant. (*Id.* at

---

[3] The facts in this part are taken from the affidavits submitted in connection with the instant motion.

73, ¶ 44). Although she had always wanted to be a mother, she and her partner decided to "medically terminate the pregnancy with extreme sadness." (*Id.*). Plaintiff spent weeks "crying and mourning the loss of what could have been" but knew she was "in no state to raise a child" due to the impact Geever's sexual assault had on her emotions and behaviors, including her deep depression and fear of regular gynecological examinations. (*Id.*). Plaintiff has continued to undergo treatment, including medication, for her depression and emotional dysregulation. (*Id.* at 73–74, ¶¶ 45–48). In 2021, Plaintiff was diagnosed with Major Depressive Order and ADHD. (*Id.* at 74, ¶ 47).

In addition to these mental health challenges, Plaintiff also attests that her "entire life changed following Geever's rape." (*Id.* at 74, ¶ 49). She describes personality and physical changes, challenges with intimacy, regular night terrors, flashbacks, isolation and loss of community, career setbacks, and alcohol use. (*Id.* at 74–76, ¶¶ 50–59). She engaged in "reckless and out of character" behavior including, "self-medicating with alcohol and marijuana" and jumping off a forty-foot cliff into an abandoned quarry. (*Id.* at 76, ¶ 60). Plaintiff "began contemplating suicide following Geever's rape" and "nearly followed through with an attempt in 2022." (*Id.* at 77, ¶ 61). She has "adjusted [her] entire life as a result of Geever's rape, in an effort to prevent this from ever happening to [her] again," and takes measures such as working and travelling alone, avoiding crowds and being alone with men, having multiple locks on her doors, and carrying personal protective devices (*Id.* at 77, ¶ 62).

Plaintiff's sister submitted an affidavit corroborating the "severe and permanent mental, psychological, and emotional injuries" Plaintiff sustained as a result of Geever's sexual assault including executive dysfunction, new and intense mood episodes, a fear of others, and chronic fatigue. (*Id.* at 86–88, ¶¶ 5–17). Plaintiff's partner also submitted an affidavit describing

Plaintiff's night terrors and how she has "struggle[d] every day with the effects of Geever's sexual assault." (*Id.* at 90–91, ¶¶ 5–8). He describes her "suicidal ideation" and "inability to control her emotions" as well as the strain her trauma has had on their relationship. (*Id.* at 91–92, ¶¶ 9–12).

Plaintiff also underwent an evaluation with a clinical psychologist in January 2025, and the evaluating psychologist submitted an affidavit as well as a report detailing Plaintiff's diagnoses and recommended course of treatment.[4] (*Id.* at 94–95, ¶¶ 2, 6–7). The psychologist opined that Plaintiff meets the diagnostic criteria for PTSD with a "trauma index" of Geever's sexual assault, and "debilitating" symptoms including intrusive memories, flashbacks, nightmares, avoidance of internal thoughts and external reminders, negative changes to mood and cognition, irritability, hypervigilance, recklessness, difficulty with concentration, problems with sleep, and relationship challenges. (*Id.* at 96, ¶ 9). The psychologist also attests that Plaintiff meets the diagnostic criteria for C-PTSD given Plaintiff's difficulties with managing and regulating emotions, persistent negative beliefs, and difficulties sustaining relationships. (*Id.* at 96–97, ¶ 10). Additionally, Plaintiff meets the diagnostic criteria for Major Depressive Disorder, displaying eight of nine symptoms,[5] including: (1) Plaintiff feels debilitatingly depressed for days at a time; (2) Plaintiff has lost interest in activities she used to love doing; (3) Plaintiff lost weight unintentionally, regularly lacks appetite, and struggles to pay attention to food intake; (4) Plaintiff suffers from significantly disrupted sleep; (5) Plaintiff struggles with a lack of motivation, fatigue, and exhaustion; (6) Plaintiff experiences persistent feelings of self-blame and guilt; (7) Plaintiff reports inability to function day to day; and (8) Plaintiff reports passive

---

[4] The report was filed under seal. (Dkt. No. 44-1, at 100).

[5] Only five symptoms are required to meet the diagnostic criteria. (Dkt. No. 44-1, at 97, ¶ 11).

suicidal ideation. (*Id.* at 97–98, ¶ 11). The psychologist attests that Plaintiff would benefit from "therapeutic, medical, and pharmacological treatment for the debilitating mental health difficulties stemming from the sexual assault." (*Id.* at 98, ¶ 14).

## III.    MOTION FOR DEFAULT JUDGMENT

### A.    Procedural Requirements

"Rule 55 of the Federal Rules of Civil Procedure provides a two-step process for obtaining a default judgment." *Priestley v. Headminder, Inc.*, 647 F.3d 497, 504 (2d Cir. 2011). First, under Rule 55(a), the plaintiff must obtain a clerk's entry of default. Fed. R. Civ. P. 55(a) ("When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."); *see also* Local Rule 55.1 (requiring a party seeking a clerk's entry of default to "submit an affidavit showing that (1) the party against whom it seeks a judgment . . . is not an infant, in the military, or an incompetent person (2) a party against whom it seeks a judgment for affirmative relief has failed to plead or otherwise defend the action . . . and (3) it has properly served the pleading to which the opposing party has not responded"). Second, under Federal Rule 55(b)(2), the plaintiff must "apply to the court for entry of a default judgment." *Priestley*, 647 F.3d at 505; *see also* Local Rule 55.2(b) ("A party shall accompany a motion to the Court for the entry of a default judgment, pursuant to Fed. R. Civ. P. 55(b)(2), with a clerk's certificate of entry of default[,] . . . a proposed form of default judgment, and a copy of the pleading to which no response has been made.").

Here, Plaintiff has complied with the procedural requirements for obtaining a default judgment against Defendant Geever. On April 22, 2024, Plaintiff requested a clerk's entry of default under Rule 55(a), and, as required by Local Rule 55.1, Plaintiff submitted an affidavit affirming that Defendant Geever (1) is not an infant, in the military, or an incompetent person;

(2) was properly served; and (3) has defaulted in this action. (Dkt. No. 27). On April 23, 2024, Plaintiff received a clerk's entry of default against Defendant Geever. (Dkt. No. 29). And, on January 30, 2025, Plaintiff moved for a default judgment against Defendant Gever under Federal Rule of Civil Procedure 55(b)(2) and Local Rule 55.2(b). (Dkt. No. 44). Therefore, as the procedural requirements for entry of a default judgment are met, the Court will address liability.

### B.    Liability

By failing to appear in this action or respond to Plaintiff's Complaint, Defendant Geever is deemed to have admitted the factual allegations in the Complaint with respect to liability (as distinct from damages). *Greyhound Exhibitgroup, Inc.*, 973 F.2d at 158 ("[A] party's default is deemed to constitute a concession of all well pleaded allegations of liability"). "The decision whether to enter default judgment is committed to the district court's discretion." *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 116 (2d Cir. 2015) (citation omitted). Even where a defendant has admitted all well-pleaded facts in the complaint by virtue of default, a district court "need not agree that the alleged facts constitute a valid cause of action," and may decline to enter a default judgment on that ground. *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011) (quoting *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981)). Indeed, the Second Circuit has "suggested that, prior to entering default judgment, a district court is 'required to determine whether the [plaintiff's] allegations establish [the defendant's] liability as a matter of law.'" *Id.* (alteration in original) (citation omitted). Accordingly, the Court considers whether Plaintiff's allegations establish Defendant Geever's liability with respect to each of the three claims brought against him: (1) assault, (2) battery/sexual battery, and (3) intentional infliction of emotional distress ("IIED"). (Dkt. No. 25, ¶¶ 102–132).

An "assault" is an "intentional placing of another person in fear of imminent harmful or offensive contact" and a "battery" is an "intentional wrongful physical contact with another

person without consent." *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 108 (2d Cir. 1993) (citing cases). "[R]ape is 'an undisputed assault and battery.'" *Id.* (quoting *United Nat'l Ins. Co. v. The Tunnel, Inc.*, 988 F.2d 351, 354 (2d Cir. 1993)). Here, the Complaint plainly alleges that Defendant Geever raped Plaintiff. (*See* Dkt. No. 25, ¶¶ 84–92, 104–08, 114–17).

An IIED claim has four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993). The New York Court of Appeals, however, "has cautioned that a claim for IIED may not be sustainable 'where the conduct complained of falls well within the ambit of other traditional tort liability.'" *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 159 (2d Cir. 2014) (quoting *Fischer v. Maloney*, 43 N.Y.2d 553, 557–58 (1978)). Here, Plaintiff identifies Geever's alleged outrageous conduct as "locking [Plaintiff] in his motel room and isolating her in close quarters; tackling and physically restraining her on the bed; choking her with his hands for his own sexual gratification; forcing oral sex on her; ignoring her cries for him to stop; and forcibly penetrating her with his penis." (Dkt. No. 25, ¶ 124). The IIED claim therefore "depends [on] conduct that amounts to a sexual assault or battery." *Henry v. Oluwole*, 108 F. 4th 45, 61 (2d Cir. 2024). Because the Complaint "does not plead facts distinct from sexual assault, assault, or battery," and "contains no separate allegations of outrageous conduct," the Court finds that Plaintiff's IIED claim fails as a matter of law as duplicative. *See id.*; *see also Stines v. Sanchez*, No. 21-cv-7884, 2025 WL 1435067, at *5, 2025 U.S. Dist. LEXIS 95145, at *14 (S.D.N.Y. May 19, 2025) (denying summary judgment and dismissing IIED claim because it "overlap[ped] with [the] sexual assault and battery claims such that it [was] subsumed

within those claims"); *but cf. Dixon v. Reid*, 744 F. Supp. 3d 323, 329 (S.D.N.Y. 2024) (denying motion to dismiss IIED claim because it did "not so completely overlap with [the] sexual assault/battery claim that it [was] subsumed within that claim") *and Doe v. Hyassat*, No. 18-cv-6110, 2024 WL 1955354, at *4, 2024 U.S. Dist. LEXIS 81448, at *9 (S.D.N.Y. May 3, 2024) (finding defendant liable for IIED on motion for default judgment where defendant drugged plaintiff without her knowledge, sexually assaulted her, and infected her with a venereal disease that caused her to suffer vision loss).

Accordingly, the Court finds that Plaintiff's allegations establish Defendant Geever's liability with respect to the assault and battery/sexual battery claims but not with respect to the IIED claim.

## C.    Damages

"[I]t is well established that '[w]hile a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages.'" *Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contractors Inc.*, 699 F.3d 230, 234 (2d Cir. 2012) (citation omitted). "There must be an evidentiary basis for the damages sought by plaintiff, and a district court may determine there is sufficient evidence either based upon evidence presented at a hearing or upon a review of affidavits and documentary evidence." *Id.* (citing Fed. R. Civ. P. 55(b)(2)). A court may rely "upon detailed affidavits and documentary evidence, supplemented by the District Judge's personal knowledge of the record." *Fustok v. Conticommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989).

Here, Plaintiff's request is supported by her own affidavit (Dkt. No. 44-1, at 65–78), her sister's affidavit, (*id.* at 86–88), her partner's affidavit, (*id.* at 90–92), and medical records, including an affidavit from a clinical psychologist, (*id.* at 94–99), and a report prepared by that

psychologist detailing Plaintiff's diagnoses and recommended course of treatment, (*id.* at 100). In other cases, including in the sexual assault context, courts have found similar offers of evidentiary support to be sufficient to assess damages without a hearing. *See Gavel v. Korang*, No. 20-cv-3475, 2024 WL 4203732, at *2, 4, 2024 U.S. Dist. LEXIS 155940, at *6, 9–10 (S.D.N.Y. Aug. 28, 2024) (recommending that plaintiff's uncontested submissions, which included her declaration, medical reports, expense sheet, and receipts, were sufficient for the court to determine damages without a hearing), *report and recommendation adopted*, 2024 WL 4203248, 2024 U.S. Dist. LEXIS 165915 (S.D.N.Y. Sept. 16, 2024); *Hyassat*, 2024 WL 1955354, at *5 & n.3, 2024 U.S. Dist. LEXIS 81448, at *11 & n.3 (finding plaintiff "provided significant evidentiary support for the damage awards" she sought in the form of her own affidavit, her mother's affidavit, and medical records); *A.B. v. Staropoli*, No. 08-cv-4585, 2013 WL 12441525, at *3–6, 2013 U.S. Dist. LEXIS 206771, at *8–19 (S.D.N.Y. Dec. 11, 2013) (awarding damages on the basis of an affidavit from each plaintiff and an evaluating psychiatrist); *Estevez-Yalcin v. Children's Vill.*, No. 01-cv-8784, 2007 WL 2746807, at *1, 2007 U.S. Dist. LEXIS 69511, at *3–4 (S.D.N.Y. Sept. 12, 2007) (finding a hearing on damages unnecessary because plaintiffs submitted detailed affidavits, neither party requested a hearing, and there were no contested issues of fact). Accordingly, the Court finds that Plaintiff's supporting documentation provides a sufficient evidentiary basis to award damages such that the Court finds a hearing would be unnecessary.

### 1.    Non-Economic Compensatory Damages

"Compensatory damages recoverable for sexual assault include compensation for the injury itself, conscious pain and suffering including mental and emotional anxiety which can be based on the plaintiff's subjective testimony plus special damages, which need not be pleaded." *Doe v. Alsaud*, No. 13-cv-571, 2017 WL 4541426, at *3, 2017 U.S. Dist. LEXIS 167359, at *10

(S.D.N.Y. Oct. 10, 2017) (cleaned up) (citations omitted). "The measure of damages for pain and suffering and emotional distress is fair and reasonable compensation to be fixed by the trier of fact in the light of all the evidence in the case." *Mathie v. Fries*, 935 F. Supp. 1284, 1304 (E.D.N.Y. 1996), *aff'd* 121 F.3d 808 (2d Cir. 1997). Because there is no "mathematical computation" or "precise formula" to measure such damages, courts should review precedents and make "[r]eference to other awards in similar cases." *Id.* at 1304–05; *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990). Courts can consider and evaluate many factors in "assessing the appropriateness of an award of damages for a sexual assault," including "the social and emotional betrayal, humiliation and isolation suffered by the victim as well as the threat to the victim's self-esteem and physical, psychic and emotional integrity and health, in addition to actual therapeutic and medical expenses." *Mathie*, 935 F. Supp. at 1306.

In assessing non-economic damages, "[a] review of other cases involving sexual assaults reflects that they frequently trigger substantial compensatory awards, typically in the low-to-mid hundreds of thousands of dollars." *Offei v. Omar*, No. 11-cv-4283, 2012 WL 2086294, at *5, 2012 U.S. Dist. LEXIS 80171, at *15 (S.D.N.Y. May 18, 2012) (citing cases), *report and recommendation adopted*, 2012 WL 2086356, 2012 U.S. Dist. LEXIS 80144 (S.D.N.Y. June 8, 2012); *see also Angulo v. 36th St. Hospitality LLC*, 19-cv-5075, 2020 WL 4938188, at *12–14, 2020 U.S. Dist. LEXIS 137816, at *32–38 (S.D.N.Y. July 31, 2020) (awarding $300,000 in emotional distress damages where defendant raped plaintiff once and harassed her on an ongoing basis), *report and recommendation adopted*, 2020 WL 4936961, 2020 U.S. Dist. LEXIS 153278 (S.D.N.Y. Aug. 24, 2020); *see also Staropoli*, 2013 WL 12441525, at *6–8, 2013 U.S. Dist. LEXIS 206771, at *19–25 (awarding $600,000 in compensatory damages where plaintiff, a minor, was groomed and sexually abused in numerous instances by defendant, her soccer coach

but noting that there was "little evidence" concerning the plaintiff's more recent psychological state).

However, courts have also awarded higher damages in sexual assault cases, depending on the specific circumstances of each case. In support of her request for $1,250,000 in past and future pain and suffering, Plaintiff cites a number of cases where courts awarded similar amounts. (Dkt. No. 44-2, at 16–17 (citing *Lent v. CCNH, Inc.*, No. 13-cv-942, 2015 WL 7283186, at *5, 2015 U.S. Dist. LEXIS 154349, at *13–14 (N.D.N.Y. Nov. 16, 2015) (awarding $1.25 million in past and future pain and suffering where plaintiff endured "ongoing sexual assault [as] a minor, inaction by employers to correct abusive work settings, and documented psychological conditions resulting from depression and PTSD"); *Alsaud*, 2017 WL 4541426, at *1–2, 6, 2017 U.S. Dist. LEXIS 167359, at *2, 4, 16 (awarding $1.25 million in past and future pain and suffering to plaintiff who was drugged and repeatedly raped over the course of several hours, resulting in "significant and disturbing physical injuries"); *Hyassat*, 2024 WL 1955354, at *1, 5, 2024 U.S. Dist. LEXIS 81448, at *2, 12–13 (awarding $1.25 million for past and future pain and suffering to a plaintiff who was drugged and raped and suffered sexually transmitted diseases); *Noonan v. Becker*, No. 14-cv-4084, 2018 WL 1738746, at *1–2, 7, 2018 U.S. Dist. LEXIS 60704, at *3, 18 (S.D.N.Y. Apr. 10, 2018) (awarding $1 million in non-economic compensatory damages to a plaintiff who was assaulted and raped), *report and recommendation adopted*, 2018 WL 2088279, 2018 U.S. Dist. LEXIS 75313 (S.D.N.Y. May 3, 2018); *Ortiz v. New York City Hous. Auth.*, 22 F. Supp. 2d 15, 38–40 (E.D.N.Y. 1998) (upholding jury verdict of $3 million in compensatory damages for past and future pain and suffering where plaintiff was raped at gunpoint); *Splawn v. Lextaj Corp.*, 197 A.D.2d 479, 480–81 (1st Dep't 1993) (upholding $2 million award for past and future pain and suffering in rape case); *Pantages v. L.G. Airport*

14

*Hotel Assocs., Inc.*, 187 A.D.2d 273, 273 (1st Dep't 1992) (upholding $1.875 million award for past and future pain and suffering where plaintiff was raped, sodomized, and assaulted by three men))).

While there are factual differences between the cited cases and the instant case, the Court finds the cited cases instructive given the fact that each case involves sexual assault, "the ultimate violation of self" which is "very often accompanied by physical injury" and "can also inflict mental and psychological damage." *Alsaud*, 2017 WL 4541426, at *4, 2017 U.S. Dist. LEXIS 167359, at *11 (quoting *Coker v. Georgia*, 433 U.S. 584, 597–98 (1977)). Indeed, like many of the cited cases, the record here shows that Defendant Geever's conduct "has manifested itself in several psychological and emotional conditions that Plaintiff has had to suffer through, and which will continue to burden her for the foreseeable future." *Lent,* 2015 WL 7283186, at *4, 2015 U.S. Dist. LEXIS 154349, at *12. It is well-documented through the supporting affidavits that Plaintiff has suffered extreme emotional distress and a complete upending of her life, as evidenced by her symptoms which have persisted fifteen years since the date of the attack.

Having considered compensatory awards in the Circuit in comparable cases, the specific circumstances of this case, and the significant effects the attack has had and will continue to have on Plaintiff, the Court finds that $750,000 is fair and reasonable for Plaintiff's past and future pain and suffering.

### 2.    Economic Compensatory Damages

In addition to the non-economic damages for pain and suffering, Plaintiff also seeks economic compensatory damages in the amount of $520,900 for future medical and psychological treatment. (Dkt. No. 44-2, at 21). Such damages must be "reasonably certain to be incurred and necessitated by plaintiff's injuries." *Rivera v. Home Depot USA, Inc.*, 776 F. App'x

4, 7 (2d Cir. 2019) (quoting *Schultz v. Harrison Radiator Div. Gen. Motors Corp.*, 90 N.Y.2d 311, 321 (1997)) (upholding a damage award based on an expert report that included line-by-line estimates of what the plaintiff would need going forward based on review of the plaintiff's medical records). The award must be "supported by competent evidence," that is not "purely speculative" which "establishes the need for, and the cost of, medical care." *Abedin v. Osorio*, 216 A.D. 3d 708, 709–10 (2d Dep't 2023) (citations omitted). In other sexual assault cases, courts have awarded economic damages for future counseling where an expert testifies that the plaintiff likely needs additional counseling. *See Lent*, 2015 WL 7283186, at *5, 2015 U.S. Dist. LEXIS 154349, at *15.

Here, the clinical psychologist who evaluated Plaintiff recommended the following treatments as directly attributable to the harm caused by Defendant:

| Treatment | Cost per Session | Total Cost |
|---|---|---|
| Individual Trauma-Focused Therapy | $325 | $169,000 |
| Cognitive Behavioral Therapy ("CBT") | $325 | $33,800 |
| Individual Therapy | $325 | $84,500 |
| Collateral Couples Therapy | $425 | $88,400 |
| Family Therapy | $425 | $44,200 |
| Psychiatric Visits | $425 | $51,000 |
| Psychiatric Medication | $5,000 per year | $50,000 |

(Dkt. No. 44-1, at 98–99). Together, these treatments total $520,900. The report provides further details about each kind of treatment and why it is recommended for Plaintiff. (*See id.* at 100). Although Plaintiff has not affirmed that she plans to follow the recommended course of treatment, the evaluating psychologist has documented the necessity of these treatments to her mental health. (*Id.*); *cf. D.R. v. Santos Bakery, Inc.*, 716 F. Supp. 3d 228, 241 (S.D.N.Y. 2024) (finding a jury's award for future medical expenses impermissibly speculative where nobody

testified at trial that plaintiff would elect to undergo the surgery, and the doctor did not testify that the surgery was necessary or recommended).

The Court finds the declaration and report from the evaluating psychologist to be competent and non-speculative evidence that establishes the need for, and the cost of, some of the recommended medical care. The psychologist's explanation for CBT, however, is founded on the *possibility* of unresolved depression. (*See* Dkt. No. 44-4, at 124). The Court finds that this recommendation is too vague and that it is not reasonably certain Plaintiff will incur this expense. The Court also reduces the family therapy duration to one year and the couples therapy duration to two years, finding such an award reasonable and supportable on the instant record. *See Register v. SAS Morrison LLC*, 189 A.D.3d 591, 593 (1st Dep't 2020) (reducing a jury award for future medical expenses because "there was inadequate support in the record for . . . clinical psychologist services"); *Jansen v. C. Raimondo & Son Constr. Corp.*, 293 A.D.2d 574, 575 (2d Dep't 2002) (reducing jury award as speculative where doctor testified that plaintiff may need additional occupational therapy, but only testified to a definite period of two to four months at three sessions each week). Therefore, the Court awards Plaintiff a total of $420,800 for future medical and psychological treatment.

### 3.    Punitive Damages

Plaintiff further seeks punitive damages in the amount of $1,250,000. (Dkt. No. 44-2, at 22–24). Punitive damages are appropriate under New York law where "the wrong complained of is morally culpable, or is actuated by evil and reprehensible motives, not only to punish the defendant but to deter him." *Walker v. Sheldon*, 10 N.Y.2d 401, 404 (1961). An award of punitive damages is justified it there is evidence in the record of "quasicriminal conduct," "utterly reckless behavior," "malicious intent on the part of defendants to injure plaintiffs," or "gross, wanton or willful fraud or other morally culpable conduct." *See Maitrejean v. Levon*

*Properties Corp.*, 87 A.D.2d 605, 605–06 (2d Dep't 1982), *aff'd* 57 N.Y.2d 902 (1982).

Although there is "no such thing as a *correct* amount of punitive damages, a legal system has an

obligation to ensure that such awards for intangibles be fair, reasonable, predictable, and

proportionate." *Payne v. Jones*, 711 F.3d 85, 93 (2d Cir. 2012). In awarding punitive damages,

courts should consider (1) "the degree of reprehensibility of the tortious conduct," (2) the ratio of

punitive damages to compensatory damages, and (3) awards imposed in comparable cases.

*Patterson v. Balsamico*, 440 F.3d 104, 120 (2d Cir. 2006) (citation omitted).

 Here, "[t]he sexual violence committed by the Defendant undeniably constitutes morally

reprehensible or utterly reckless behavior making a punitive damage award proper." *Alsaud*,

2017 WL 4541426, at *7, 2017 U.S. Dist. LEXIS 167359, at *19. Defendant sexually assaulted

Plaintiff and "shattered [her] emotional well-being," causing life-long ramifications years after

the attack. *Id.* Defendant's conduct is even more morally reprehensible because he used his fame

and status to lure a much younger fan into his hotel room under false pretenses. *See Doe v.

Hyassat*, No. 18-cv-6110, 2024 WL 2862547, at *6, 2024 U.S. Dist. LEXIS 67482, at *15

(S.D.N.Y. Apr. 11, 2024) (detailing how the defendant abused the prestige of his position to lure

the plaintiff under false pretenses), *report and recommendation adopted*, 2024 WL 1955354,

2024 U.S. Dist. LEXIS 81448 (S.D.N.Y. May 3, 2024).

 As to the second factor, courts are to determine "whether there is a reasonable

relationship between the punitive damages award and the harm likely to result from the

defendant's conduct as well as the harm that actually occurred." *Alla v. Verkay*, 979 F. Supp. 2d

349, 374 (E.D.N.Y. 2013) (quoting *B.M.W. of N. Am. v. Gore*, 517 U.S. 559, 581 (1996)). In a

case with "substantial compensatory damages," a 1:1 ratio is permissible. *Id.*

In considering comparable cases, courts have awarded similar amounts in punitive damages. *See Alsaud*, 2017 WL 4541426, at *7, 2017 U.S. Dist. LEXIS 167359, at *20 (awarding $1 million in punitive damages in sexual assault case); *Hyassat*, 2024 WL 1955354, at *6, 2024 U.S. Dist. LEXIS 81448, at *14 (awarding $1.25 million in punitive damages in sexual assault case); *Noonan*, 2018 WL 2088279, at *1, 2018 U.S. Dist. LEXIS 75313, at *2 (awarding $1 million in punitive damages in sexual assault case).

Accordingly, the Court finds that an award of $750,000 is "fair, reasonable, predictable, and proportionate." *Payne*, 711 F.3d at 93.

## IV.    MOTION TO SEAL

### A.    Legal Standard

"The notion that the public should have access to the proceedings and documents of courts is integral to our system of government." *United States v. Erie Cnty.*, 763 F.3d 235, 238–39 (2d Cir. 2014). "Indeed, the common law right of public access to judicial documents is said to predate even the Constitution itself." *Id*. at 239. The First Amendment to the U.S. Constitution "also protects the public's right to have access to judicial documents." *Id*. A party seeking to seal documents submitted to a court bears the burden of showing that sealing is proper. *See DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 826 (2d Cir. 1997).

### 1.    Common Law Right of Access

The Second Circuit has articulated a three-step process for determining whether documents should be sealed in light of the common law right of access. "Before any such common law right can attach . . . a court must first conclude that the documents at issue are indeed 'judicial documents.'" *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). To constitute a judicial document, "the item filed must be relevant to the performance of

the judicial function and useful in the judicial process." *United States v. Amodeo* (*Amodeo I*), 44 F.3d 141, 145 (2d Cir. 1995).

Second, after determining that the documents are judicial documents and that the "common law presumption of access attaches," the court must "determine the weight of that presumption." *Lugosch*, 435 F.3d at 119. According to the Second Circuit,

> [T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts. Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance.

*United States v. Amodeo* (*Amodeo II*), 71 F.3d 1044, 1049 (2d Cir. 1995). When a document plays a role in a court's adjudication of litigants' substantive rights—a function that is "at the heart of Article III"—the presumption is strong, but "[a]s one moves along the continuum, the weight of the presumption declines." *Id.* When "documents are usually filed with the court and are generally available, the weight of the presumption is stronger than where filing with the court is unusual or is generally under seal." *Id.* at 1050.

Third, the court must balance any "competing considerations" against the weight of the presumption of access. *Lugosch*, 435 F.3d at 120. "Such countervailing factors include but are not limited to 'the danger of impairing law enforcement or judicial efficiency' and 'the privacy interests of those resisting disclosure.'" *Id.* (quoting *Amodeo II*, 71 F.3d at 1050); *accord Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 143 (2d Cir. 2016). When weighing privacy interests, courts should consider "the degree to which the subject matter is traditionally considered private rather than public." *Amodeo II*, 71 F.3d at 1051. Courts should also assess the "nature and degree of injury," paying heed to "the sensitivity of the information and the subject" and "how the person seeking access intends to use the information." *Id.* at 1051.

### 2.    First Amendment

The First Amendment right of access stems from the qualified right of the public and the press "to attend judicial proceedings and to access certain judicial documents." *Lugosch*, 435 F.3d at 120 (quoting *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir. 2004)). Once a court concludes that there is a qualified First Amendment right of access to the judicial documents at issue, it may only seal the documents "if specific, on the record findings are made demonstrating the closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id*. (quoting *In re N.Y. Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987)). "Broad and general findings by the trial court . . . are not sufficient to justify closure." *Id*. (quoting *In re N.Y. Times Co.*, 828 F.2d at 116). Examples of "higher values" may include law enforcement interests, the privacy of innocent third parties, *Amodeo II*, 71 F.3d at 1050, and the attorney-client privilege, *Lugosch*, 435 F.3d at 125.

### B.    Discussion

With the motion for default judgment, Plaintiff contemporaneously filed a Motion for Leave to Redact and/or Seal Plaintiff's Motion for Default Judgment. (Dkt. No. 45). Specifically, Plaintiff seeks leave to redact the identities of (1) non-party family members that submitted affidavits in support of her motion for default judgment; (2) non-party medical professionals that treated Plaintiff; and (3) a non-party expert witness who opined as to Plaintiff's injuries and damages. (Dkt. No. 45-2, at 1). Plaintiff also seeks leave to file the medical report prepared by her expert witness under seal as it contains sensitive medical information. (*Id.*).

The documents at issue here are clearly judicial documents. *See Spin Master, Ltd. v. Aomore-Us*, No. 23-cv-7099, 2024 WL 3250815, at *2, 2024 U.S. Dist. LEXIS 116960, at *4 (S.D.N.Y. June 28, 2024) ("There can be no doubt that the documents [associated with plaintiff's motions for preliminary injunction and default judgment] are judicial documents[.]").

Having determined that the documents at issue are judicial documents, the Court must assess weight of the presumption of documents. A strong presumption attaches to materials filed in connection with a dispositive motion, *Olson v. Major League Baseball*, 29 F.4th 59, 90 (2d Cir. 2022).

Finally, the Court must assess whether the privacy interests of the Plaintiff and the non-parties justify redaction or filing under seal. Courts in this Circuit repeatedly held that "privacy interests of innocent third parties should weigh heavily in a court's balancing equation," and that "[s]uch interests . . . are a venerable common law exception to the presumption of access." *Amodeo II*, 71 F.3d at 1051 (cleaned up) (collecting cases). Therefore, consistent with this Circuit's precedent, the non-parties identified in Plaintiff's motion for default judgment have a substantial overriding privacy interest that justifies their redaction.

Courts have also recognized that an individual has a substantial privacy interest in their medical information that warrants filing under seal. See *AngioDynamics, Inc. v. C.R. Bard, Inc.*, No. 17-cv-598, 2022 WL 2643583, at *25, 2022 U.S. Dist. LEXIS 120384, at *77 (N.D.N.Y. July 8, 2022). The expert medical report submitted with Plaintiff's motion for default judgment contains sensitive information relating to Plaintiff's medical history and treatment that justify filing under seal. The public's right to access court records is not prejudiced as substantial portions of the expert's findings are publicly available through the expert's declaration. Having reviewed Plaintiff's proposed redactions and medical reports, and finding them to be narrowly tailored and consistent with *Lugosch*, 435 F.3d at 119-27, the Court grants Plaintiff's motion to redact and seal, (Dkt. No. 45), the stated portions of Plaintiff's motion for default judgment.

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff's motion for default judgment (Dkt. No. 44) is **GRANTED in part** with respect to the assault and battery/sexual battery claims; and it is further

**ORDERED** that Plaintiff's motion for default judgment (Dkt. No. 44) is otherwise **DENIED** with respect to the IIED claim; and it is further

**ORDERED** that Plaintiff is awarded default judgment against Defendant Geever on the assault and battery/sexual battery causes of action in the sum of $1,170,800; and it is further

**ORDERED** that Plaintiff is awarded punitive damages against Defendant Geever in the sum of $750,000; and it is further

**ORDERED** that Plaintiff's motion to seal (Dkt. No. 45) is **GRANTED**; and it is further

**ORDERED** that Plaintiff serve a copy of this Memorandum-Decision and Order on Defendant and file a certificate of service by August 11, 2025; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated: <u>July 22, 2025</u>
          Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge